UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
<u>Caption in Compliance with D.N.J. LBR 9004-1</u>

**MANDELBAUM BARRETT PC**
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
(973) 736-4600
(973) 325-7467 Facsimile
Jeffrey M. Rosenthal
jrosenthal@mblawfirm.com
Vincent J. Roldan
vroldan@mblawfirm.com
Katie F. Warren
KWarren@mblawfirm.com

*Proposed Counsel for Francesca's Acquisition, LLC, et al.*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCESCA'S ACQUISITION, LLC, *et al.*,[1] | Case No. 26 – [] () |
| Debtors. | (Joint Administration Requested)<br>(Shortened Notice Requested) |

**DECLARATION OF CURT KROLL,**
**CHIEF FINANCIAL OFFICER OF FRANCESCA'S ACQUISITION LLC**
**IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Curt Kroll, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer ("<u>CFO</u>") of Francesca's Acquisition, LLC

("<u>Acquisition</u>"), Francesca's Operations, Inc. ("<u>Operations</u>"), Francesca's Administrative

---

[1] The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Francesca's Acquisition, LLC (3616); Francesca's Operations, Inc. (6872); Francesca's Administrative Management, Inc. (5788); and Francesca's IP Company, Inc. (9588).  The Debtors' service address is 8760 Clay Road, Suite 100, Houston, TX 77080

1

Management, Inc. ("Management"), and Francesca's IP Company, Inc. ("IP Company," and together with Acquisition, Operations, Management, and IP Company, the "Company" or the "Debtors") in the above captioned chapter 11 cases (the "Chapter 11 Cases").

2.     I am a Partner employed by SierraConstellation Partners, LLC ("Sierra") and provide interim management and operational and financial advisory services to underperforming companies and companies in transition.  My experience includes chief restructuring officer roles, chief financial officer roles, interim management, refinancings, distressed acquisitions, and in- and out-of-court restructurings.  I have held roles in various industries including retail, industrial manufacturing, real estate, financial services, and healthcare.  I hold both a bachelor's and master's degree in accountancy from the University of Missouri.  I am a licensed Certified Public Accountant (CPA Inactive). In February 2024, the Debtors engaged Sierra to provide restructuring and financial advisory services, and the Debtors appointed me as CFO on or about March 5, 2024.

3.     As CFO, I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records.  I submit this declaration (the "Declaration") to assist the Court and parties in interest in understanding the circumstances that led to the commencement of these Chapter 11 Cases and in support of:  (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"); and (b) the emergency relief that the Debtors requested from the Court pursuant to the motions filed contemporaneously herewith (each, a "First Day Motion," and collectively, the "First Day Motions").

4.     Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, my discussions with the Debtors' management team and advisors, information learned from my review of relevant

documents and information supplied to me by members of the Debtors' management team, and consultation with the Debtors' professional advisors, including other professionals of Sierra, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I have obtained this information during my tenure working with the Debtors, and my analysis of and experience with the Debtors' operations and circumstances is ongoing.  To the extent I learn that any information provided herein is materially inaccurate, I will promptly notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge.  I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5.      In order to enable the Debtors to minimize the adverse effects of the commencement of these Chapter 11 Cases on their business operations and to ensure an orderly store closing and wind down process, the Debtors have requested various types of relief in the First Day Motions aimed at, among other things, (a) preserving customer relationships while wind-down sales are conducted; (b) maintaining vendor confidence and employee morale; (c) ensuring the continuation of the Debtors' cash management system and other business operations without interruption; (d) securing access to cash collateral necessary to continue the Debtors' operations throughout the store closing process; (e) establishing certain administrative procedures to facilitate a smooth transition into, and uninterrupted operations throughout, the chapter 11 process; and (f) continuing the process of closing the Debtors' stores and selling the Debtors' merchandise expeditiously and efficiently to ensure an orderly wind down.  Gaining and maintaining the support of the Debtors' employees, customers, vendors and suppliers, lenders, creditors, and certain other

key constituencies, as well as maintaining the Debtors' day-to-day business operations with minimal disruption, will be critical to the success of these Chapter 11 Cases.

6.      This Declaration is divided into three parts.  **Part I** provides an overview of the Debtors' business operations and describes the Debtors' business, organization structure, and prepetition indebtedness.  **Part II** describes the circumstances precipitating the commencement of these chapter 11 cases.  **Part III** summarizes the First Day Motions and explains why the relief requested therein is appropriate and necessary.

## I.      <u>OVERVIEW OF THE DEBTORS</u>

### A.      The Debtors' Business

7.      The Company is a leading specialty retailer of women's apparel and accessories focused on a Gen Z and multigenerational customer, operating approximately 400 boutiques across 45 states, together with an e-commerce website.   The Company was founded in Houston in 1999, grew rapidly during its first decade to approximately 200 stores by 2010, and completed an initial public offering in 2011. The business peaked around 2016-2017 at approximately 700 stores and over $500 million in sales.

8.      The Company brand experience emphasizes a unique, discovery-oriented boutique feel with limited-quantity, trend-right assortments at attractive price points delivered in-store and online. Most of the Debtors' stores can be found within upscale malls and lifestyle shopping centers.   In 2025, 66% of the Company's products consisted of apparel and jewelry, and the remaining consisted of gifts and accessories.  The majority of the Debtors' merchandise is unique to Francesca's.  After 2021, the Company shifted its product mix to focus on lower margin but higher volume products, including dresses and tops.  Many of the Company's products are sold under proprietary labels and in limited quantities, creating a sense of scarcity and driving customer

loyalty.  The Company estimates that its customers have a 70% repurchase rate.  The Debtors operate one main e-commerce website under the Francesca's brand at francescas.com.  E-commerce sales made up approximately 13% of sales in 2025, and have continually expanded over the past few years.

**B.     The Debtors' Distribution and Employee Base**

9.      The majority of the Debtors' merchandise is distributed through the Debtors' warehouse and distribution center (located within corporate headquarters) in Houston.  The distribution center occupies approximately 218,000 square feet, consisting of approximately 171,000 square feet of warehouse and distribution space, which services the Debtors' boutiques and e-commerce sales, and approximately 47,000 square feet of office space for the Debtors' corporate headquarters. Merchandise is generally received, inspected, managed, stored, and organized for distribution through the distribution center. The Debtors lease each of their retail stores and the distribution center.

10.     The Debtors' employees are crucial to the Company's operations at headquarters / the Debtors' home office, the distribution center, and in retail stores across the United States.  As of the Petition Date, the Debtors employ approximately 3,000 employees, of whom approximately 2,650 are hourly and approximately 425 are salaried.  The majority of the Debtors' employees work at the Debtors' retail stores in a variety of sales and supervisory positions.  The retention of these employees during the Chapter 11 Cases will be critical to ensure an orderly store closing and wind down process.

4915-6358-2605, v. 5

**C.    The Debtor's Organizational Structure**

11.    In September 2024, the Debtors were acquired by non-debtor affiliate MAS Acquisition, LLC ("MAS Acquisition").  MAS Acquisition, LLC is a holding company with no operations.  MAS Acquisition is the 100% owner of Francesca's Acquisition, LLC, and Francesca's Acquisition, In LLC is the 100% owner of each of the other Debtors:

<u>**The Company's Corporate Structure**</u>



**D.    Debtors' Prepetition Capital Structure**

12.    As of the Petition Date, the Debtors have approximately $30.1 million in total secured debt, the holders of which support the Debtors' bankruptcy cases and store closing sale process.  As described below, the Debtors' outstanding prepetition funded-debt obligations relate to a financing arrangement consisting of (a) a revolving credit facility ($26.1 million outstanding) with two tranches: the Committed Revolving A Loans and the Committed Revolving B Loans

(each as defined in the Fifth Forbearance Agreement (as defined below)), and (b) a term loan

facility ($4 million outstanding) under the Prepetition Loan Documents[2] (as defined below).

13.      On February 21, 2024, the Debtors, as borrowers, entered into that certain

Revolving Credit Agreement, as amended by that certain First Amendment to Revolving Credit

Agreement dated May 2, 2024, and that certain Waiver, Consent and Second Amendment to Credit

Agreement dated September 6, 2024 (as may have been further amended, restated, modified, or

supplemented from time to time, the "Prepetition Credit Agreement") with Tiger Finance, LLC,

as Administrative Agent and Collateral Agent ("Tiger"), Second Avenue Capital Partners LLC, as

Funding Agent ("Second Avenue" and together with Tiger, the "Prepetition Agents"), and the

Lenders party thereto (collectively, with Tiger and Second Avenue, the "Prepetition Secured

Lenders").  Pursuant to the Prepetition Credit Agreement, the associated Revolving Note (the

"Prepetition Revolving Note") and the Term Note (the "Prepetition Term Note", together with the

Prepetition Revolving Note, the "Prepetition Notes", and, collectively with the Prepetition Credit

Agreement and all schedules and exhibits attached thereto and all other agreements, documents,

instruments and/or amendments executed and delivered in connection therewith, the "Prepetition

Loan Documents"), the Prepetition Secured Lenders extended to the Debtors a revolving, asset-

based facility in the aggregate amount up to Forty Million and 00/100 Dollars ($40,000,000) (the

"Prepetition Revolving Loans") and a term facility in the amount of Four Million Five Hundred

---

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Prepetition Loan
Documents.

4915-6358-2605, v. 5

Thousand and 00/100 Dollars ($4,500,000) (the "Prepetition Term Loan", together with the Prepetition Revolving Loans, the "Prepetition Secured Loans").

14.    The Obligations under the Prepetition Loan Documents are secured by a first priority lien on substantially all of the Debtors' assets, including, among other things, all accounts, goods, equipment, inventory, fixtures, and intangible assets including intellectual property.  As of the Petition Date, the Debtors are in default under the Prepetition Credit Agreement.

15.    Certain Events of Default have occurred under the Prepetition Credit Agreement and the parties have entered into forbearance agreements from time to time, most recently on February 4, 2026, when the Debtors and Prepetition Secured Lenders, through the Prepetition Agents, entered into that certain Fifth Forbearance Agreement and Seventh Amendment to Credit Agreement.

## II.    EVENTS LEADING TO THESE CHAPTER 11 CASES

16.    A convergence of factors contributed to the Debtors' need to commence these Chapter 11 Cases.  Internal factors have constrained the Debtors' liquidity, including significant cash needs to support the Company's operations as the Company emerged from its prior restructuring.  Macroeconomic factors that have disrupted the retail industry generally have also impacted the Company, including shifts in the competitive landscape, a move towards online channels, supply chain issues, and increased costs of goods and services due to inflation, among other factors.  The Company has explored every reasonable option to overcome these hurdles.

### A.    Factors Impacting the Company's Business

17.    Due to a combination of operational challenges and the economic shutdown caused by COVID-19, the Company restructured at the end of 2020, closing approximately 200

8

unprofitable stores and restructuring go-forward leases.[3]    The business quickly returned to profitability in 2021 and 2022, with revenue returning to 2016 levels, and average store sales expanding by 27% or more from 2019 to 2022.

18.    Unfortunately, a January 31, 2023 data breach shut down the Company's systems and materially disrupted the Company's operations, resulting in an impact on sales and EBITDA due to inventory and pricing systems paralysis.  Later on in 2023 and 2024, the Company faced further challenges due to a disruptive e-commerce upgrade, and the Company's non-core brands Franki and Richer Poorer either lost significant EBITDA or failed to build sufficient traction to make the investments in such brands worthwhile.  Both of these brands are now dormant. Between 2022 and 2024, the business faced additional challenges as the Company spent more on marketing and promotion efforts to drive sales.

19.    After MAS Acquisition acquired the Company in September 2024, the Company began a plan to review inventory, refocus on the target customer, and improve product assortment and merchandising. Since the acquisition, the Company has executed significant cost reductions (including in freight / logistics and labor), reduced discounts, and realized positive same store sales in 2025, with an increase in margins from 2024 to 2025.  While on a positive trajectory, the Company continued to struggle with supply chain issues and the ability to access merchandise throughout this time period due to certain issues with product delivery from certain vendors, however.  The Company anticipated an additional capital infusion in January 2026, which unfortunately never came to fruition.  By January 2026, these supply chain issues negatively

---

[3] *In re FHC Holdings Corporation, et al.,* Case No. 20-13076 (Bankr. D. Del. Dec. 3, 2020).

4915-6358-2605, v. 5

impacted the ability of vendors from filling orders, which caused a cascading effect on the Debtor's business.

**B.    Prepetition Turnaround and Restructuring Efforts**

20.    The Company has taken numerous measures to counteract internal and external headwinds and remain competitive.    The Company engaged Sierra to, among other things (a) assess the financial situation and provide guidance related to cash flow management, and identify strategic alternatives; (b) perform financial analyses, including cash flow planning, vendor analysis, and other analysis to support the strategic alternatives; (c) provide management support in evaluating and responding to vendors, lenders, landlords and other stakeholders during negotiations; and (d) if necessary, prepare a comprehensive asset recovery analysis to determine the path forward to maximize recovery.    During approximately the same time period, the Company engaged seasoned retail executive Bridgit Lombard to serve as Executive Chair.    Under Ms. Lombard's leadership, the Company continued its internal turnaround and cost-savings measures.    These actions allowed the Company to maintain business for a short time period, but did not solve the systemic problems facing the Company including an increasingly tough macroeconomic environment.

21.    Prior to January 2026, the Company actively and in good faith attempted to secure alternative funding and capital investments to support operations. These efforts included discussions with at least six investors, with at least one investor pledging funds sufficient to maintain operations through January 2026. On or about December 30, 2025, however, the Company learned that the potential investor would not be providing the necessary capital. Less than a week later, the Company then learned that two of its major suppliers had their own funding

terminated by their respective lenders, which made it impossible for the suppliers to deliver necessary product to the Company.

22.    Ultimately, in January 2026, the Company received a notice of default from its lenders.  After consulting with the Prepetition Agents, the Company, in its business judgment, determined no strategic alternative existed to preserve value for the Debtors' stakeholders outside of a court-supervised orderly store closing and liquidation process.  As the Company prepared to file for these Chapter 11 Cases, Drew Baird was appointed as independent director to spearhead the Company's special committee overseeing the liquidation and disposition of assets.    On or about January 14, 2026, the Company announced that it would be closing substantially all of its retail stores, and started conducting going out of business sales all such retail locations.  Those sales are ongoing as of the Petition Date and will continue throughout the Chapter 11 Cases, as detailed in the motions set forth below and filed contemporaneously with this Declaration.

### III.    FIRST DAY MOTIONS[4]

23.    Along with this Declaration, the Debtors filed the First Day Motions, seeking orders granting various forms of relief intended to facilitate the efficient administration of these Chapter 11 Cases.  I am familiar with the contents of each First Day Motion (including the exhibits thereto), and believe that the relief sought in each First Day Motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (b) constitutes a critical element in achieving a successful bankruptcy process; and (c) is in the best interests of the Debtors, their estates, and their creditors.  The First Day Motions seek orders granting various forms of relief intended to stabilize the Debtors' business operations, minimize the adverse effects

---

[4] Capitalized terms used but not defined in this section shall have the meanings set forth in the applicable First Day Motion.

of the commencement of these Chapter 11 Cases, and facilitate the efficient administration of these

Chapter 11 Cases. Further, a vast majority of these motions are both procedural and non-

adversarial, in addition to having the support of the Debtors' prepetition senior secured lenders.

The First Day Motions include:

**A.    Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>")**

24.    The Joint Administration Motion seeks joint administration for procedural purposes

only will provide significant administrative convenience without harming the substantive rights of

any party in interest.  Specifically, the Debtors request that one file and one docket be maintained

for all of the jointly administered cases under the case of Francesca's Acquisition. Given the

integrated nature of the Debtors' operations, joint administration will provide significant

administrative convenience without harming the substantive rights of any party in interest.  Many

of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  Joint

administration will allow the U.S. Trustee and all parties in interest to monitor these chapter 11

cases efficiently and with greater ease, as all filings will be available on one docket rather than

across three dockets.  The relief requested in the Joint Administration Motion is in the best interest

of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the

Debtors' ability to operate their businesses in chapter 11 without disruption. Parties in interest will

also benefit from the cost reductions associated with joint administration of the Debtors' Chapter

11 Cases

**B.    *Debtors' Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent* (the "<u>Stretto Retention Application</u>")**

25.    In the Stretto Retention Application, the Debtors seek entry of an order authorizing

the Debtors to employ Stretto, Inc. ("<u>Stretto</u>") as claims, noticing, and solicitation agent in

accordance with the terms and conditions set forth in the engagement letter attached to the Stretto

Retention Application. The Debtors request approval to employ Stretto to serve as Claims and

Noticing Agent in their chapter 11 cases to provide the services outlined in their engagement letter.

The Debtors believe that the appointment of Stretto as claims and noticing agent is in the best

interest of the Debtors' estates and their creditors because the distribution of notices and the

processing of claims will be expedited.  The relief requested in the Stretto Retention Application

is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, as

Stretto has the expertise required for complex chapter 11 cases, and their services and will facilitate

the Debtors' ability to operate their businesses in chapter 11 without disruption.

     **C.**     *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of the Notice of Commencement, and (III) Granting Related Relief* **(the "Creditor Matrix Motion")**

26.     The Creditor Matrix Motion seeks authority to (a) redact certain personally

identifiable information for individuals within the consolidated list of creditors (the "Creditor

Matrix"; (b) approving the form and manner of the notice of commencement, attached to the

motion as Exhibit A.  Redaction of personal identification is necessary to protect the privacy

interests of individuals who may be listed on the Creditor Matrix, the Schedules and Statements,

and any other documents which may be filed.  Additionally, approval of the form and manner of

the notice of commencement is necessary to not only properly serve notice to interested parties,

but also to avoid confusion among creditors and prevent the Debtors' estates from incurring

unnecessary costs.

     **D.**     *Debtors' Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (II) Granting Related Relief* **(the "Schedules Extension Motion")**

4915-6358-2605, v. 5

27.     The Schedules Extension Motion seeks a court order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (the "Schedules and Statements") by 21 days, for a total of 35 days from the Petition Date, through and including March 11, 2026.  Ample cause exists to grant said extensions, as to prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to hundreds of claims, assets, leases, and contracts from each of the four Debtor entities, requiring a significant expenditure of time and effort on the part of the Debtors.  Preparation of these documents was not practicable prepetition, given the Debtors' focus on preparing a smooth transition into chapter 11.  Finally, the relief requested will not prejudice any party in interest.

**E.      *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, and (II) Granting Related Relief* (the "Taxes Motion")**

28.     Pursuant to the Taxes Motion, the Debtors seek entry of an order (i) authorizing the Debtors to pay certain prepetition taxes and related obligations and (ii) granting related relief. In the ordinary course of business, the Debtors collect, withhold, and incur taxes and fees related to sales and use, property, income, franchise, annual reporting fees, audits, and business and regulatory fees.  The Debtors remit the Taxes and Fees to various federal, state, and local governments and authorities on a monthly, quarterly, semi-annual, or annual basis.

29.     Certain of the Taxes may constitute so-called "trust-fund" obligations that (i) are required to be collected from third parties and held in trust for payment to taxing and regulatory authorities and (ii) are not property of the Debtors' estates.  Many of the Taxes are priority claims entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code and, thus, must be

14

paid in full under any chapter 11 plan before any distribution is made to general unsecured creditors. Delayed payment of the Taxes may cause the Taxing Authorities to take disruptive actions, including audits, lien filings, moving for relief from the automatic stay, and other administrative procedures, all of which would consume valuable time and resources and divert the Debtors' attention from their business operations and restructuring efforts.

30.     The Debtors seek authority to make payments where (a) the Taxes and Fees have accrued or were incurred prepetition but (i) were not paid prepetition or (ii) were paid in an amount less than actually owed, (b) the Debtors made payments prepetition that were lost or the Taxing Authorities did not receive the prepetition payments in full, which may give rise to interest and other penalties, (c) the Taxes and Fees were incurred for prepetition periods and become due and payable after the Petition Date, (d) the Taxes and Fees accrued or are incurred postpetition, and (e) the Taxes and Fees are for so-called "straddle" periods.

31.     The Debtors estimate that approximately $1,925,000 in Taxes and Fees have accrued as of the Petition Date and will become due and owing after the Petition Date either in the ordinary course, comprised of (i) $0 of Income Taxes; (ii) $142,500 of Franchise Taxes; (iii) $1,190,000 of Sales and Use Taxes; (iv) $560,000 of Property Taxes; (v) de minimis amounts, if any, of other taxes, regulatory fees, and licensing fees; and (vi) $0 of Other Taxes.

32.     Failing to pay the Taxes and Fees could materially disrupt the Debtors' business operations. Paying the Taxes and Fees is both a sound exercise of the Debtors' business judgment and further the efficient and value-maximizing administration of the Debtors' estates. The relief requested in the Taxes Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**F.      Debtors' Motion For Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Coverage, and (C) Continue to Pay Brokerage Fees, and (II) Granting Related Relief (the "<u>Insurance Motion</u>")**

33.      Pursuant to the Insurance Motion, the Debtors seek entry of an order, (a) authorizing the Debtors to (i) continue their Insurance Program on an uninterrupted basis in the ordinary course of the Debtors' businesses, (ii) renew, supplement, modify, extend, terminate, or purchase insurance policies in the ordinary course of business on a postpetition basis, and (iii) pay all prepetition and postpetition insurance obligations relating to the Insurance Program, as applicable (collectively, the "<u>Insurance Obligations</u>") and (b) granting related relief.

34.      In the ordinary course of business, the Debtors maintain seven insurance policies with numerous third-party insurance carriers. The Insurance Policies provide coverage for, among other things, automobile, crime, cyber liability, director and officer liability, employed lawyers professional liability, employment practices liability, fiduciary liability, general liability, international liability, marine cargo, products and completed operations liability, property, and workers compensation. In addition, certain of the Insurance Policies provide layers of excess liability coverage. As of the Petition Date, the Debtors do not believe there are any accrued but unpaid amounts, but seek authority to continue paying the insurance policies nonetheless out of an abundance of caution.

35.      To preserve the value of the Debtors' business operations, properties, and assets, it is essential that the Debtors be able to continue or renew the Insurance Policies and enter into new insurance policies. In many cases, regulations, laws, and contract provisions that govern the Debtors' commercial activities require the types of coverage provided for under the Insurance Policies, as well as the Bankruptcy Code and the operating guidelines issued by the U.S. Trustee. The relief requested in the Insurance Motion is to ensure uninterrupted coverage under the

Insurance Policies. Therefore, the Debtors seek authorization to maintain the existing Insurance Policies and brokerage accounts, pay prepetition obligations (if any) related thereto upon entry of the order, and renew, amend, supplement, extend, or purchase new Insurance Policies on a postpetition basis in the ordinary course of business consistent with past practice. The relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**G.** **Debtors' Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion")**

36. Pursuant to the Utilities Motion, and in light of the severe consequences to the Debtors' operations should the Utility Companies interrupt their services, the Debtors seek entry of an order (a) determining that the Adequate Assurance Deposit provides the Utility Companies with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) prohibiting the Utility Companies from altering, refusing, or discontinuing services, (c) approving the Adequate Assurance Procedures for resolving any dispute in connection with the Adequate Assurance Deposit, and (d) granting related relief.

37. On average, the Debtors spend approximately $390,000 per month on utilities, excluding utility amounts paid through rent at certain of their retail locations. As of the Petition Date, the Debtors estimate that approximately $390,000 on account of their Utility Services will become due and owing within the next twenty-one days. The Debtors intend to satisfy postpetition obligations owed to the Utility Companies in the ordinary course of business and in a timely manner. Cash on hand and cash generated in the ordinary course of business as well as anticipated

access to cash collateral available will provide the Debtors with sufficient liquidity to pay the Utility Companies for Utility Services in accordance with past practice.

38.     As the Adequate Assurance Deposit, the Debtors propose to deposit $195,000 into a segregated account after the Order is entered. The Adequate Assurance Deposit is equal to approximately one half of the Debtors' average monthly cost of Utility Services, calculated based on the historical average of payments made to the Utility Companies over the approximate twelve-month period prior to the Petition Date, excluding certain amounts and subject to certain adjustments. Currently, no Utility Companies hold deposits for the Utility Services. The Proposed Adequate Assurance demonstrates the Debtors' ability to pay for future Utility Services in accordance with past practice and constitutes sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code.  The relief requested in the Utilities Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

H.      ***Motion For Entry Of Interim and Final Orders (i) Authorizing Use of Cash Collateral (ii) Granting Adequate Protection, Liens, and Superpriority Claims, (iii) Scheduling a Final Hearing and (iv) Granting Relate Relief* (the "<u>Cash Collateral Motion</u>")**

39.     The Debtors have insufficient funds to operate their Debtors through consummation of their store closings and sale of their intellectual property. Facing a liquidity crisis, the Debtors, with the assistance of their advisors, including Sierra, determined that they required incremental and immediate liquidity to address their postpetition capital needs.  Access to the liquidity provided by access to Cash Collateral in accordance with the Budget will provide the Debtors with the means to maintain operations (including in the immediate term) and to fund these chapter 11 cases in accordance with the Budget.

4915-6358-2605, v. 5

40.    The Debtors must immediately have access to Cash Collateral in order to maximize the value of the estate. Without authorization to use Cash Collateral, the Debtors will not have sufficient liquidity to operate their business through their going out of business sales and IP asset sale. In my view, absent the use of Cash Collateral, the Debtors would suffer immediate and irreparable harm, and the value of their assets and businesses would be severely diminished to the detriment of all stakeholders.

41.    As set forth in the Budget, the proceeds of Cash Collateral will be used to repay certain pre-petition obligations, fund general working capital, and fund operational expenses and restructuring expenses of the Debtors. I believe that immediate authorization to use Cash Collateral will enable the Debtors to stabilize their operations in the immediate term, while also allowing for the orderly GOB sale process and IP asset sale. This will enable the Debtors to achieve the primary objective to maximize the value of their assets.

42.    Based on current projections and estimates, I believe that the Debtors' ability to access Cash Collateral will provide sufficient liquidity to support the Debtors' working capital needs and to operate in chapter 11.

43.    The Debtors, with the assistance of Sierra, prepared an initial 5-week budget based on the Debtors' projected postpetition cash needs.  In preparing the Budget, Sierra worked closely with the Debtors' management and the Debtors' other professional advisors. The Budget contains line items for each category of cash flow anticipated to be received or disbursed during the identified period. I believe that the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of the Debtors' business for the period set forth in the Budget. Further, I believe that the Budget establishes that the Debtors will have adequate liquidity during the identified period to maintain operations and administer these cases.

44.     Based on my experience and involvement in the consideration and negotiation of the budget, I believe that the use of Cash Collateral is the best available option, in the best interest of the Debtors' estates and stakeholders, and is necessary and appropriate under the circumstances. The terms of the Interim Order are the product of extensive, arm's-length negotiations concerning the terms of the cash collateral order and budget. In light of the circumstances and the Debtors' urgent need for immediate liquidity and postpetition funding for these Chapter 11 Cases, the Debtors should be authorized to use Cash Collateral.

**I.**      ***Debtors' Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Permitting the Debtors to Modify the Automatic Stay in Their Sole Discretion to Proceed with Litigation or Contested Matters Commences Prepetition, (III) Approving the Form and Manner of Notice, and (IV) Granting Related Relief* (the "<u>Automatic Stay Motion</u>")**

45.     The Automatic Stay Motion seeks entry of an order (a) restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code; (b) modifying the automatic stay, to the extent the Debtors deem appropriate in their sole discretion, to proceed with litigation or contested matters commenced before the Petition Date (as defined herein); (c) approving the form and manner of notice related thereto. The Debtors' supply chain is dependent on certain international vendors and third-party logistics providers, among others. The Debtors do not seek to expand or enlarge the rights afforded to them under the Bankruptcy Code with the Automatic Stay Motion, but file the motion out of an abundance of caution and to assist them in most effectively informing creditors who may be unfamiliar with the broad protections offered by the Bankruptcy Code.

**J.**      ***Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain and Administer Their Existing Customer Programs and (B) Honor Certain Prepetition Obligations and (II) Granting Related Relief* (the "<u>Customer Programs Motion</u>")**

4915-6358-2605, v. 5

46.     Through the Customer Programs Motion, the Debtors seek to continue the Debtors' Customer Programs, including, among others:  (a) gift card programs, (b) sales promotions and customer related marketing incentive programs, (c) a rewards program, (d) a guest services program, and (f) credit card and other payment processing programs.  Maintaining the goodwill of their customers is critical to the Debtors' ongoing sales efforts in these Chapter 11 Cases and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

47.     As of the Petition Date, the Debtors estimate that there are approximately $3,800,000 of prepetition obligations outstanding related to Customer Programs.   These obligations include accrued credits, adjustments, discounts, prepayments, or other similar programs owing to customers.  The majority of these obligations *do not* entail the expenditure of cash.  Accordingly, by this Motion, the Debtors seek authorization, but not direction, to maintain the Customer Programs in the ordinary course of business and consistent with past practices and to continue to honor all customer-related obligations, including honoring any prepetition obligations associated therewith.  For the avoidance of doubt, by this Motion, the Debtors are not seeking to assume or reject any executory contracts pursuant to section 365 of the Bankruptcy Code.  Continuing the identified Customer Programs is essential to maintaining the Debtors' customer base for its store closing sales during the chapter 11 cases.

**K.     *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Honor and Continue Their Employee Benefits Programs and (II) Granting Related Relief* (the "<u>Employee Wages and Benefits Motion</u>")**

48.     Through the Employee Wages and Benefits Motion, the Debtors seek authority to pay and honor certain prepetition obligations for, among other things: (a) Unpaid Wages, (b) unpaid Bonus Payments, (c) Employee Discounts, (d) the Job-Related Expenses, (e) Withholding Obligations, (f) Payroll Fees, (g) amounts owed pursuant to the Employee Benefits Programs,

including health insurance, and paid time off, among others, (h) the Retention Programs; and (i) all other employee benefits that the Debtors have historically provided in the ordinary course of business (each as defined herein and, collectively, and as more fully described herein, the "Employee Compensation and Benefits Programs"), and to pay all costs incident to the foregoing.

49.     As of the Petition Date, the Debtors employ approximately 3,000 employees who perform a variety of critical functions for the Debtors.  The Debtors must retain their Employees' skills and their knowledge and understanding of the Debtors' infrastructure, operations, and customer relations to effectively conduct store closing sales and maximize value for the benefit of all of the Debtors' stakeholders.  The Debtors' Employees rely on their compensation and benefits for their daily living needs and to support their families.  If the Debtors are not permitted to continue to meet and sustain their payroll and benefits obligations, the Debtors' workforce will be materially and negatively impacted, which the Debtors expect would affect productivity and retention and, in turn, threaten the Debtors' ability to continue their operations.  The Debtors' timely payment of workforce-related obligations is necessary for the Debtors to maintain ordinary course operations and avoid personal financial hardship to the Employees.

50.     In addition to their base compensation, Employees who hold key leadership positions at the Debtors' retail stores are eligible to earn additional compensation based on achievement of established sales goals.  The Bonus Program motivates the Store Leaders to meet defined sales targets and helps the Debtors retain talented Employees.  Executives and insiders of the Debtors are not eligible to participate in the Bonus Program or receive the Bonus Payments. As of the Petition Date, the Debtors estimate that they owe approximately $60,000 on account of unpaid Bonus Payments that were earned in January 2026.  The Debtors seek authority to pay all

unpaid Bonus Payments as they come due and to continue the Bonus Program in the ordinary course of business on a postpetition basis.

51.     Further, to help retain Employees during this critical time period, the Debtors have implemented a retention program for Employees located in the Debtors' administrative home office (the "Home Office Employees"), as well as a retention program for Employees who work in the Debtors' retail stores and warehouse.  For each week a Home Office Employee stays with the company, the Debtors pay an additional one day of the respective Home Office Employee's pay (the "Home Office Retention Program").  As of the Petition Date, the Debtors estimate that they owe approximately $435,000 on account of the Home Office Retention Program.

52.     Employees in the Debtors' stores and warehouse locations are eligible for an additional 10% of wages earned, until such time that the relevant store is closed or the Employee's employment ends (the "Warehouse / Store Retention Program" and together with the Home Office Retention Program, the "Retention Programs").  As of the Petition Date, the Debtors estimate that they owe approximately $935,000 on account of the Warehouse / Store Retention Program.

53.     Executives and insiders of the Debtors are not eligible to participate in either of the Retention Programs.  The Debtors seek authority to continue these programs and pay prepetition amount owed in the ordinary course of business. The relief requested in the Employee Wages and Benefits Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**L.**     ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Honor Certain Obligations Relating Thereto, (C) Maintain Existing Business Forms and Books and Records, and (D) Continue to Perform Intercompany Transfers; (II) Granting a Waiver of Certain Deposit and Investment Requirements in 11 U.S.C. § 345(b) and the U.S. Trustee***

4915-6358-2605, v. 5

*Guidelines; and (III) Granting Related Relief* (the "<u>Cash Management Motion</u>")

54.      The Debtors' Cash Management Motion seeks authority for the Debtors to, among other things: continue to operate their cash management system as set forth on **<u>Exhibit C</u>** attached to the Cash Management Motion and maintain their existing bank accounts set forth on **<u>Exhibit D</u>** to the Cash Management Motion, including honoring certain prepetition obligations related thereto, and continue Intercompany Transactions and funding consistent with the Debtors' historical practice.  The Debtors use the Cash Management System to collect and disburse cash generated by their business, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, obtain accurate account balances and other financial data, forecast financial performance, and ensure cash availability and liquidity.  The Cash Management System is tailored to meet the Debtors' operating needs while reducing administrative expenses.  The Debtors maintain daily oversight over the Cash Management System and implement controls for entering, processing, and releasing funds.  Any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' business and operations to the detriment of their estates and numerous stakeholders.

55.      The principal source of revenue for the Debtors' business is payments from their retail customers.  The Debtors depend on the efficient collection, transfer, and disbursement of funds. Given the economic and operational scale and complexity of the Debtors' enterprise, any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' operations to the detriment of their estates and stakeholders.  Additionally, Intercompany Transactions are an integral part of the Cash Management System and essential to the Debtors' continued operations.  Absent the relief requested, the Debtors would be required to adopt a new, segmented cash management system, or find different service providers, which would be

financially and logistically burdensome and cause the Debtors' operations to grind to a halt, reducing the value of the Debtors' business. To minimize the disruption caused by these Chapter 11 Cases and to maximize the value of the Debtors' estates, the Debtors request authority to continue to utilize their existing Cash Management System and continue Intercompany Transactions, along with certain other relief requested in the Cash Management Motion.

**M.**     ***Debtors' Motion for Entry of Interim and Final Orders (I) Approving and Authorizing the Debtors to Assume and Perform Under the Store Closing Consulting Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving Modifications to Certain Customer Programs, and (IV) Granting Related Relief* (the "<u>Store Closing Motion</u>")**

56.     The Debtors' Store Closing Motion requests entry of an order (a) authorizing the Debtors to assume and perform under the Consulting Agreement by and among Tiger Capital Group, LLC and SB360 Capital Partners, LLC, with any such related sales to be free and clear of all liens, claims and encumbrances; (b) approving the abandonment of certain Store Closing Assets; (c) approving modifications to certain customer programs, including the acceptance of gift cards for up to 30 days; (d) approving the Sale Incentive Program; (e) authorizing the sale or disposition of the Store Closing Assets free and clear of all liens, clams, and encumbrances; and (f) granting related relief.  The Store Closing Sales are necessary and valuable part of the Debtors' chapter 11 cases, and are a critical step in maximizing and preserving value for all of the Debtors' stakeholders.

57.     The purpose of the Store Closing Motion is to put organized Court-approved procedures in place so that the Debtors can continue the Store Closing Sales, which began prior to the Petition Date. Assumption and performance under the Consulting Agreement is an appropriate use of the Debtors' business judgment as the Debtors proceed to through an orderly liquidation process.  The Debtors have determined, in the sound exercise of their business judgment and in consultation with their advisors, that the Store Closing Procedures provide the best and most

efficient means of selling the Store Closing Assets to maximize the value to their estates. Additionally, the Store Closing Sales requires that the Debtors make certain modifications to their customer programs to reflect new realities. Such changes will be clearly posted for customers at cash registers and on the Debtors' website for the duration of the Store Closing Sales.  Finally, in effectuating the Store Closing Sales, the Debtors intend to liquidate the saleable personal property, Merchandise, and Owned FF&E.  To the extent Burdensome Property exceeds the scope of the property abandoned pursuant to the Store Closing Procedures—such as Burdensome Property held by shippers or other agents of the Debtors—that the Debtors are requesting the Court's approval to abandon any Burdensome Property for the benefit of their estates and creditors.

58.    Overall, each of these motions seek to ensure the continuation of the Debtors' business operations without interruption as they transition into chapter 11.  I believe that the relief requested in the motions is necessary to give the Debtors an opportunity to work towards successful Chapter 11 Cases that will benefit all of the Debtors' stakeholders.

59.    Several of these motions request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate an irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

60.    In my opinion, approval of the relief sought in each of the motions is critical to successfully implementing the Debtors' chapter 11 strategy efficiently and with minimal

4915-6358-2605, v. 5

disruption to their business operations, thereby permitting the Debtors to preserve and maximize value for the benefit of all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing statements are true and correct.

Dated:  February 5, 2026                          /s/              *Curt Kroll*
                                                  Curt Kroll
                                                  Chief Financial Officer
                                                  Francesca's Acquisition, LLC

4915-6358-2605, v. 5