# Exhibit A

**Services Agreement**

Docusign Envelope ID: 9CC7277F-2C30-448A-9193-FB8F640FE795

## Services Agreement

This Services Agreement (this "**Agreement**") is entered into as of January 24, 2026 between Stretto, Inc. ("**Stretto**") and Francesca's Acquisition LLC (together with its affiliates and subsidiaries, the "**Company**").[1]

In consideration of the promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Services**

   (a) Stretto agrees to provide the Company with consulting services regarding (i) legal noticing, maintenance of claims registers, creditor mailing matrices, an electronic platform for filing proofs of claim, plan solicitation, balloting, tabulation of votes, disbursements, and administrative support in preparation of schedules of assets and liabilities and statements of financial affairs ("**Claims Administration, Noticing, and Solicitation Services**"); and (ii) crisis communications, claims analysis and reconciliation, preference analysis and recovery, contract review and analysis, case research, public securities, depository management, treasury services, confidential online workspaces or data rooms (publication to which shall not violate the confidentiality provisions of this Agreement), and any other services agreed upon by the parties or otherwise required by applicable law, governmental regulations, or court rules or orders (all such services collectively, the "**Services**").

   (b) The Company acknowledges and agrees that Stretto will often take direction from the Company's representatives, employees, agents, and/or professionals (collectively, the "**Company Parties**") with respect to providing Services hereunder. The parties agree that Stretto may rely upon, and the Company agrees to be bound by, any requests, advice, or information provided by the Company Parties to the same extent as if such requests, advice, or information were provided by the Company.

   (c) The Company agrees and understands that Stretto shall not provide the Company or any other party with legal advice.

2. **Rates, Expenses and Payment**

   (a) Stretto will provide the Services on an as-needed basis and upon request or agreement of the Company. Stretto's charges for Services through the effective date of a chapter 11 plan shall be at the rates attached hereto as **Exhibit C** (the "**Preferred Rate Structure**"). The Company agrees that the Preferred Rate Structure shall not be applicable to Services provided to the entity or entities (including the Company) responsible for implementing a confirmed and effective chapter 11 plan and that such Services will be provided at Stretto's then prevailing rates. The Company agrees to pay for reasonable out of pocket expenses incurred by Stretto in connection with providing Services hereunder.

   (b) Stretto will bill the Company no less frequently than monthly. All invoices shall be due and payable upon receipt. Where an expense or group of expenses to be incurred is expected to exceed $10,000 (e.g., publication notice), Stretto may require advance or direct payment from

---

[1] The Company shall include, to the extent applicable, the Company, as debtor and debtor in possession in any chapter 11 case, together with any affiliated debtors and debtors in possession whose chapter 11 cases are jointly administered with the Company's chapter 11 case. Each affiliated entity shall be jointly and severally liable for the Company's fees and expenses.

(c) In the case of a dispute with respect to an invoice amount, the Company shall provide a detailed written notice of such dispute to Stretto within 10 days of receipt of the invoice.

(d) The undisputed portion of the invoice will remain due and payable immediately upon receipt thereof. Late charges shall not accrue on any amounts disputed in good faith.

(e) The Company shall pay any fees and expenses for Services relating to, arising out of, or resulting from any error or omission made by the Company or the Company Parties.

(f) The Company shall pay or reimburse any taxes that are applicable to Services performed hereunder or that are measured by payments made hereunder and are required to be collected by Stretto or paid by Stretto to a taxing authority.

(g) Upon execution of this Agreement, the Company shall pay Stretto an advance of $[TBD]. Stretto may use such advance against unpaid fees and expenses hereunder. Stretto may use the advance against all prepetition fees and expenses. Company shall upon Stretto's request, which request may take the form of an invoice, replenish the advance to the original advance amount. Stretto may also, at its option hold such advance to apply against unpaid fees and expenses hereunder.

(h) Stretto reserves the right to make reasonable increases to the Preferred Rate Structure on a periodic basis. If any such increase represents an increase greater than 10% from the previously effective level, Stretto shall provide 30 days' notice to the Company of such increase.

(i) Payments to Stretto under the terms of this Agreement for services rendered, may be remitted by Company using either (or both) of the following methods:

>   **Wire Transmission**
>   Bank Name – Banc of California
>   Bank Address – 110 West A Street, Suite 100, San Diego, CA 92101
>   ABA – 122238200
>   Account Number – 1000681781
>   Account Name – Stretto, Inc.
>
>   **Check**
>   Stretto, Inc.
>   Attn: Accounts Receivable
>   410 Exchange, Suite 100
>   Irvine, CA 92602

**3. Retention in Bankruptcy Case**

(a) If the Company commences a case pursuant to title 11 of the United States Code (the "**Bankruptcy Code**"), the Company promptly shall file any necessary application with the Bankruptcy Court to retain Stretto to provide the Services. The form and substance of such applications and any order approving them shall be reasonably acceptable to Stretto.

(b) If the Company seeks authorization in a chapter 11 case to obtain postpetition financing, including debtor-in-possession loans or use of cash collateral, the Company shall include Stretto's fees and expenses incurred hereunder in any professional compensation carve-out.

Docusign Envelope ID: 9CC7277F-2C30-448A-9193-FB8F640FE795

(c) If any Company chapter 11 case converts to a case under chapter 7 of the Bankruptcy Code, Stretto will continue to be paid for Services pursuant to 28 U.S.C. § 156(c) and the terms hereunder.

4. **Confidentiality**

    (a) The Company and Stretto agree to keep confidential all non-public records, systems, procedures, software, and other information received from the other party in connection with the Services provided hereunder; provided, however, that if any such information was publicly available, already in the receiving party's possession or known to it, independently developed by the receiving party, lawfully obtained by the receiving party from a third party, or required to be disclosed by law, then the receiving party shall bear no responsibility for publicly disclosing such information.

    (b) If either party reasonably believes that it is required to disclose any confidential information pursuant to an order from a governmental authority, (i) such party shall provide written notice to the other party promptly after receiving such order, to allow the other party sufficient time, if possible, to seek any remedy available under applicable law to prevent disclosure of the information; and (ii) such party will limit such disclosure to the extent such party's counsel in good faith determines such disclosure can be limited.

5. **Property Rights**

Stretto reserves to itself and its agents all property rights in and to all materials, concepts, creations, inventions, works of authorship, improvements, designs, innovations, ideas, discoveries, know-how, techniques, programs, systems, specifications, applications, processes, routines, manuals, documentation, and any other information or property (collectively, "**Property**") furnished by Stretto for itself or for use by the Company hereunder. The foregoing definition of Property shall include any and all data, from any source, downloaded, stored, and maintained by Stretto's technology infrastructure. Fees and expenses paid by the Company do not vest in the Company any rights in such Property. Such Property is only being made available for the Company's use during and in connection with the Services provided by Stretto hereunder.

6. **Bank Accounts**

At the request of the Company or the Company Parties, Stretto shall be authorized to establish accounts with financial institutions in the name of and as agent for the Company to facilitate cash management and distributions pursuant to a chapter 11 plan or other transaction. To the extent that certain financial products are provided to the Company pursuant to Stretto's agreement with financial institutions, Stretto may receive compensation from such institutions for the services Stretto provides pursuant to such agreement.

7. **Term and Termination**

    (a) This Agreement shall remain in effect until terminated by either party: (i) on 30 days' prior written notice to other party; or (ii) immediately upon written notice for Cause (as defined herein). "**Cause**" means (i) gross negligence or willful misconduct of Stretto that causes material harm to the Company's restructuring under chapter 11 of the Bankruptcy Code, (ii) the failure of the Company to pay Stretto invoices for more than 60 days from the date of invoice or (iii) the accrual of invoices or unpaid Services in excess of the advance held by Stretto where Stretto reasonably believes it likely will not be paid.

Docusign Envelope ID: 9CC7277F-2C30-448A-9193-FB8F640FE795

(b) If this Agreement is terminated after Stretto is retained pursuant to Bankruptcy Court order, the Company promptly shall seek entry of a Bankruptcy Court order discharging Stretto of its duties under such retention, which order shall be in form and substance reasonably acceptable to Stretto.

(c) If this Agreement is terminated, the Company shall remain liable for all amounts then accrued and/or due and owing to Stretto hereunder.

(d) If this Agreement is terminated, Stretto shall coordinate with the Company and, to the extent applicable, the clerk of the Bankruptcy Court, to maintain an orderly transfer of record keeping functions, and Stretto shall provide the necessary staff, services, and assistance required for such an orderly transfer. The Company agrees to pay for such Services pursuant to the Preferred Rate Structure.

**8. No Representations or Warranties**

Stretto makes no representations or warranties, express or implied, regarding the services and products sold or licensed to the Company hereunder or otherwise with respect to this Agreement, including, without limitation, any express or implied warranty of merchantability, fitness or adequacy for a particular purpose or use, quality, productiveness, or capacity. Notwithstanding the foregoing, if the above disclaimer is not enforceable under applicable law, such disclaimer will be construed by limiting it so as to be enforceable to the extent compatible with applicable law.

**9. Indemnification**

(a) To the fullest extent permitted by applicable law, the Company shall indemnify and hold harmless Stretto and its members, directors, officers, employees, representatives, affiliates, consultants, subcontractors, and agents (collectively, the "**Indemnified Parties**") from and against any and all losses, claims, damages, judgments, liabilities, and expenses, whether direct or indirect (including, without limitation, counsel fees and expenses) (collectively, "**Losses**") resulting from, arising out of, or related to Stretto's performance hereunder. Without limiting the generality of the foregoing, Losses include any liabilities resulting from claims by any third parties against any Indemnified Party.

(b) Stretto and the Company shall notify each other in writing promptly upon the assertion, threat or commencement of any claim, action, investigation, or proceeding that either party becomes aware of with respect to the Services provided hereunder.

(c) The Company's indemnification of Stretto hereunder shall exclude Losses resulting from Stretto's gross negligence or willful misconduct.

(d) The Company's indemnification obligations hereunder shall survive the termination of this Agreement.

**10. Limitations of Liability**

Except as expressly provided herein, Stretto's liability to the Company for any Losses, unless due to Stretto's gross negligence or willful misconduct, shall be limited to the total amount paid by the Company to Stretto for the portion of the particular work that gave rise to the alleged Loss. In no event shall Stretto be liable for any indirect, special, or consequential damages (such as loss of anticipated profits or other economic loss) in connection with or arising out of the Services provided hereunder.

Docusign Envelope ID: 9CC7277F-2C30-448A-9193-FB8F640FE795

11. **Company Data**

   (a) The Company is responsible for, and Stretto does not verify, the accuracy of the programs, data and other information it or any Company Party submits for processing to Stretto and for the output of such information, including, without limitation, with respect to preparation of statements of financial affairs and schedules of assets and liabilities (collectively, "**SOFAs and Schedules**"). Stretto bears no responsibility for the accuracy and content of SOFAs and Schedules, and the Company is deemed hereunder to have approved and reviewed all SOFAs and Schedules filed on its behalf.

   (b) The Company agrees, represents, and warrants to Stretto that before delivery of any information to Stretto: (i) the Company has full authority to deliver such information to Stretto; (ii) it has complied with all applicable data protection laws in the collection and retention of personal data (including providing any required notices and/or disclosures to data subjects, consumers, or other necessary parties); and (iii) Stretto is authorized to use such information to perform Services hereunder and as otherwise set forth in this Agreement.

   (c) The Company also agrees and represents that, before delivery of any information to Stretto that is personal data subject to the GDPR or other data protection laws, Company shall notify Stretto of the impending delivery and request any modification to this Agreement that Company believes may be required by the applicable data protection laws with respect to that personal data. For the avoidance of doubt, Stretto shall not be required to comply with data protection laws and regulations unless and until they take effect during the term of the Agreement and are applicable to the information Company delivers to Stretto. Personal data shall have the meaning assigned to the terms "personal data" and/or "personal information" under the applicable data protection laws.

   (d) If Company notifies Stretto of the applicability of the GDPR to personal data delivered pursuant to this Agreement, the parties agree that the Agreement shall be subject to the terms set forth in the GDPR Addendum attached hereto as **Exhibit A** and incorporated herein in its entirety by reference.

   (e) Attached hereto as **Exhibit B** and incorporated herein in its entirety by reference are notification procedures in the event of a Data Security Incident (as defined therein).

   (f) Any data, storage media, programs or other materials furnished to Stretto by the Company may be retained by Stretto until the Services provided hereunder are paid in full. The Company shall remain liable for all fees and expenses incurred by Stretto under this Agreement as a result of data, storage media or other materials maintained, stored, or disposed of by Stretto. Any such disposal shall be in a manner requested by or acceptable to the Company; provided that if the Company has not utilized Stretto's Services for a period of 90 days or more, Stretto may dispose of any such materials in a manner to be determined in Stretto's sole reasonable discretion, and be reimbursed by the Company for the expense of such disposition, after giving the Company 30 days' notice. The Company agrees to initiate and maintain backup files that would allow the Company to regenerate or duplicate all programs, data, or information provided by the Company to Stretto.

   (g) Notwithstanding the foregoing, if Stretto is retained pursuant to Bankruptcy Court order, disposal of any Company data, storage media, or other materials shall comply with any applicable court orders and rules or clerk's office instructions.

12. **California Consumer Privacy Act.**
    (a) Definitions. In this Section 12,
        (i) "**CCPA**" means the California Consumer Privacy Act of 2018, including amendments and final regulations;
        (ii) "**Personal Information**" has the same meaning given to such term under section 1798.140 of the CCPA and is limited to Personal Information contained in any Company data provided to Stretto by the Company in order for Stretto to provide Services under this Agreement; and
        (iii) "**Commercial Purposes**", "**Sell**", "**Share**", "**Business**", and "**Service Provider**" have the same meanings assigned to them in section 1798.140 of the CCPA.
    (b) Relationship Between the Parties. To the extent the Company is considered a Business under the CCPA, and subject to the terms of this Section 12, Stretto will act solely as Company's Service Provider with respect to Personal Information.
    (c) Restrictions. Stretto will not: (i) Sell or Share Personal Information, (ii) retain, use, or disclose Personal Information for any purpose other than for the specific purpose of performing the Services specified in this Agreement, including retaining, using, or disclosing Personal Information for any Commercial Purpose other than providing the Services specified in this Agreement unless otherwise permitted under the CCPA; (iii) retain, use, or disclose the Personal Information outside the direct business relationship between Stretto and the Company; or (iv) combine the Personal Information that Stretto receives from, or on behalf of, the Company with Personal Information that it receives from, or on behalf of, another person or persons, or collects from its own interaction with a consumer, except as permitted by CCPA.

13. **Non-Solicitation**

The Company agrees that neither it nor any of its subsidiaries or affiliates shall directly or indirectly solicit for employment, employ, or otherwise retain as employees, consultants, or otherwise, any employees of Stretto during the term of this Agreement and for a period of 12 months after termination thereof unless Stretto provides prior written consent to such solicitation or retention.

14. **Force Majeure**

Whenever performance by Stretto of any of its obligations hereunder is materially prevented or impacted by reason of any act of God, government requirement, strike, lock-out or other industrial or transportation disturbance, fire, flood, epidemic, lack of materials, law, regulation or ordinance, act of terrorism, war or war condition, or by reason of any other matter beyond Stretto's reasonable control, then such performance shall be excused.

15. **Choice of Law**

The validity, enforceability, and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of New York.

16. **Arbitration**

Any dispute arising out of or relating to this Agreement or the breach thereof shall be finally resolved by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. There shall be three arbitrators named in accordance with such rules. The arbitration

shall be conducted in the English language in Irvine, California in accordance with the United States Arbitration Act.  Notwithstanding the foregoing, upon commencement of any chapter 11 case(s) by the Company, any disputes related to this Agreement shall be decided by the bankruptcy court assigned to such chapter 11 case(s).

17. **Integration: Severability; Modifications: Assignment**

    (a) Each party acknowledges that it has read this Agreement, understands it, and agrees to be bound by its terms, and further agrees that it is the complete and exclusive statement of the agreement between the parties, which supersedes and merges all prior proposals, understandings, agreements, and communications between the parties relating to the subject matter hereof.
    (b) If any provision of this Agreement shall be held to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall in no way be affected or impaired thereby.
    (c) This Agreement may be modified only by a writing duly executed by an authorized representative of the Company and an officer of Stretto.
    (d) This Agreement and the rights and duties hereunder shall not be assignable by the parties hereto except upon written consent of the other; provided, however, that Stretto may assign this Agreement to a wholly-owned subsidiary or affiliate without the Company's consent.

18. **Electronic Signatures; Effectiveness of Counterparts**

This Agreement may be executed with electronic signatures using DocuSign or a similar service that provides a complete, automated history of the sending and signing, including key event timestamps. If the Parties execute this Agreement electronically, they agree that their electronic signatures are the legally binding equivalent to their handwritten signatures.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which shall constitute one and the same agreement.  This Agreement will become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, which delivery may be made by exchange of copies of the signature page by fax or email.

19. **Notices**

All notices and requests in connection with this Agreement shall be sufficiently given or made if given or made in writing via hand delivery, overnight courier, U.S. Mail (postage prepaid) or email, and addressed as follows:

If to Stretto:	Stretto
	410 Exchange, Ste. 100
	Irvine, CA 92602
	Attn: Sheryl Betance
	Tel: 714.716.1872
	Email: sheryl.betance@stretto.com

If to the Company:     Curt Kroll, CFO
   101 Creekside Crossing
   Suite 1700-388
   Brentwood, TN 37027
   Tel:  213-289-3671
   Email:  ckroll@scpllc.com

With a copy to:     Nicholas Miller, Esq
   McDonald Hopkins, LLC
   300 N. LaSalle Street
   Suite 1400
   Chicago, IL 60654
   Tel:  312-642-6938
   Email:  nmiller@mcdonaldhopkins.com

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement effective as of the date first above written.

STRETTO, INC.

_____
By: Sheryl Betance

Title: Senior Managing Director


Francesca's Acquisition, LLC

_____
By: Curt Kroll

Title: Chief Financial Officer

Docusign Envelope ID: 9CC7277F-2C30-448A-9193-FB8F640FE795

## Exhibit A

## GDPR Addendum

This GDPR Addendum is a part of the Services Agreement (the "**Agreement**") by and between Stretto (the "**Processor**") and the Company (together, the "**Parties**") only if Company notifies Processor in advance of processing relevant data that such data is subject to the GDPR pursuant to Paragraphs 11(c) and 11(d) of the Agreement[2].

### RECITALS

**WHEREAS**,

(A)  The Processor and the Company have agreed to the following terms regarding the Processing of Company Personal Data.

(B)  The Company acts as a Controller of the Company Personal Data.

(C)  The Company wishes to subcontract certain Services, pursuant to the Agreement, which imply and require the processing of personal data, to the Processor.

(D)  The Company instructs the Processor to process Company Personal Data.

(E)  The Parties seek to implement a data processing agreement that complies with the requirements of the current legal framework in relation to data processing and with the Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, and repealing Directive 95/46/EC (General Data Protection Regulation or "**GDPR**").

**NOW THEREFORE**, the Company and the Processor agree as follows:

1.  **Definitions.** The parties agree that the following terms, when used in this GDPR Addendum, shall have the following meanings.

    (a)  "**Addendum**" shall mean this GDPR Addendum;

    (b)  "**Company Personal Data**" means any Personal Data Processed by the Processor or a Subprocessor on behalf of the Company pursuant to or in connection with the Agreement, and may include, for example, Personal Data of Company's employees, clients, customers, creditors, equity interest holders, or counter-parties;

    (c)  "**Data Protection Laws**" means EU Directive 95/46/EC, as transposed into domestic legislation of each Member State and as amended, replaced or superseded from time to time, including by the GDPR and laws implementing or supplementing the GDPR;

---

[2] Capitalized terms utilized but not defined in the GDPR Addendum have the meanings ascribed to them in the Agreement.

Docusign Envelope ID: 9CC7277F-2C30-448A-9193-FB8F640FE795

(d) "**Services**" means the services the Processor provides to the Company pursuant to the Agreement;

(e) "**Subprocessor**" means any person appointed by or on behalf the Processor to process Personal Data on behalf of the Company in connection with the Agreement;

(f) "**Technical and organizational security measures**" means those measures aimed at protecting Personal Data against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access, in particular where the processing involves the transmission of data over a network, and against all other unlawful forms of processing;

(g) The terms "**Commission**", "**Controller**", "**Data Subject**", "**Member State**", "**Personal Data**", "**Personal Data Breach**", "**Processor**", "**Processing**", "**Special Categories of Personal Data**", and "**Supervisory Authority**" shall have the same meaning as in the GDPR, and their derivative terms shall be construed accordingly.

2. **Obligations of the Company.** The Company agrees and warrants:

(a) that the Processing, including the transfer itself, of the Company Personal Data has been and will continue to be carried out in accordance with the relevant provisions of the applicable Data Protection Laws (and, where applicable, has been notified to the relevant authorities of the Member State);

(b) that it has instructed and throughout the duration of the Services will instruct the Processor to process the Company Personal Data transferred only on the Company's behalf and in accordance with the applicable Data Protection Laws, the Agreement, and this Addendum;

(c) that the Processor will implement appropriate technical and organizational security measures with respect to the Personal Data;

(d) that after assessment of the requirements of the applicable Data Protection Laws, the technical and organizational security measures implemented by Processor are appropriate to protect the Company Personal Data against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access, in particular where the processing involves the transmission of data over a network, and against all other unlawful forms of processing, and that these measures ensure a level of security appropriate to the risks presented by the processing and the nature of the data to be protected having regard to the state of the art and the cost of their implementation;

(e) that it will ensure compliance with the technical and organizational security measures; and

(f) that the Company Personal Data transferred to Processor does not include or involve any special categories of data, as defined by Article 9 of the GDPR.

Docusign Envelope ID: 9CC7277F-2C30-448A-9193-FB8F640FE795

3. **Obligations of the Processor.** The Processor agrees:

(a) to comply with the Data Protection Laws;

(b) to process the Company Personal Data only on behalf of the Company and in compliance with the Company's instructions and this Addendum unless required to do so by Data Protection Laws to which Processor is subject; in such a case, the Processor shall inform the Company of that legal requirement before processing, unless that law prohibits such information on important grounds of public interest; if Processor cannot comply with the Company's instructions, it agrees to inform promptly the Company of its inability to comply with such instructions, in which case the Parties shall work together in good faith to resolve Processor's inability to process Personal Data pursuant to the Company's instructions for no less than thirty (30) days, and failing resolution, Company is entitled to suspend the processing of Personal Data and/or terminate the Agreement;

(c) that it has implemented reasonable and appropriate technical and organizational security measures before processing the Company Personal Data;

(d) that it will promptly notify the Company about:

(i) any legally binding request for disclosure of the Company Personal Data required by law, subpoena, warrant, court order, government agency, or law enforcement unless otherwise prohibited by law, subpoena, warrant, court order, government agency, or law enforcement;

(ii) any Personal Data Breach ; and

(iii) any request received directly from any Data Subject and shall not otherwise respond to such request, unless required by Data Protection Laws;

(e) to respond promptly to reasonable inquiries from the Company relating to Processor's processing of the Company Personal Data and to abide by the advice of the supervisory authority with regard to the Processing of the Company Personal Data;

(f) to treat all confidential information and/or Company Personal Data received by Company in accordance with the confidentiality provisions in the Agreement. Any Subprocessor authorized by Processor or the Company shall contractually agree to maintain the confidentiality of such information or be under an appropriate statutory obligation of confidentiality; and

(g) that it shall have the Company's authorization to use Sub-processors from an agreed list and shall specifically inform the Company in writing of any intended changes to that list through the addition or replacement of Sub-processors at least thirty (30) days in advance, thereby giving Company sufficient time to be able to object to such changes prior to the engagement of the Sub-processor(s). The data importer shall provide the data exporter with the information necessary to enable the data exporter to exercise its right to object.

4. **Obligations after Termination of Personal Data Processing Services.**

(a) The Parties agree that within 10 business days of the termination of the Agreement or provision of Services, the Processor and any Subprocessor shall, at the choice of the Company, return all Company Personal Data and the copies thereof to the Company or shall destroy all the Company Personal Data and notify the Company that it has done so, unless prohibited by applicable law, subpoena, warrant, court order, government agency, or law enforcement. In that case, the Processor will abide by the confidentiality provisions in the Agreement and will not further process the Company Personal Data.

(b) The Processor and any Subprocessor warrant that upon request of the Company and/or of the supervisory authority, it will submit its data-processing facilities for an audit of the technical and organizational security measures.

5. **Notices.**

(a) All notices and communications given under this Addendum must be delivered as provided for by the Agreement.

*Remainder of page is intentionally blank.*

Docusign Envelope ID: 9CC7277F-2C30-448A-9193-FB8F640FE795

## Exhibit B

## Data Security Incident Notification Procedures

1. The following definitions shall apply to these data security incident notification procedures:

    (a) "**Covered Data**" means, in any form, format, or media, nonpublic information (i.e., information that is not posted on a public website maintained by Stretto in accordance with the Bankruptcy Code, the Bankruptcy Rules, or applicable bankruptcy case procedures or local rules, or filed on a non-confidential basis with the court-sponsored PACER or other docket filing system) provided or transferred to Stretto by Company or by an individual creditor, shareholder, or other third party for the purposes of Stretto's performance under this Agreement.

    (b) "**Data Security Incident**" means the unauthorized or accidental access to, or use, disclosure, alteration, loss, or destruction of, Covered Data.

    (c) "**Determine**" means Stretto has actual knowledge or reasonable certainty that a Data Security Incident has occurred.

    (d) "**Discover**" means Stretto reasonably believes that a Data Security Incident has occurred.

2. When Stretto Discovers a potential Data Security Incident, Stretto shall begin an investigation into the nature and scope of the potential Data Security Incident at the direction of Stretto's Chief Information Security Officer and/or incident response team.

3. As soon as practicable, but not later than seventy-two (72) hours after Stretto Determines that a Data Security Incident has occurred, Stretto will provide confidential written notification of the Data Security Incident to the Company and the attorney of record for the Company (collectively, the "**Company Notice Parties**"). Stretto may, in its discretion, provide confidential written or oral notification of the Data Security Incident to (a) the Bankruptcy Court, (b) the Clerk of the Bankruptcy Court, (c) the appropriate representative of the Office of the United States Trustee, and (d) all official committees of the Court (collectively, the "**Court Notice Parties**", and with the Company Notice Parties, the "**Notice Parties**") and, if Stretto provides such additional notice, Stretto shall contemporaneously (or sooner) notify the Company and its attorney of record that Stretto has provided such additional notice.

4. The notification described in Section 3 (the "**Preliminary Notification**") shall include the following information, to the extent known by Stretto at the time of the Preliminary Notification:

    (a) a brief description of the nature of the Data Security Incident, including how it occurred, when it occurred, and the date that Stretto Discovered the Data Security Incident;

    (b) a description of the Covered Data potentially impacted;

    (c) where appropriate, a description of what steps Stretto has taken or is taking to investigate and mitigate the effects of the Data Security Incident; and

Docusign Envelope ID: 9CC7277F-2C30-448A-9193-FB8F640FE795

(d) where appropriate, any corrective measures Stretto has taken or will take to reduce the likelihood of similar incident.

5. If requested, Company shall reasonably assist Stretto with Stretto's investigation of, and response to, a potential or actual Data Security Incident. After providing the Preliminary Notification, Stretto and the Notice Parties who have received notification will confer to determine, if necessary, an appropriate method to notify (a "**Supplemental Notification**") (a) creditors or claimants whose Covered Data may have been impacted by the Data Security Incident, and (b) any state, federal, or international governmental authorities or regulators, in accordance with applicable law.

6. If a law enforcement official informs Stretto that providing notification to third parties regarding the Data Security Incident would impede a criminal investigation or cause damage to national security, Stretto may delay any Preliminary Notification or Supplemental Notification for the time period specified by the law enforcement official.

7. Unless otherwise required by law, regulation, or court order, in providing any Preliminary Notification or Supplemental Notification, Stretto shall not be required to disclose (a) confidential or privileged information, (b) information that a law enforcement official has directed to remain confidential, (c) information regarding any other Stretto clients, or (d) the identities of any Stretto employees.

8. Notwithstanding any provisions to the contrary in this Agreement, in Stretto's discretion, Stretto may make public statements regarding a Data Security Incident, whether by posting on its website, in a statement to the media, or in a public filing. Stretto will endeavor to provide Company notice of the content of any such statement prior to publicly releasing such statement.

*Remainder of page is intentionally blank.*

Docusign Envelope ID: 9CC7277F-2C30-448A-9193-FB8F640FE795

**Exhibit C**

**Preferred Rate Structure**

Docusign Envelope ID: 9CC7277F-2C30-448A-9193-FB8F640FE795

**STRETTO**

## OUR PRICING
# Preferred Rate Structure

| CONSULTING SERVICES & RATES | |
|---|---|
| **Analyst**<br>The Analyst processes incoming mail, creditor correspondence and returned mail, and supports the case team with administrative tasks as required. | Waived |
| **Consultant (Associate/Senior Associate)**<br>The Associate manages the various data collection processes required by the Chapter 11 process. This includes, among other things, compiling the creditor matrix, completing Schedules/SOFA form and generating drafts of same for counsel and advisors, reviewing and processing claims and ballots, and coordinating all physical and electronic noticing.<br><br>The Senior Associate oversees projects for compilation of the Schedules & SOFA forms, the creditor matrix and noticing. In addition, they oversee quality control and generate custom claim and ballot reports. Senior Associates average over seven years of experience. | $70-$200 |
| **Director / Managing Director**<br>The Director is the primary contact for the company, counsel and other professionals and oversees and supports all aspects of the administration for the entirety of an engagement.<br><br>The Managing Director provides industry and/or project specific expertise to support complex matters. Professionals, including Stretto's executive management team will serve in this role when appropriate. Stretto's Directors and Managing Directors have over fifteen years of experience and are typically former restructuring professionals. | $210-$250 |
| **Solicitation Director**<br>The Solicitation Associate reviews, tabulates and audits ballots, and executes plan solicitation and other public securities mailings. The Solicitation Associate also prepares customized reports relating to voting and other corporate events, including exchange offers and rights subscriptions. The Solicitation Associate also interfaces with banks, brokers, nominees, depositories and their agents regarding solicitations and related communications. | $275 |
| **Executive Management**<br>Our Executive Management team oversees Stretto's Corporate Restructuring group and will provide consulting support to this matter at no charge. | Waived |

## CALL CENTER AND COMMUNICATION SUPPORT SERVICES

| | |
|---|---|
| **Tier 1 Support**<br>Automated IVR telephone support | Waived |
| **Tier 2 Support**<br>AI-Enhanced client support including real-time online chat and document summarization | $15 |
| **Tier 3 Live Support**<br>Dedicated, live communications team support including telephone and email communication | $65-$95 |

## PRINTING & NOTICING SERVICES

| | |
|---|---|
| Printing | $0.12 (per image)[1] |
| Postage/Overnight Delivery | Preferred Rates |
| ECF Email Noticing | Waived |
| Email Document Service | Pricing Available on Request |
| Fax Noticing | $0.10 (per page) |
| Envelopes | Varies by Size |
| Coordinate and Publish Legal Notices | Pricing Available on Request |
| Public Securities Events | Varies by Event |

## ELECTRONIC SERVICES

| | |
|---|---|
| Case Homepage Set-Up and Hosting | Waived |
| Robotic Process Automation[2] | Starting at $0.48 (per process) |
| Encrypted HTTPS Bandwidth (volume discount applies) | Starting at $0.125 (per MB) |
| Online Monthly Operating Report Platform Subscription | Waived |
| AI-Enhanced Communications Platform (monthly) | Starting at $500 per month[3] |

[1] Print Surcharge of $0.05 may apply to mailings requested outside carrier hours (8am – 6pm ET, Monday – Friday)

[2] Includes ECF docket automation, subscription-based docket notifications, USPS bulk mail operations, address validation, e-filing transactions, cloud computing charges, and related activities

[3] Monthly rate based on size of creditor matrix

Docusign Envelope ID: 9CC7277F-2C30-448A-9193-FB8F640FE795

| CLAIMS ADMINISTRATION & MANAGEMENT EXPENSES | |
|---|---|
| License Fee and System Maintenance | $0.10 (per creditor per month) |
| Database and System Access (Unlimited Users) | Waived |
| Online Claims Filing Portal | Waived |
| Online Ballots Filing Portal | Waived |
| Preference Analysis (Initial Preference Review) | Standard Hourly Rates |

| DOCUMENT MANAGEMENT SERVICES | |
|---|---|
| Electronic Imaging (Per Imaged Page) | $0.10 |
| FedRAMP Compliant File Retention (volume discount applies) | Starting at $0.125 (per MB) |
| Virtual Data Room | Available Upon Request |

| CALL CENTER AND COMMUNICATION SUPPORT SERVICES | |
|---|---|
| Case-Specific Toll-Free Number and Voice-Mail Box | Waived |
| Interactive Voice Response (Per Minute) | Waived |
| Monthly Maintenance Charge | Waived |

| DISBURSEMENT SERVICES | |
|---|---|
| Check Issuance | Available on Request |
| Account Opening Fee | Available on Request |
| W-9 Mailing and Maintenance of TIN Database | Standard Hourly Rates |
| Disbursements - Record to Transfer Agent | Quoted at Time of Request |