UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re<br><br>FRANCESCA'S ACQUISITION,<br>LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.  26-11312 (MEH)<br><br>Hon. Mark E. Hall |

## COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF LIQUIDATION

**MANDELBAUM BARRETT PC**
Jeffrey M. Rosenthal, Esq.
Vincent J. Roldan, Esq.
Katie F. Warren, Esq.
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
Phone: (973) 736-4600
Facsimile: (973) 325-7467
jrosenthal@mblawfirm.com
vroldan@mblawfirm.com
kwarren@mblawfirm.com

*Counsel for the Debtors and Debtors in
Possession*

**FOX ROTHSCHILD LLP**
Joseph J. DiPasquale, Esq.
Michael R. Herz, Esq.
Agostino A. Zammiello, Esq.
49 Market Street
Morristown, NJ  07960
(973) 992-4800 (Telephone)
(973) 992-9125 (Facsimile)
jdipasquale@foxrothschild.com
mherz@foxrothschild.com
azammiello@foxrothschild.com

*Counsel for the Official Committee of
Unsecured Creditors*

---

[1] The Debtors' entities in these chapter 11 cases, along with the last four digits of each Debtors entity's federal tax identification number, are: Francesca's Acquisition, LLC (3616); Francesca's Operations, Inc. (6872); Francesca's Administrative Management, Inc. (5788); and Francesca's IP Debtors, Inc. (9588). The Debtors' service address is 8760 Clay Road, Suite 100, Houston, TX 77080.

## TABLE OF CONTENTS

**SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS** ...........................3

**ARTICLE 1 - HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTORS**........3

**ARTICLE 2 - THE PLAN**.................................................................................................12

**ARTICLE 3 - CONFIRMATION AND VOTING PROCEDURES** ....................................31

**ARTICLE 4 - CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO
VOTING** ........................................................................................................38

**ARTICLE 5 -CONDITIONS PRECEDENT**........................................................................42

**ARTICLE 6 - RELEASE; INJUNCTION; EXCULPATION.**..............................................43

**ARTICLE 7 - PROVISIONS GOVERNING DISTRIBUTIONS** .......................................46

**ARTICLE 8 -PLAN INTERPRETATION, CONFIRMATION AND VOTING** ...............53

**ARTICLE 9 - JURISDICTION**...........................................................................................54

**ARTICLE 10 - MISCELLANEOUS PROVISIONS**............................................................56

**ARTICLE 11 - CERTAIN FEDERAL INCOME TAX CONSEQUENCES** .....................58

**ARTICLE 12 - DEFINITIONS AND RULES OF INTERPRETATION**............................60

**ARTICLE 13 - RECOMMENDATION AND CONCUSION** .............................................72

i

4912-8223-7850, v. 8
187746688.2

## DISCLAIMERS

THIS COMBINED DISCLOSURE STATEMENT AND PLAN CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS AND DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN THAT MAY BE ATTACHED AND ARE INCORPORATED BY REFERENCE AND DESCRIBE EVENTS IN THESE CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THIS INFORMATION IS FAIR AND ACCURATE, THIS INFORMATION IS QUALIFIED IN ITS ENTIRETY TO THE EXTENT THAT IT DOES NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  THE TERMS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN GOVERN TO THE EXTENT OF ANY INCONSISTENCY WITH ANY OTHER DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE DOCUMENTS RELATED THERETO, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED HEREIN OR ATTACHED HERETO ARE MADE AS OF THE DATE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, UNLESS ANOTHER TIME IS SPECIFIED.  THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. THERE CAN BE NO ASSURANCES THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THIS DATE.  THE DEBTORS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.  THE DELIVERY OF THE COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.  EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND IN THE RELATED EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES IN THE UNITED STATES OR ANY OTHER JURISDICTION.

THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTIONS 1123 AND 1125 AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS. THIS

1

COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION, NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION, OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. NO OTHER GOVERNMENTAL OR OTHER REGULATORY AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

EXCEPT AS EXPRESSLY SET FORTH HEREIN, NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS AND INVOLVE MATERIAL RISKS AND UNCERTAINTIES THAT ARE SUBJECT TO CHANGE BASED ON A NUMBER OF FACTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES AND THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR ADVISORS. ALTHOUGH THE DEBTORS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTORS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF SUCH PROJECTED RECOVERIES.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

IF YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN.  PRIOR TO DECIDING WHETHER OR HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM THAT IS ENTITLED TO VOTE SHOULD CAREFULLY REVIEW ALL OF THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

4912-8223-7850, v. 8
187746688.2

> **THE DEBTORS AND THE CREDITORS' COMMITTEE ARE THE PLAN PROPONENTS. THE COMMITTEE IS COMPRISED OF SEVEN MEMBERS, EACH OF WHICH HOLDS GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS. THE DEBTORS AND THE CREDITORS' COMMITTEE RECOMMEND ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

## SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

The Plan contemplates the orderly wind-down of the Debtors. By the time the Bankruptcy Court conducts a hearing on confirmation of the Plan, the Debtors will have (a) closed the sale of their intellectual property assets pursuant to section 363 of the Bankruptcy Code, and (b) liquidated their inventory via court-approved Store Closing Sales.

The Plan contemplates the distribution of proceeds paid by a Liquidating Trustee and provides that (a) all allowed administrative and priority claims are paid in full; and (b) general unsecured creditors will receive their *pro rata* share of the Liquidating Trust Proceeds.

## ARTICLE 1

## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTORS

### 1.1.  Nature of the Debtors' Business.

Prior to bankruptcy, the Debtors were a leading specialty retailer of women's apparel and accessories focused on a Gen Z and multigenerational customer, operating approximately 400 boutiques across 45 states, together with an e-commerce website. The Debtors' business was founded in Houston in 1999, grew rapidly during its first decade to approximately 200 stores by 2010, and completed an initial public offering in 2011. The business peaked around 2016-2017 at approximately 700 stores and over $500 million in sales.

The Debtors' brand experience emphasized a unique, discovery-oriented boutique feel with limited-quantity, trend-right assortments at attractive price points delivered in-store and online. Most of the Debtors' stores were located within upscale malls and lifestyle shopping centers. In 2025, 66% of the Debtors' products consisted of apparel and jewelry, and the remainder consisted of gifts and accessories. After 2021, the Debtors shifted their product mix to focus on lower-margin but higher-volume products, including dresses and tops. Many of the Debtors' products were sold under proprietary labels and in limited quantities, creating a sense of scarcity and driving customer loyalty. The Debtors operated one main e-commerce website under the Francesca's brand at francescas.com. E-commerce sales made up approximately 13% of sales in 2025 and had continually expanded over the prior few years.

### 1.2.  Prepetition Capital Structure.

As of the Petition Date, the Debtors, through their pre-petition ownership structure set forth in Section 1.4, had approximately $30.1 million in total secured debt, the holders of which support

4912-8223-7850, v. 8
187746688.2

the Debtors' bankruptcy cases and store closing sale process. As described below, the Debtors' outstanding prepetition funded-debt obligations relate to a financing arrangement consisting of (a) a revolving credit facility (approximately $26.1 million outstanding on the Petition Date) with two tranches: the Committed Revolving A Loans and the Committed Revolving B Loans (each as defined in the Fifth Forbearance Agreement (as defined below)), and (b) a term loan facility (approximately $4 million outstanding on the Petition Date) under the Prepetition Loan Documents (as defined below).

On February 21, 2024, the Debtors, as borrowers, entered into that certain Revolving Credit Agreement, as amended by that certain First Amendment to Revolving Credit Agreement dated May 2, 2024, and that certain Waiver, Consent and Second Amendment to Credit Agreement dated September 6, 2024 (as may have been further amended, restated, modified, or supplemented from time to time, the "Prepetition Credit Agreement") with Tiger Finance, LLC, as administrative agent and collateral agent ("Tiger"), Second Avenue Capital Partners LLC, as funding agent ("Second Avenue" and together with Tiger, the "Prepetition Agents"), and the Lenders party thereto (collectively, with Tiger and Second Avenue, the "Prepetition Secured Lenders"). Pursuant to the Prepetition Credit Agreement, the associated Revolving Note (the "Prepetition Revolving Note") and the Term Note (the "Prepetition Term Note", together with the Prepetition Revolving Note, the "Prepetition Notes", and, collectively with the Prepetition Credit Agreement and all schedules and exhibits attached thereto and all other agreements, documents, instruments and/or amendments executed and delivered in connection therewith, the "Prepetition Loan Documents"), the Prepetition Secured Lenders extended to the Debtors a revolving, asset-based facility in the aggregate amount up to Forty Million and 00/100 Dollars ($40,000,000) (the "Prepetition Revolving Loans") and a term facility in the amount of Four Million Five Hundred Thousand and 00/100 Dollars ($4,500,000) (the "Prepetition Term Loan", together with the Prepetition Revolving Loans, the "Prepetition Secured Loans").

The obligations under the Prepetition Loan Documents are secured by a first priority lien on substantially all of the Debtors' assets, including, among other things, all accounts, goods, equipment, inventory, fixtures, and intangible assets including intellectual property. As of the Petition Date, the Debtors were in default under the Prepetition Credit Agreement.

Certain events of default have occurred under the Prepetition Credit Agreement and the parties entered into forbearance agreements from time to time, most recently on February 4, 2026 (the "Fifth Forbearance Agreement"), when the Debtors and Prepetition Secured Lenders, through the Prepetition Agents, entered into the Fifth Forbearance Agreement and a seventh amendment to the Credit Agreement.

### 1.3.    Filing of the Debtors' Chapter 11 Cases.

The Debtors each filed voluntary petitions for relief under the Bankruptcy Code on February 5, 2026 (the "Petition Date"). The Chapter 11 Cases are pending in the United States Bankruptcy Court for the District of New Jersey (Newark).

### 1.4.    Legal Structure and Ownership.

In September 2024, a non-debtor affiliate, MAS Acquisition, LLC ("MAS Acquisition"), acquired the Debtors. MAS Acquisition is a holding company with no operations. MAS

4912-8223-7850, v. 8
187746688.2

Acquisition is the 100% owner of Francesca's Acquisition, LLC ("Francesca's Acquisition"), and Francesca's Acquisition is the 100% owner of each of the other Debtors:

**The Debtors' Corporate Structure**



### 1.5.    Debtors' Assets.

The Debtors' assets are set forth in their Schedules filed on March 9, 2026.  In sum, the Debtors collectively scheduled approximately $43.5 million in assets as of the Petition Date.[2]  Of this, scheduled amounts included approximately (i) $3.19 million in Cash or Cash equivalents, (ii) approximately $2.1 million in deposits and prepayments, (iii) approximately $2.4 million in accounts receivable, (iv) approximately $25 million in inventory and finished goods, (v) approximately $9.7 million in office fixtures and equipment, and (vi) $1.1 million in a federal net tax operating loss.

### 1.6.    Debtors' Liabilities.

The Debtors' liabilities are set forth in their Schedules filed on March 9, 2026.  In sum, the Debtors scheduled amounts including approximately (i) $28.1 million in secured debt, (ii) $0 in priority unsecured claims, and (iii) $62 million in General Unsecured Claims (excluding inter-company payables).

The deadline to file claims in these Chapter 11 Cases (other than for governmental entities and Administrative Expense Claims) was April 28, 2026. The Governmental Bar Date is August 20, 2026. The Administrative Expense Claims Bar Date was May 28, 2026. The Debtors have not

---

[2] Not including a $1,091,465,288 inter-company receivable on the books owing from Francesca's Operations, Inc. to Francesca's Administrative Management, Inc.

had an opportunity to compare or reconcile the filed claims against their books and records.  In total, the claims register plus scheduled claims reflects about $228 million in general unsecured claims[3] and about $3 million in filed priority claims.  The Debtors believe the majority of filed claims supersede the claims reflected in the Debtors' Schedules.

### 1.7.     Events Leading to the Filing of the Chapter 11 Cases.[4]

A multitude of factors contributed to the Debtors' need to commence these Chapter 11 Cases.  Factors included, but are not limited to, internal factors that constrained the Debtors' liquidity, including significant cash needs to support the Debtors' operations as the Debtors emerged from their prior restructuring.  Macroeconomic factors disrupting the retail industry generally also impacted the Debtors, including shifts in the competitive landscape, a move towards online channels, supply chain issues, and increased costs of goods and services due to inflation, among other factors.

A combination of operational challenges and the economic shutdown caused by COVID-19 required the Debtors to restructure under chapter 11 at the end of 2020 in the United States Bankruptcy Court for the District of Delaware,[5] closing approximately 200 unprofitable stores and restructuring go-forward leases.   The Debtors emerged from bankruptcy in July 2021, and business quickly returned to profitability later that year , with revenue returning to 2016 levels by 2022, and average store sales expanding by 27% or more from 2019 to 2022.

On January 31, 2023, a data breach shut down the Debtors' systems and materially disrupted the Debtors' operations, negatively impacting sales and EBITDA due to inventory and pricing systems paralysis. Later in 2023 and 2024, the Debtors faced further challenges due to a disruptive e-commerce upgrade. The Debtors' non-core brands, Franki and Richer Poorer, either lost significant EBITDA or failed to build sufficient traction to make the investments in such brands worthwhile, and both brands are now dormant. Between 2022 and 2024, the business faced additional challenges as the Debtors spent more on marketing and promotion efforts to drive sales.

After MAS Acquisition acquired the Debtors in September 2024, the Debtors began a plan to review inventory, refocus on the target customer and improve product assortment and merchandising. Following the acquisition, the Debtors executed significant cost reductions (including in freight/logistics and labor), reduced discounts and realized positive same-store sales in 2025, with an increase in margins from 2024 to 2025.  However, the Debtors experienced continued struggles with supply chain issues and access to merchandise, despite an otherwise positive trajectory during this period.  The Debtors anticipated an additional capital infusion in January 2026, which did not come to fruition.  By January 2026, two of the Debtors' major suppliers ceased operations and continuing supply chain issues caused a cascading decline in the Debtors' business.

---

[3] Not including a $1,091,465,288 inter-company receivable on the books owing from Francesca's Operations, Inc. to Francesca's Administrative Management, Inc

[4] Section 1.7 is not intended to be an exhaustive list of all the events that led to the Debtors' filing for bankruptcy and the commencement of these Chapter 11 Cases.  Instead, this section merely provides an overview of some events that led to the bankruptcy filing.

[5] *See* case no. 20-13076 (BLS).

4912-8223-7850, v. 8
187746688.2

**1.8.**    <u>**Significant Events During the Chapter 11 Cases.**</u>

The Debtors spent the early part of these Chapter 11 Cases stabilizing operations and maximizing liquidity to ensure a solid position from which to implement their wind-down strategy centered around continuing Store Closing Sales that began prepetition and selling intellectual property assets. The Debtors filed a motion [D.I. 3] on the Petition Date to enable the Estates to continue the Store Closing Sales to liquidate remaining inventory, and interim relief was granted on February 11, 2026 [D.I. 87]. The Debtors obtained interim cash collateral relief on February 8, 2026 [D.I. 42] to finance wind-down efforts. The Debtors entered these Chapter 11 Cases intending to sell their intellectual property assets and to also seek bids from potential qualified going-concern buyers. The Debtors filed a motion to approve bid procedures on February 9, 2026 [D.I. 45], which was granted by the Court on February 12, 2026 [D.I. 96].

The Debtors sought standard operational "first day" relief to support their winddown efforts, including interim and final relief for the payment of wages, taxes, insurance, utilities and maintenance of cash management systems, as well as maintenance of existing customer loyalty programs [D.Is. 6, 10, 15, 16, 20, 22] (collectively, the "First Day Relief"). The Debtors retained Professionals including general bankruptcy counsel, Mandelbaum Barrett PC ("Mandelbaum") [D.I. 233]; Professionals providing restructuring personnel and Chief Financial Officer services, SierraConstellation Partners LLC ("SCP") [D.I. 234]; Professionals to market and sell Debtors' Assets, Hilco IP Services LLC ("Hilco") [D.I. 235]; and claims and noticing agent Professionals, Stretto, Inc. (the "Claims and Noticing Agent") [D.I. 76] (collectively, the "Professional Retentions"). The Debtors resolved minor informal objections and comments to First Day Relief and Professional Retentions consensually. The Court entered orders regarding all First Day Relief and Professional Retentions, except as to final relief relating to cash collateral, by March 3, 2026, within twenty-six days of the Petition Date. Cash collateral relief and related issues are discussed in further detail below, as are the Store Closing Sales, the eventual sale of Debtors' intellectual property assets to Stand Out for Good, Inc. (the "Stalking Horse Bidder"), the issue of stub rent and lease and contract rejection-related issues.

On February 23, 2026, the Office of the United States Trustee appointed the Creditors' Committee, consisting of seven (7) members.  The Creditors' Committee thereafter retained Fox Rothschild LLP as attorneys [D.I. 372] and Emerald Capital Advisors as financial advisors [D.I. 375].

**(a) Store Closing Sales**

As noted, the Debtors obtained interim relief to continue the chain-wide "going out of business" Store Closing Sales, which commenced prior to the Petition Date, under a consulting agreement by and between Tiger, SB360 Capital Partners, LLC and GA Retail Solutions, LLC (the "Store Closing Sale Consulting Agreement") [D.I. 87]. The Debtors managed the concerns of several constituencies in negotiations spanning several weeks to obtain final Store Closing Sale relief from the Court on March 26, 2026, forty-nine days after the Petition Date (the "Final Store Closing Sale Order") [D.I. 333]. Landlord groups, the Creditors' Committee and certain government entities raised concerns relating to final Store Closing Sale relief, and informal and formal objections were received [D.Is. 210, 217, 219, 242, 250, 258].

The Debtors addressed landlord concerns regarding Store Closing Sale signage and "going dark" provisions with language in the Final Store Closing Sale Order addressing signage requirements, preserving shopping center operating requirements and creating dispute resolution

4912-8223-7850, v. 8
187746688.2

processes to address any potential landlord compliance issues. Landlords sought adequate assurances based on concerns that despite any potential profitability of Store Closing Sales, the Debtors would become administratively insolvent. The Debtors addressed these concerns in the Stub Rent Stipulation as discussed in further detail below.

The Creditors' Committee objected to final Store Closing Sale relief regarding transparency in the calculation and distribution of fees under the Store Closing Sale Consulting Agreement (the "Store Closing Sale Consulting Fees") [D.I. 224]. The Debtors, the Creditors' Committee, and the Consultant for the Store Closing Sales negotiated provisions in the Final Store Closing Sale Order to meet the concerns of the Creditors' Committee, including provisions for periodic reporting, post-Store Closing Sale reconciliations, and a mechanism for the Creditors' Committee to object to the Store Closing Sale Consulting Fees.

Government entity concerns related to potential clashes between Store Closing Sale procedures and laws regulating advertising, consumer protection, public safety and tax revenue. The Debtors addressed these concerns in the Final Store Closing Sale Order by setting forth procedures for government entities to raise compliance issues with the Debtors without interrupting the Store Closing Sales.

**(b) Stub Rent and Cash Collateral**

Final cash collateral relief became inextricably tied with Store Closing Sale and stub rent issues. Landlords and the Creditors' Committee objected to final relief because proceeds of Store Closing Sales were used in part to pay down Prepetition Secured Lenders while many landlords were forced to continue honoring their leases without payment to allow for the Store Closing Sales to continue, to finance the Chapter 11 Cases. Landlords and the Creditors' Committee filed omnibus objections covering their interrelated concerns as to final cash collateral relief, stub rent, and final Store Closing Sale relief throughout early March 2026 [D.Is. 210, 217, 219, 242, 250, 258] (the "Consolidated Objections").

On March 12, 2026, the Court conducted a status hearing at which the Debtors, objecting landlords, and the Creditors' Committee reached broad terms of agreement on the disposition of final Store Closing Sale relief and final cash collateral relief, as well as stub rent issues.[6] The Stub Rent Stipulation established a $2,832,751.51 reserve carved out of the cash collateral budget to address stub rent (the "Stub Rent Reserve"). As part of the Stub Rent Stipulation, the Prepetition Agents agreed that the amounts in the Stub Rent Reserve would not be applied to pay down balances on the Prepetition Secured Loans. The Stub Rent Stipulation provided that the parties would come to agreement on the mechanism for timing and distribution of stub rent amounts prior to or in conjunction with entry of any order granting final cash collateral relief (the "Final Cash Collateral Order"). In exchange, the objecting landlord parties agreed to entry of the final Store Closing Sale Order.

The Court agreed to adjourn a final hearing on cash collateral relief several times, most recently until April 16, 2026 [D.I. 361] to allow the parties to continue negotiations based on a cash collateral budget proposed after the conclusion of the Store Closing Sales.

---

[6] The Court ordered the *Stipulation and Agreed Order Regarding Stub Rent Reserve* on March 18, 2026 [D.I. 330] (the "Stub Rent Stipulation").

8

4912-8223-7850, v. 8
187746688.2

The Debtors, Prepetition Secured Lenders, and the Creditors' Committee attended mediation on May 13, 2026, with the Hon. Vincent F. Papalia, United States Bankruptcy Judge, to attempt to resolve cash collateral and more global issues in these cases. Although the parties did not reach a resolution at mediation, the parties did eventually reach the Global Settlement, which is memorialized in the proposed Final Cash Collateral Order [D.I. 502] and the proposed Settlement Order [D.I. 500]. The Global Settlement includes the following salient terms:[7]

- The Prepetition Secured Lenders shall pay to the Debtors' Estates the sum of $3 million, comprising proceeds of Cash Collateral previously applied to the Term Loan Claims ($2.3 million) and Tranche B Claims ($700,000).
- The Prepetition Secured Lenders shall receive releases as set forth in the Settlement Agreement.
- The following parties shall not be released under the Global Settlement: Simon Barlava; Morris Barlava; Andrew Clarke; Bridgit Lombard; Christine Kaighn; Victoria Taylor; MAS Acquisition, LLC, or any other current or former director, officer, manager, member, employee, affiliates or insiders of the Debtors other than TerraMar and/or its principals and affiliates, each of which shall be released other than respect to any claims or causes of action against TerraMar and any of its representatives covered by any directors and officers' liability insurance policy; *provided*, *however*, that any recoveries resulting therefrom shall be limited to the insurance policies, exclusive of any deductibles and costs of defense.
- The Prepetition Secured Lenders shall fully fund the Carve Out and the Carve Out Reserves in the amount of $1,015,000, including:
  - $715,000 on account of all accrued and unpaid fees and expenses of any Professional (as defined in the Interim Cash Collateral Order) and the claims agent (the "Professional Fees") as set forth in the budget attached to the Final Cash Collateral Order;
  - All accrued and unpaid Clerk and United States Trustee Fees in an amount estimated by the Debtors to be no more than $125,000, and Chapter 7 Trustee Fees in the amount of $50,000[8], that are subject to the Carve Out; and
  - $125,000 on account of the Post-Carve Out Reserve.
- The Debtors' Estates shall retain any and all claims and causes of action, including, but not limited to the following claims and causes of action and the resulting recoveries thereof: (1) Avoidance Actions; (2) commercial tort claims as defined in Article 9 of the Uniform Commercial Code; (3) claims against present or former officers and directors of the Debtors, including, for the avoidance of doubt, direct or derivative claims or causes of action against any and all current and former officers, directors, shareholders, members, managers, employees, affiliates or insiders of the Debtors, including but not limited to for breach of fiduciary duty or aiding and abetting breach of fiduciary duty, or under and pursuant to any directors and officers or fiduciary insurance policies (including for bad faith) maintained by

---

[7] The foregoing is intended to merely be a summary of the Global Settlement, qualified entirely by the terms thereof.
[8] Upon the Effective Date of the Plan, the $50,000 reserved for a Chapter 7 Trustee would be paid to the Liquidating Trust.

9

4912-8223-7850, v. 8
187746688.2

the Debtors; (4) the non-exclusive right to seek a determination by the bankruptcy court of any tax, fine or penalty relating to a tax, or any addition to a tax, under section 505 of the Bankruptcy Code; (5) any tax refunds, including, but not limited to tariff refunds; and (6) the Debtors' interest in the Discover Financial Services merchant class action litigation and the Google LLC advertising antitrust litigation; *provided*, that with respect to all Estate recovered proceeds of the preceding items (5) and (6) (collectively, the "Shared Recoveries"), (i) the proceeds thereof shall be distributed to the Prepetition Secured Lenders, on account of the remaining outstanding balance of the Prepetition Loan Obligations as of the date of any such recovery and payment, and the Estates, in accordance with the following waterfall:

- o the Prepetition Secured Lenders shall receive the first $500,000 in net Shared Recoveries proceeds recovered, if any;
- o the Estates will receive the next $500,000 in net Shared Recoveries proceeds recovered, if any; and
- o the Prepetition Secured Lenders and the Estates shall each share 50% in all further net Shared Recoveries proceeds recovered thereafter, if any; and

- (ii) any settlement, sale or resolution of the Shared Recoveries must be approved by each of the Estates, the Committee, and the Prepetition Secured Lenders; provided, however, that approval of any such settlement, sale or resolution shall be considered in good faith and resolved within a commercially reasonable amount of time not to exceed five (5) business days.

- The Prepetition Secured Lenders shall fund from Cash Collateral on hand 503(b)(9) claims in an amount estimated by Debtors to be no more than $200,000.

- The Prepetition Secured Lenders funded a cash reserve from Cash Collateral in the aggregate amount of $2,832,751.51 which reserve has been fully distributed and paid to the Debtors' landlords on account of all stub rent claims.

### (c) Texas Tax Authorities

Attorneys for various tax authorities in Texas objected to final cash collateral approval [D.I. 510], asserting senior liens for unpaid ad valorem taxes of about $154,000 for the tax periods 2022-2025. At the time of the filing of the Plan, this objection was still pending. The Debtors however believe that by the time of the hearing on confirmation of the Plan, this objection will be resolved.

### (d) Lease and Contract Rejection

Although the Debtors marketed and were open to accepting going-concern bids in the sale process (discussed below), no going-concern bidders emerged and thus no leases or non-intellectual property-related contracts were assumed. The Debtors established a fourteen-day negative notice process for lease and contract rejection [D.I. 261] (the "Rejection Procedures Order"). Between three omnibus rejection orders [D.Is. 259, 292, 293] and orders relating to rejection notices filed under the negative-notice procedures in the Rejection Procedures Order

4912-8223-7850, v. 8
187746688.2

[D.Is. 349-351, 354, 359 and 360], the Debtors rejected all of their store and office leases and 69 of their unexpired executory contracts by April 2, 2026, significantly reducing administrative costs. March 29, 2026 was the last day of business at the Debtors' stores, and the Debtors closed all stores by March 31, 2026.

### (e) Sale of Debtors' Intellectual Property Assets

The Court entered an order approving bid procedures on February 12, 2026 [D.I. 96] (the "Bid Procedures Order") one week after the Petition Date. The Bid Procedures Order provided for a bid deadline of March 5, 2026, an auction date, if an auction would be held, of March 9, 2026, and a hearing to approve the sale on March 12, 2026 (the "Sale Hearing"), and also authorized the Debtors to enter into a stalking horse agreement with the Stalking Horse Bidder. Objections to any sale were due to be filed by March 6, 2026.

Hilco began marketing the Debtors' intellectual property assets prepetition, in addition to marketing the Debtors' assets as a going concern, to over 48,000 marketing contacts. Twenty-eight parties accessed the data room to review the Debtors' holdings and financial information. Ultimately, no qualified bids were received other than that of the Stalking Horse Bidder, and the Debtors cancelled the scheduled auction [D.I. 266]. The Debtors filed a *Notice of Successful Bidder and Designation of Contracts* on March 10, 2026 [D.I. 278].

After the Sale Hearing, the Court entered an order approving the sale of the Debtors' intellectual property assets to the Stalking Horse Bidder for the purchase price of $7,000,000 on March 12, 2026 (the "IP Sale Order"), which deemed the sale free and clear of all liens, claims, and encumbrances after finding notice of the sale and consideration sufficient, the negotiations properly "arm's-length" and procedurally fair, and having been conducted in good faith [D.I. 295]. Assets sold to the Stalking Horse Bidder under the Intellectual Property Asset Purchase Agreement ("APA") approved by the Court as part of the IP Sale Order included (i) all trademarks, copyrights, and domain names, (ii) social media accounts, (iii) brand and product design collateral, (iv) toll-free telephone numbers, (v) customer data, and (vi) goodwill.

### (f) Class Action Lawsuit

On March 12, 2026, a class action claimant commenced an adversary proceeding against the Debtors styled *Sek v. Francesca's Acquisition*, Adv. No. 26-11314. The Debtors filed an answer to this complaint and the pretrial conference has been adjourned from time to time.

### 1.9.   Projected Recovery of Avoidable Transfers.

The Debtors have not completed their investigation into prepetition transactions, and further investigation will be performed by the Liquidating Trustee upon the Effective Date of the Plan. The Statements of Financial Affairs filed by the Debtors reflect approximately $30,797,914.37 in payments made by Francesca's Administrative Management, Inc. and $98,849,209.28 in payments made by Francesca's Operations, Inc. within the ninety (90) day period prior to the Petition Date.

If you received a payment or other transfer of property within the ninety (90) day period prior to the Petition Date, the Liquidating Trustee may seek to avoid such transfer.

11

4912-8223-7850, v. 8
187746688.2

**1.10.** **Other Litigation.**

The Debtors reserve the rights of the Liquidating Trustee to prosecute all Causes of Action not otherwise released in this Plan, the Final Cash Collateral Order, or the Settlement Order, including, but not limited to, (i) any claims or causes of action listed in the Debtors' Schedules or Statements of Financial Affairs, (ii) Avoidance Actions, (iii) prepetition commercial tort claims as defined in Article 9 of the Uniform Commercial Code, and (iv) claims against present or former officers and directors of the Debtors, including, for the avoidance of doubt, direct or derivative claims or causes of action against any and all current and former officers, directors, shareholders, members, managers, employees, affiliates or insiders of the Debtors, including but not limited to for breach of fiduciary duty or aiding and abetting breach of fiduciary duty, or under and pursuant to any directors and officers or fiduciary insurance policies (the "Litigation Claims").

## ARTICLE 2

## THE PLAN

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY AND TO CONSULT WITH AN ATTORNEY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

The classification and treatment of Claims against the Debtors pursuant to the Plan is as set forth below and as further detailed in Article 2 hereof:[9]

| Class | Claim / Interest | Treatment | Status | Voting Rights |
|---|---|---|---|---|
| 1 | Pre-Petition Agent Claims | The Holder of the Class 1 Claim shall receive the net proceeds of the Sale of the Assets on which the Holder has a lien in accordance with the Final Cash Collateral Order and Settlement Order and shall not receive any further distribution from assets of the Debtors' Estates.    Pursuant to the | Unimpaired | Deemed to Accept |

_____

[9] The information set forth herein is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the Claims reconciliation process.  Actual recoveries may widely vary within these ranges and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distributions received by Holders of Allowed Claims. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect estimates as of the date hereof only. The reconciliation of Claims remains ongoing, which may impact the estimated amounts and projected recoveries reflected above. In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors reserve the right, but expressly disclaim any obligation, to update any estimates or assumptions after the date hereof on any basis.

4912-8223-7850, v. 8
187746688.2

| Class | Claim / Interest | Treatment | Status | Voting Rights |
|---|---|---|---|---|
| | | Final Cash Collateral Order, Global Settlement, and Settlement Order, all Claims against the Debtors' Estates by the Pre-Petition Agents have been fully resolved. Nothing herein shall prohibit the Pre-Petition Agents from seeking recovery on account of their claims from non-Estate assets. | | |
| 2 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive either (i) delivery of collateral securing such Allowed Other Secured Claim, (ii) the net proceeds, if any, of the Sale or other disposition of the Assets on which such Holder has a Lien; or (iii) such other, less favorable treatment as may be agreed to in writing by the Holder of such Allowed Other Secured Claim and the Liquidating Trustee. Any Deficiency Claim which may arise on account of the lack of Collateral or otherwise resulting from the aforesaid treatment shall be treated as a Class 4 General Unsecured Claim. | Unimpaired | Deemed to Accept |
| 3 | Priority Non-Tax Claims (for Wages, Commissions, related) against Debtors | Each Holder of an Allowed Priority Non-Tax Claim shall receive (a) an amount in Cash equal to the Allowed amount of such Priority Non-Tax Claim in accordance with section 1129(a)(9)(B) of the Bankruptcy Code, or (b) such other treatment as to which the Debtors or the Liquidating Trustee and the Holder of such Allowed Priority Non-Tax Claim shall have agreed upon in writing | Unimpaired | Deemed to Accept |
| 4 | General Unsecured Claims | Each Holder of an Allowed Class 4 Claim shall receive its *pro rata* share from the remaining portion of the | Impaired | Entitled to Vote |

13

4912-8223-7850, v. 8
187746688.2

| Class | Claim / Interest | Treatment | Status | Voting Rights |
|---|---|---|---|---|
| | | Liquidating Trust Proceeds, after satisfaction in full of senior Claims. The *pro rata* share of each Holder's Allowed Class 4 Claim shall be determined by a formula, the numerator of which is the then unsatisfied amount of such Holder's Class 4 Allowed Claim and the denominator of which is the aggregate unsatisfied amount of the remaining Allowed Class 4 Claims. | | |
| 5 | Intercompany Claims | Holders of Intercompany Claims shall receive no recovery under the Plan as a result of the deemed substantive consolidation of the Debtors' Estates for purposes of voting and Distribution. | Impaired | Deemed to Reject |
| 6 | Interests | Interests shall be cancelled and shall not receive or retain any property under the Plan on account of such Interests. | Impaired | Deemed to Reject |

In the event the Plan is not confirmed, and the Chapter 11 Cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code, the settlements provided for herein (except for the Global Settlement and Settlement Order) will be void and the projected recoveries set forth above will not be available.

In the view of the Debtors and Creditors' Committee, the Plan offers Holders of Allowed Claims the best opportunity to maximize value for recovery purposes and is therefore in the best interests of all creditors. Accordingly, the Debtors and Creditors' Committee urge the Holders of Allowed Claims to vote to accept the Plan.

## 2.1. **Unclassified Claims.**

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article 2 hereof.

**(a) Administrative Expense Claims**

All Allowed Administrative Expense Claims, other than Professional Fee Claims and Ordinary Course Professional Claims, shall be paid by the Liquidating Trustee from the Liquidating Trust Proceeds, in Cash, in such amounts as are incurred in the ordinary course of the

14

4912-8223-7850, v. 8
187746688.2

liquidation of the Debtors, or in such amounts as may be Allowed by the Bankruptcy Court (a) as soon as practicable following the later of the Effective Date or the date upon which the Court enters a Final Order allowing any such Administrative Expense Claim, or (b) upon such other terms as may exist in accordance with the ordinary course of the Debtors' liquidation, or (c) as may be agreed upon between the Holder of any such Administrative Expense Claim and the Liquidating Trustee. In the event any Disputed Administrative Expense Claims exist on the Effective Date, the Liquidating Trustee shall at all times hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Administrative Expense Claims. Administrative Expense Claims are not Impaired by the Plan.

Objections to Administrative Expense Claims (other than Professional Fee Claims) must be filed and served on the Liquidating Trustee and the requesting party by the Claims Objection Deadline. Allowed Professional Fee Claims shall be paid from the Professional Fee Reserve pursuant to Section 2.1(c) hereof.

Pursuant to the Amended Bar Date Order [D.I. 331] the Administrative Expense Claims Bar Date expired on May 28, 2026 at 5:00 p.m. ET.  Requests for payment of Administrative Expense Claims (other than Professional Fee Claims and the Claims of Governmental Units arising under Bankruptcy Code section 503(b)(1)(B), (C) or (D)) that arose after the Administrative Expense Claims Bar Date must be filed with the Claims and Noticing Agent and served on the Liquidating Trustee no later than thirty (30) days after the Effective Date.[10]  Unless otherwise ordered by the Court, Holders of Administrative Expense Claims (other than the Holders of Professional Fee Claims and the Claims of Governmental Units arising under Bankruptcy Code section 503(b)(1)(B), (C) or (D)) that do not comply with the provisions set forth herein for the allowance and payment thereof on or before the Administrative Expense Claims Bar Date shall forever be barred from asserting such Administrative Expense Claims against the Debtors, their Estates or any of their Assets.

Unless the Liquidating Trustee or any other party-in-interest objects to an Administrative Expense Claim by the Claims Objection Deadline, such Administrative Expense Claim shall be deemed Allowed in the amount requested. In the event that the Liquidating Trustee, or any other party-in-interest objects to an Administrative Expense Claim, the Court shall determine whether the Administrative Expense Claim is allowed, and if so, the Allowed amount of such Administrative Expense Claim.

The Debtors estimate of unpaid Administrative Expense Claims total $200,000, not including Professional Fee claims, but including claims under section 503(b)(9) of the Bankruptcy Code.

### (b) Priority Tax Claims

In full and final satisfaction of such Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive (a) an amount in Cash equal to the Allowed amount of such Priority Tax Claim to be paid from the Liquidating Trust Proceeds in accordance with section1129(a)(9)(C) of the Bankruptcy Code, or (b) such other treatment as to which the

---

[10] Creditors will be notified of this deadline when the Debtors serve a notice of the Effective Date.

4912-8223-7850, v. 8
187746688.2

Liquidating Trustee and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

The Debtors' claims register reflects $1.2 million in priority tax claims. The Debtors have not yet evaluated the validity of these claims and believes such claims will be subject to objection and reduction.

### (c) Final Fee Applications and Professional Fee Claims

All final requests for payment of Professional Fee Claims (the "Final Fee Applications") may be made any time after the Confirmation Date but shall be filed no later than the deadline established for filing such Claims (the "Professional Fee Claims Bar Date"). Objections, if any, to Final Fee Applications of such Professionals must be filed and served on the Liquidating Trustee, the requesting Professional and the U.S. Trustee no later than 21 days from the date on which each such Final Fee Application is filed (the "Professional Fee Claim Objection Deadline"). After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court, the Allowed amounts of such Professional Fee Claims shall be determined by the Court.

The Liquidating Trustee shall pay all Professional Fee Claims from the Liquidating Trust Proceeds in the amount Allowed by the Bankruptcy Court as soon as practicable after entry of a Final Order awarding such compensation and reimbursement of expenses pursuant to proper application in accordance with Section 2.1(c) hereof. In the event any Disputed Professional Fee Claims exist on the Effective Date, the Liquidating Trustee shall hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Professional Fee Claims until such dispute is resolved consensually or by order of the Bankruptcy Court.

Professional Fee Claims are not Impaired by the Plan.

The Debtors estimate unpaid Professional Fee Claims as of June 30, 2026, are as follows:

| Firm | Paid Fees & Expenses | Est. Unpaid Fees & Expenses[11] | Total Est. Accrued Fees & Expenses |
|---|---|---|---|
| Mandelbaum Barrett PC<br>*Counsel to the Debtors* | $822,412 | $200,000 | $1,022,412 |
| SierraConstellation Partners, LLC<br>*Financial Advisor to the Debtors* | $450,265 | $80,000 | $530,265 |
| Hilco IP Services, LLC<br>*Intangible Asset Disposition Consultant* | $850,000 | | $850,000 |
| Fox Rothschild LLP<br>*Counsel to the Creditors' Committee* | $717,172 | $60,000 | $777,172 |

---

[11] These are the estimated, budgeted fees and expenses for July and August 2026.

4912-8223-7850, v. 8
187746688.2

| Emerald Capital Advisors *Financial Advisor to the Creditors' Committee* | $324,263 | $30,000 | $354,263 |
|---|---|---|---|

### (d) Ordinary Course Professional Claims

All requests for payment of Ordinary Course Professional Claims incurred prior to the Effective Date shall be made pursuant to the Ordinary Course Professional Order. The amount of Ordinary Course Professional Claims owing to the Ordinary Course Professionals shall be paid in Cash to such Ordinary Course Professionals by the Debtors or the Liquidating Trustee, as applicable, from Cash on hand as soon as reasonably practicable after such Ordinary Course Professional Claims are Allowed. The Liquidating Trustee shall have no obligation to pay any fees and expenses incurred by any of the Ordinary Course Professionals on or after the Effective Date unless and until such Ordinary Course Professional and the Liquidating Trustee have entered into a new engagement agreement.

The Debtors do not believe there are any unpaid Ordinary Course Professional Claims.

### (e) Post-Effective Date Fees and Expenses

The Professionals employed by the Debtors and the Creditors' Committee shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities, relating to the preparation, filing and prosecution of Final Fee Applications. Any time or expenses incurred in the preparation, filing and prosecution of Final Fee Applications shall be subject to Court approval.

### 2.2    Classes of Claims and Equity Interests.

The Plan is premised upon the deemed substantive consolidation of the Debtors, as set forth in more detail below, for the limited purposes of voting, determining which Claims and Interests have accepted the Plan, confirmation of the Plan and the resultant treatment of Claims and Interests and Distributions under the terms of the Plan. Accordingly, the Plan shall serve as a motion for entry of a Court order approving the deemed substantive consolidation of the Debtors for such limited purposes.

Pursuant to Bankruptcy Code sections 1122 and 1123(a)(1), all Claims against and Interests in the Debtors (except for the Claims addressed in Section 2.1 hereof) are classified for the purposes of voting and Distribution under the Plan as set forth below. A Claim or an Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class. A Claim is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date. Except as otherwise specifically provided for herein, in the Confirmation Order or in any other Order of the Court, or required by

17

4912-8223-7850, v. 8
187746688.2

applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Bankruptcy Code section 1129(a)(10) shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors may seek Confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) with respect to any rejecting Class of Claims or Interests.

### 2.3 Treatment of Claims and Interests.

**(a) Class 1: Pre-Petition Agent Claims**

    i.    Classification: Class 1 consists of all Pre-Petition Agent Claims.

    ii.    Treatment: The Holder of the Class 1 Claims shall receive the net proceeds of the sale of the Assets on which the Holder has a lien in accordance with the Final Cash Collateral Order and Settlement Order and shall not receive any further distribution from assets of the Debtors' Estates.  Nothing herein shall prohibit the Pre-Petition Agents from seeking recovery on account of their claims from non-estate assets.

    iii.    Voting: Class 1 is Unimpaired, and, therefore, Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).  Holders of the Pre-Petition Agent Claims in Class 1 are not entitled to vote and are deemed to accept the Plan.

**(b) Class 2: Other Secured Claims**

    i.    Classification: Class 2 consists of all Secured Claims other than the Class 1 Pre-Petition Agent Claims.

    ii.    Treatment: Each Holder of an Allowed Other Secured Claim shall receive either (i) delivery of collateral securing such Allowed Other Secured Claim, (ii) the net proceeds, if any, of the sale or other disposition of the Assets on which such Holder has a Lien; or (iii) such other, less favorable treatment as may be agreed to in writing by the Holder of such Allowed Other Secured Claim and the Liquidating Trustee. Any Deficiency Claim which may arise on account of the lack of Collateral or otherwise resulting from the aforesaid treatment shall be treated as a Class 4 General Unsecured Claim.

    iii.    Voting: Class 2 is Unimpaired and, therefore, Holders of Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code

4912-8223-7850, v. 8
187746688.2

section 1126(f). Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

**(c) Class 3: Priority Non-Tax Claims**

i.  <u>Classification</u>: Class 3 consists of all Priority Claims.

ii.  <u>Treatment</u>: Each Holder of an Allowed Priority Non-Tax Claim shall receive (a) an amount in Cash equal to the Allowed amount of such Priority Non-Tax Claim in accordance with section 1129(a)(9)(B) of the Bankruptcy Code, or (b) such other treatment as to which the Debtors or the Liquidating Trustee and the Holder of such Allowed Priority Non-Tax Claim shall have agreed upon in writing.

iii.  <u>Voting</u>: Class 3 is Unimpaired and, therefore, Holders of Claims in Class 3 are conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Holders of Claims in Class 3 are not entitled to vote to accept or reject the Plan.

**(d) Class 4: General Unsecured Claims**

i.  <u>Classification</u>: Class 4 consists of all General Unsecured Claims.

ii.  <u>Treatment</u>: Each Holder of an Allowed Class 4 Claim shall receive its *pro-rata* share from the remaining portion of the Liquidating Trust Proceeds, after satisfaction in full of senior Claims. The *pro rata* share of each Holder's Allowed Class 4 Claim shall be determined by a formula, the numerator of which is the then unsatisfied amount of such Holder's Class 4 Allowed Claim and the denominator of which is the aggregate unsatisfied amount of the remaining Allowed Class 4 Claims.

iii.  <u>Voting</u>: Class 4 is Impaired. Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

**(e) Class 5: Intercompany Claims**

i.  <u>Classification</u>: Class 5 consists of all Intercompany Claims.

ii.  <u>Treatment</u>: Holders of Intercompany Claims shall receive no recovery under the Plan as a result of the deemed substantive consolidation of the Debtors' Estates for purposes of voting and Distribution.

iii.  <u>Voting</u>: Class 5 is Impaired. Holders of Intercompany Claims are deemed to reject the Plan pursuant to Bankruptcy Code section 1126(g). Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(f) Class 6: Interests**

4912-8223-7850, v. 8
187746688.2

     i.     <u>Classification</u>:  Class 6 consists of all Interests.

     ii.     <u>Treatment</u>: Interests shall be cancelled. Holders of Interests shall not receive or retain any property under the Plan on account of such Interests.

     iii.     <u>Voting</u>: Class 6 is Impaired. Holders of Interests are deemed to reject the Plan pursuant to Bankruptcy Code section 1126(g). Therefore, such Holders are not entitled to vote to accept or reject the Plan.

## 2.4.    **Estimated Number and Amount of Claims Objections.**

The Debtors or the Liquidating Trustee may object to the amount or validity of any Claim within one hundred eighty (180) days after the Effective Date or such later date as may be ordered by the Bankruptcy Court on motion of the Liquidating Trustee, by filing an objection with the Bankruptcy Court and serving a copy of the objection on the Holder of the Claim. The Claim objected to will be treated as a Disputed Claim under the Plan.  If and when a Disputed Claim is finally resolved by the Allowance of the Claim in whole or in part, the Debtors will pay the Allowed Claim in accordance with the Plan.  Nothing herein shall prejudice the Debtors or the Liquidating Trustee from seeking an extension of the claim objection deadline.

The Debtors have not yet evaluated which Claims will be objected to. The Debtors and the Liquidating Trustee reserve all rights to object to any Claims.

## 2.5.    **Treatment of Executory Contracts and Unexpired Leases.**

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed or assumed and assigned, shall be deemed automatically rejected by the Debtors.

### (a) General

All executory contracts and unexpired leases of the Debtors shall be deemed rejected as of the Effective Date, unless a particular executory contract or unexpired lease (i) has previously been assumed, assumed and assigned, or rejected pursuant to order of the Bankruptcy Court or applicable provisions of the Bankruptcy Code, or (ii) has expired or otherwise terminated pursuant to its terms.

### (b) Employment and Benefits Plans

To the extent not previously terminated, all employment and severance agreements and policies, and all employee compensation and benefit plans, policies and programs of the Debtors applicable generally to their employees, independent contractors or officers in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans, shall be terminated as of the Effective Date.

20

4912-8223-7850, v. 8
187746688.2

**2.6.**     **Means for Implementation of the Plan.**

**(a) Deemed Substantive Consolidation of the Chapter 11 Estates for Limited Purposes**

On the Effective Date, (i) any obligation of a Debtor and any guarantee thereof by any other Debtor shall be deemed to be one obligation, and any such guarantee shall be eliminated, (ii) each Claim filed or to be filed against more than one Debtor shall be deemed filed only against one consolidated Debtor and shall be deemed a single Claim against and a single obligation of the Debtors, and (iii) any joint or several liability of the Debtors shall be deemed one obligation of the Debtors. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection payment or performance made by one Debtor as to the obligations of another Debtor shall be released and shall be of no further force and effect.

The limited deemed substantive consolidation effected pursuant to this Section 2.6(a) of the Plan and the Confirmation Order (i) shall not affect the rights of any holder of a Secured Claim with respect to the collateral securing such Claim and (ii) shall not, and shall not be deemed to, prejudice the Litigation Claims, which shall survive entry of the Confirmation Order (subject to the releases set forth in Article 6 of the Plan) as if there had been no deemed substantive consolidation.

In the event the Court authorizes the Debtors to substantively consolidate less than all of their Estates: (a) the Plan shall be treated as a separate plan for each Debtor not substantively consolidated and (b) the Debtors shall not be required to resolicit votes with respect to the Plan.

**(b) Deemed Substantive Consolidation Order**

The Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Chapter 11 Cases for the limited purposes of voting and Distribution. If no objection to deemed substantive consolidation is timely filed and served by any Holder of an Impaired Claim on or before the deadline to object to the confirmation of the Plan, or such other date as may be fixed by the Court, and the Debtors meet their burden of introducing evidence to establish that deemed substantive consolidation is merited under the standards of applicable bankruptcy law, the Confirmation Order, which shall be deemed to substantively consolidate the Debtors for the limited purposes of voting and Distribution, may be entered by the Court. If any such objections are timely filed and served, a hearing with respect to the limited request for deemed substantive consolidation and the objections thereto shall be scheduled by the Court, which hearing shall coincide with the Confirmation Hearing.

**(c) Liquidating Trust**

On the Effective Date, as set forth in more detail below, the Liquidating Trust Assets, including the Estates' Assets and all Causes of Action, will be assigned and delivered to and vest in the Liquidating Trust and will be managed by the Liquidating Trustee. On or prior to the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of providing a mechanism for the economical liquidation of the Estate and distribution of the proceeds thereof to creditors in accordance with the terms of the Plan and

21

the Liquidating Trust Agreement. The Liquidating Trustee shall be chosen by the Creditors' Committee. Subject to and to the extent set forth in the Plan, the Confirmation Order, the Liquidating Trust Agreement, or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance hereof), the Liquidating Trustee shall be empowered to act as set forth herein and in the Liquidating Trust Agreement.

### (d) Plan Funding

The Plan shall be funded by a combination of the proceeds of the Sale and the proceeds from liquidation of remaining Assets, including accounts receivable, as well as the Settlement Payment, pursuant to the Final Cash Collateral Order and the Settlement Order. The Liquidating Trustee shall utilize the Liquidating Trust Proceeds for purposes of making distributions to Holders of Allowed Claims after reserving for Disputed Claims.

### (e) Appointment of the Liquidating Trustee

The Confirmation Order shall provide for the appointment of the Liquidating Trustee. The Liquidating Trustee shall be deemed the Estates' exclusive representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified under sections 704 and 1106 of the Bankruptcy Code.

### (f) Bond

The Liquidating Trustee shall serve without a bond.

### (g) Governance

The Liquidating Trustee shall be governed by the Plan and the Liquidating Trust Agreement.

### (h) Succession Matters

In the event the Liquidating Trustee dies, is terminated, or resigns for any reason, the Oversight Committee shall designate a successor. If the Oversight Committee is unable to designate a successor, the Bankruptcy Court may appoint a successor Liquidating Trustee from any candidate proposed by any party in interest. Such successor liquidating trustee shall be deemed to succeed the Liquidating Trustee in all respects, without the need for further order of the Bankruptcy Court. In the event of resignation or removal of the Liquidating Trustee, the departing Liquidating Trustee shall promptly (a) execute and deliver such documents, instruments and other writings as reasonably requested by the successor liquidating trustee or as ordered by the Bankruptcy Court; (b) turn over to the successor liquidating trustee all property of the Estates in his or her possession, custody and control, including, but not limited to all funds held in bank accounts, and all files, books and records and other documents and information related to the Debtors; and (c) otherwise assist and cooperate in effectuating the assumption of his or her obligations and functions by the successor liquidating trustee. The successor liquidating trustee may, in his or her discretion, retain such professionals as he or she deems necessary, including the Professionals of the departing Liquidating Trustee. If the Liquidating Trustee is replaced, the Professionals retained by the Liquidating Trustee shall be entitled to payment of their reasonable,

4912-8223-7850, v. 8
187746688.2

undisputed fees and expenses from the Estates through the date of the Liquidating Trustee's replacement.

### (i)  Funding of Liquidating Trustee's Activities

The source of payment for the Liquidating Trustee and his or her professionals shall be from the Liquidating Trust Proceeds and any additional recoveries by the Estates after the confirmation of the Plan.

### (j)  Indemnification

The Liquidating Trustee and his or her designees, employees or Professionals or any duly designated agent or representative of the Liquidating Trustee shall not be liable for any act or omission taken or omitted to be taken in their respective capacities other than for acts or omissions resulting from willful misconduct, gross negligence or fraud as determined by Final Order of the Bankruptcy Court. The Liquidating Trustee may, in connection with the performance of his or her functions, and in his or her sole and absolute discretion, consult with attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in good faith reliance on the advice or opinions rendered by such attorneys, accountants, financial advisors and agents, or any Final Order of the Bankruptcy Court. Notwithstanding such authority, the Liquidating Trustee shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and his or her determination not to do so shall not result in the imposition of liability, unless such determination is based on willful misconduct, gross negligence or fraud as determined by Final Order of the Bankruptcy Court. The Debtors' Estates shall indemnify and hold harmless the Liquidating Trustee and his or her designees and Professionals, and all duly designated agents and representatives (in their capacity as such) from and against all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of this Plan; *provided*, however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

### (k) Powers and Duties of Liquidating Trustee

On the Effective Date, the Liquidating Trustee shall succeed to all of the rights of the Debtors and the Estates as otherwise provided herein, with all powers necessary to protect, conserve, and liquidate all Assets, including, without limitation, control over (including the right to waive) all the Debtors' attorney-client privileges, work-product privileges, accountant-client privileges and any other evidentiary privileges relating to the Assets that, prior to the Effective Date, belonged to the Debtors pursuant to applicable law. The powers and duties of the Liquidating Trustee shall include, without further order of the Court, except where expressly stated otherwise, the rights:

    i.    to open and close bank accounts for the Debtors and their Estates as the sole signatory, invest Cash in accordance with section 345 of the Bankruptcy Code and withdraw and make distributions of Cash to Holders of Allowed Claims

4912-8223-7850, v. 8
187746688.2

and pay taxes and other obligations in connection with the wind-down of the Estates in accordance with the Plan;

ii.  to engage attorneys, consultants, agents, employees and all professional persons, to assist the Liquidating Trustee with respect to the Liquidating Trustee's responsibilities, including professional persons that may have represented the Debtors or the Creditors' Committee prior to confirmation of the Plan;

iii.  to execute and deliver all documents, and take all actions, necessary to consummate the Plan and wind-down the Estates;

iv.  to act on behalf of the Debtors and their Estates in all adversary proceedings and contested matters (including, without limitation, any Avoidance Actions and Causes of Action) then-pending or that can be commenced in the Court and in all actions and proceedings pending or commenced elsewhere, and, subject to consultation with the Oversight Committee as stated below, to settle, retain, enforce or dispute any adversary proceedings or contested matters (including, without limitation, any Litigation Claims) and otherwise pursue actions involving Assets that could arise or be asserted at any time under the Bankruptcy Code or otherwise, unless otherwise specifically waived or relinquished in the Plan;

v.  to determine whether to bring, settle, release or compromise Causes of Action, Avoidance Actions and Litigation Claims without the need for Court approval (all compromises for which the amount in controversy exceeds $250,000 must be approved by the Oversight Committee or the Court to the extent the Oversight Committee objects);

vi.  to dispose of, and deliver title to or otherwise realize the value of, all the remaining Assets;

vii.  to coordinate the storage, maintenance and disposal of the Records as he or she determines in his or her reasonable discretion in compliance with any applicable state and federal rules;

viii.  to oversee compliance with the Debtors' accounting, finance and reporting obligations;

ix.  to prepare U.S. Trustee quarterly reports and financial statements, and such other reports and financial statements as may be necessary or helpful to the Liquidating Trustee to carry out his or her duties, and to manage the calculation and disbursement of U.S. Trustee fees;

x.  to oversee the filing of final tax returns, audits and other corporate dissolution documents if required;

xi.  to object to Claims against the Debtors;

24

xii.    to compromise and settle Claims by and against the Debtors and their Estates without the need for Bankruptcy Court approval (all compromises of Claims where the proposed Allowed amount of such Claim exceeds $250,000 must be approved by the Oversight Committee, and to the extent the Oversight Committee declines to approve a compromise recommended by the Liquidating Trustee, the Liquidating Trustee may seek Bankruptcy Court approval of such compromise over the objection of the Oversight Committee);

xiii.    to perform any additional corporate actions as necessary to carry out the wind-down, liquidation and ultimate dissolution of the Debtors;

xiv.    to implement and/or enforce all provisions of the Plan;

xv.    to implement and/or enforce all agreements entered into prior to the Effective Date;

xvi.    to abandon any Assets without the need for approval of the Court, and upon such abandonment, such Assets shall cease to be Assets of the Estates; and

xvii.    to use such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to the Plan or Order of the Bankruptcy Court or as may be necessary and proper to carry out the provisions of the Plan.

**2.7.    <u>Establishment of Oversight Committee.</u>**

**(a) Appointment of Oversight Committee**

On or after the Effective Date, the Oversight Committee shall be appointed and shall consist of Holders of Allowed Class 4 Claims willing to serve. Members of the Oversight Committee will be selected by the Creditors' Committee, or the Liquidating Trustee as the case may be, upon consultation with the U.S. Trustee. The Oversight Committee shall not exceed seven (7) members. The Oversight Committee shall have the authority specified in the Plan and Liquidating Trust Agreement. Any actions taken by the Oversight Committee shall be by majority vote. The Liquidating Trustee shall consult with and provide information to the Oversight Committee with respect to any material action to be taken or not to be taken by the Liquidating Trustee as set forth in the Plan and the Liquidating Trust Agreement.

**(b) Reimbursement of Costs and Expenses**

Except for the reimbursement of reasonable, actual costs and expenses incurred in connection with their duties as members of the Oversight Committee, the members of the Oversight Committee shall serve without compensation. Reasonable expenses incurred by members of the Oversight Committee may be paid by the Liquidating Trustee upon presentation of proper documentation without the need for Court approval. Reasonable expenses incurred by members of the Oversight Committee may be paid by the Liquidating Trustee upon presentation of proper documentation without the need for Court approval. To the extent that the Oversight Committee declines to approve a settlement proposed by the Liquidating Trustee and the Liquidating Trustee opts to seek Court approval of the settlement over the objection of the

4912-8223-7850, v. 8
187746688.2

Oversight Committee, then the Oversight Committee may retain attorneys to prosecute its objection, the reasonable costs of which will be paid by the Liquidating Trustee in the same manner as the Liquidating Trustee's Professionals.

### (c) Liability of Members of the Oversight Committee

Subject to any applicable law, the members of the Oversight Committee shall not be liable for any act done or omitted by a member in such capacity, while acting in good faith and in the exercise of business judgment. Members of the Oversight Committee shall not be liable in any event except for gross negligence or willful misconduct in the performance of their duties hereunder.

### (d) Indemnification

Except as otherwise set forth in this Plan and to the extent permitted by applicable law, the Members of the Oversight Committee shall not be liable for any act or omission taken or omitted to be taken in their respective capacities other than for acts or omissions resulting from willful misconduct, gross negligence or fraud as determined by Final Order of the Court. The Estates shall indemnify and hold harmless the Members of the Oversight Committee from and against all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties; provided however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

### 2.8.    Establishment of Disputed Claims Reserve.

As soon as practicable following the Effective Date, the Disputed Claims Reserve shall be established by the Liquidating Trustee if and as required; provided, however, that the Liquidating Trustee shall have no obligation to fund the Disputed Claims Reserve until, at the latest, immediately prior to the making of a Distribution to Holders of Allowed Claims of the same Class as the Disputed Claims. The Disputed Claims Reserve shall be funded from available Cash in an amount equal to the amount Holders of Disputed Claims would have otherwise been entitled but for the dispute. The assets in the Disputed Claims Reserve shall be held separately from other assets held by the Liquidating Trustee subject to an allocable share of all expenses and obligations, on account of Disputed Claims. Funds shall be removed from the Disputed Claims Reserve as the Disputed Claims are resolved, which funds shall be distributed as provided in Section 2.3 of the Plan. Notwithstanding any other provision of the Plan to the contrary, subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, the Liquidating Trustee may treat any assets allocable to, or retained on account of, the Disputed Claims Reserve as held by one or more discrete entities holding Disputed Claims for federal, and applicable state, local or other, income tax purposes, and may determine that such entity or entities shall constitute "disputed ownership funds" under, and may make the election permitted by, Treasury Regulation 1.468B-9, or any successor provision thereto.

26

4912-8223-7850, v. 8
187746688.2

### 2.9.      Preservation of Causes of Action.

Except as otherwise provided in this Plan, including the release, exculpation, and injunction provisions in Article 6 of the Plan, or in any contract, instrument, release or agreement entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, all Claims or Causes of Action that the Debtors or the Estates may have against any person or entity are preserved, including without limitation any and all Causes of Action under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code.

### 2.10.      General Disposition of Assets.

Pursuant to section 1123(a)(5) of the Bankruptcy Code and subject to the terms of this Plan, as soon as is reasonably practicable following the Effective Date, the Liquidating Trustee shall sell or otherwise dispose of, and liquidate to or otherwise convert to Cash, any non-Cash Assets in such manner as the Liquidating Trustee shall determine is in the best interests of the Estates and Holders of Allowed Claims.

### 2.11.      Exemption from Certain Transfer Taxes.

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale or transfer of any of the Assets, or any sale or transfer of, from or by the Debtors, pursuant to, in contemplation of, or in connection with the Plan or pursuant to the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 2.12.      Execution of Documents to Effectuate Plan.

From and after the Effective Date, the Liquidating Trustee shall have the exclusive power and authority to execute any instrument or document to effectuate the provisions of the Plan or the Liquidating Trust Agreement. Entry of the Confirmation Order shall authorize the Liquidating Trustee to take, or cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan or the Liquidating Trust Agreement. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action.

### 2.13.      Dissolution of Debtors.

Following the Effective Date, the Debtors, through the activities of the Liquidating Trustee, shall continue in existence for the purposes of, among other things, completing the liquidation of Assets, winding up affairs and filing appropriate tax returns. Upon the entry of an order closing

4912-8223-7850, v. 8
187746688.2

these Chapter 11 Cases, the Debtors shall be deemed dissolved for all purposes. No other actions or filings or payments shall be required in furtherance of such dissolution.

Upon the Effective Date, the Debtors' board of directors shall be dissolved and the members thereof shall have no further obligation or duty with respect to any of the Debtors, the Estates or the Chapter 11 Cases. For the avoidance of doubt, nothing in this section 2.13 shall be construed as a waiver or release of the Debtors' current and former board of directors, officers, directors, shareholders, members, managers, employees, affiliates or insiders of the Debtors, except as set forth herein, and the Liquidating Trustee reserves all rights to pursue the Causes of Action.

### 2.14.    **Post-Confirmation Reports and Fees.**

Following the Effective Date and until the Chapter 11 Cases are closed, not less than once every ninety (90) days, the Liquidating Trustee shall file all post-Effective Date reports required during such periods and shall pay from the Liquidating Trust Proceeds all post-Effective Date fees charged or assessed against the Estates under 28 U.S.C. § 1930 during such periods together with applicable interest pursuant to 31 U.S.C. § 3717.

### 2.15.    **Dissolution of Creditors' Committee.**

On the Effective Date, the Creditors' Committee shall be deemed to be dissolved and the members of the Creditors' Committee shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Cases, provided, however, that the Creditors' Committee shall remain in existence for the purpose of reviewing and approving Final Fee Applications of Professionals.

### 2.16.    **Insurance Preservation.**

Nothing in the Plan shall diminish or impair the enforceability of any Insurance Policies that may cover Claims against the Debtors or any other Person.

For the avoidance of doubt, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Debtors will be deemed to have assumed all D&O Liability Insurance Policies pursuant to Sections 105 and 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan or Confirmation Order, confirmation of the Plan will not discharge, release, impair, or otherwise modify any obligations, including but not limited to, indemnity obligations of the insurers under the D&O Liability Insurance Policies assumed by the foregoing assumption of the D&O Liability Insurance Policies, any agreements, documents, and instruments related thereto, and each such indemnity obligation, if any, will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no proof of Claim, Administrative Claim, or Cure Amount Claim need be filed; provided that notice of such claim be delivered to (i) the Debtors or after the Effective Date, the Liquidating Trustee and (ii) if different, any insured; and that any and all rights of the Debtors, any insured or Liquidating Trust to dispute such indemnity obligation are expressly reserved.

4912-8223-7850, v. 8
187746688.2

## 2.17.   Releases and Exculpation.

The Plan proposes for the Debtors to release the Released Parties as set forth in Section 6.4 hereof and to exculpate the Exculpated Parties as set forth in Section 6.5 hereof.

### (a) Governing Standard for Approval

The Bankruptcy Code supports the inclusion of debtor releases in a chapter 11 plan. Section 1123(b)(3)(A) of the Bankruptcy Code states that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."   11 U.S.C. § 1123(b)(3).  A debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (citation omitted). In evaluating the propriety of a debtor release, courts in the Third Circuit often considers whether: (i) the released party has made a substantial contribution to the debtor's reorganization; (ii) the release is essential to the debtor's reorganization; (iii) a substantial majority of creditors support the release; (iv) there is an identity of interest between the debtor and the released party; and (v) a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.  *See*, *e.g.*, *Zenith Elecs. Corp.*, 241 B.R 92, 110 (Bankr. D. Del. 1999) (citation omitted).  Not all factors must be satisfied for a court to approve a debtor release. *See In re Wash, Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) ("These factors are neither exclusive nor conjunctive requirements but simply provide guidance in the [c]ourt's determination of fairness") (internal citation omitted).

The Debtors believe the proposed Releases satisfy applicable standards because they are a valid exercise of the Debtors' business judgment, are fair, reasonable and in the best interests of the Debtors' Estates.  The Debtors believe that the proposed recoveries set forth herein would not be possible without the Released Parties efforts.

## 2.18.   Deemed Substantive Consolidation for Limited Purposes.

As set forth in Section 2.6(b) herein, the Plan contemplates and is predicated upon entry of an order substantively consolidating the Debtors' Estates and Chapter 11 Cases for purposes of voting and Distribution only.

In function, substantive consolidation treats separate legal entities as if they were deemed merged into a single survivor left with all cumulative assets and liabilities (except for inter-entity liabilities, which are erased).  The result is that claims of creditors against separate debtors are deemed converted into claims against a single consolidated debtor solely for purposes of voting and distributions under the chapter 11 plan.

If substantive consolidation – for the limited purposes of voting and distribution – is authorized by this Court through the Confirmation Order, on the Effective Date, (a) all assets and liabilities of the Debtors will be deemed merged or treated as if they were single pool of assets for the limited purposes of voting and distribution under the Plan; (b) any guarantee of an obligation of a Debtor by another Debtor will be deemed eliminated; (c) each Claim Scheduled, filed or to be filed against any Debtor will be deemed filed only against Francesca's Acquisition and will be

29

4912-8223-7850, v. 8
187746688.2

deemed a single Claim against and a single obligation of Francesca's Acquisition; and (d) any joint or several liability of the Debtors will be deemed one obligation of Francesca's Acquisition. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment, or performance made by one Debtor as to the obligations of another Debtor will be deemed released and of no further force and effect.

As will be set forth in greater detail in the Debtors' pleadings in support of Confirmation of the Plan and, if necessary, through testimony at the Confirmation Hearing, the Debtors believe that substantive consolidation for the limited purposes described herein is merited here because, among other things:

(i) the Debtors are interrelated and operated as a consolidated enterprise, including through use of a centralized cash management system, by making policy and management decisions from their corporate headquarters and through common directors and officers, by agreeing to be jointly and severally liable for various obligations or serving as guarantors for one another, and by publicly touting the integrated nature of their operations on their website and in their corporate logo; and

(ii) the benefits of consolidation for the limited Plan purposes described herein outweigh the harm, if any, to creditors, particularly given the size of the Intercompany Claims. The only Class to be affected by the limited consolidation contemplated by the Plan is Class 4 General Unsecured Claims. One of the sources of recovery for Class 4 is the proceeds of Litigation Claims. It is not reasonably possible or practicable to allocate the proceeds of such Litigation Claims on a debtor-by-debtor basis.[12]

Therefore, the Debtors submit that substantive consolidation for the limited purposes described herein is an appropriate remedy here and will further establish the need for its application in their pleadings in support of confirmation of the Plan.

---

[12] *See*, *e.g.*, *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 103-04 (Bankr. N.D. Tex. 2017) ("the fact that distributions for general unsecured creditors and equity interest holders will be ***based on recoveries from litigation claims*** is a significant reason why the Debtors decided to request that these estates be substantively consolidated. Specifically, as a result of the postpetition analysis and investigation of potential causes of action that the Debtors and Creditors' Committee conducted, the Debtors determined that a number of significant causes of action (a) were jointly owned by all of the Debtors, or (b) would be difficult to allocate between estates. Because of the foregoing factors, the court believes that substantive consolidation will achieve a fair and equitable result for all creditors and equity interest holders of the Debtors and will enable the assets of the Debtors to be administered in an efficient manner. If the estates are not substantively consolidated, the time and expense to allocate assets and liabilities between estates will be enormous") (emphasis in original).

30

# ARTICLE 3

## CONFIRMATION AND VOTING PROCEDURES

### 3.1.   Confirmation Procedure.

#### (a) Confirmation Hearing

On July___, 2026, the Court entered the order approving the solicitation and voting procedures (the "Solicitation Procedures Order"), authorizing the Debtors to solicit acceptances of the Plan. A hearing to consider confirmation of the Plan pursuant to Bankruptcy Code section 1129 has been scheduled to commence on **August____, 2026 at 10:00 a.m. (Eastern Prevailing Time)** (the "Confirmation Hearing"). The Confirmation Hearing may be continued from time to time without further notice other than the announcement by the Debtors in open court of the adjourned date(s) at the Confirmation Hearing or any continued hearing or as indicated in any notice filed with the Court.

The Confirmation Hearing will be held before the Honorable Mark E. Hall at the United States Bankruptcy Court for the District of New Jersey, 50 Walnut Street, 3rd Floor, Newark, N.J. 07102.

#### (b) Procedure for Objections

Any objection to confirmation of the Plan must (a) be made in writing; (b) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules; (c) state the name and address of the objecting party and the nature and amount of any Claim or Interest asserted by such party against the Debtors, their Estates or their property; (d) state with particularity the legal and factual bases and nature of any objection to confirmation of the Plan; (e) be filed with the Court, and served upon the following parties (collectively, the "Notice Parties"):

i.   Counsel to the Debtors:  Mandelbaum Barrett PC, 3 Becker Farm Road, Suite 105, Roseland, New Jersey 07068, Attn: Jeffrey M. Rosenthal at jrosenthal@mblawfirm.com, Vincent J. Roldan at vroldan@mblawfirm.com and Katie F. Warren at KWarren@mblawfirm.com.

ii.   The Office of the U.S. Trustee:  Jeffrey Sponder (jeffrey.m.sponder@usdoj.gov).

iii.   Counsel to the Prepetition Secured Lenders:  Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Alan Brody (brodya@gtlaw.com) Jeffrey M. Wolf (Jeffrey.Wolf@gtlaw.com), Julia Frost-Davies (Julia.FrostDavies@gtlaw.com), and Charlie Liu (Charlie.Liu@gtlaw.com).

iv.   Counsel to the Creditors' Committee:  Fox Rothschild LLP, 49 Market St, Morristown, NJ 07960, Attn: Joseph J. DiPasquale (jdipasquale@foxrothschild.com), Michael R. Herz (mherz@foxrothschild.com), and Agostino A. Zammiello (azammiello@foxrothschild.com).

4912-8223-7850, v. 8
187746688.2

so as to be received on or before **August ___, 2026 at 4:00 p.m. (Eastern Prevailing Time)**. **Unless an objection to confirmation of the Plan is timely filed and served, it may not be considered by the Court at the Confirmation Hearing.**

### 3.2.  Statutory Requirements for Confirmation.

### (a) General Requirements

The Court will confirm the Plan only if it meets all the applicable requirements of Bankruptcy Code section 1129, as discussed herein. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against and be "fair and equitable" with respect to such Class; and (b) must be feasible. The Court must also find that (a) the Plan has classified Claims and Interests in a permissible manner; (b) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.

### (b) Classification of Claims and Interests

Bankruptcy Code section 1123 provides that a plan must classify the claims and interests of a Debtors' creditors and equity interest holders. In accordance with Bankruptcy Code section 1123, Article 2 of the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those Claims which, pursuant to Bankruptcy Code section 1123(a)(1), need not be and have not been classified). A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Plan is also required, under Bankruptcy Code section 1122, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class. In accordance with Bankruptcy Code section 1122, the Plan creates separate Classes to deal respectively with secured Claims, unsecured Claims, and Intercompany Claims. The Debtors and Creditors' Committee believe that the Plan's classifications place substantially similar Claims or Interests in the same Class and thus, meet the requirements of Bankruptcy Code section 1122.[13]

The Bankruptcy Code also requires that a plan provide the same treatment for each Claim or Interest of a particular Class unless a Holder agrees to a less favorable treatment of its Claim or Interest. The Debtors and Creditors' Committee believe that the Plan complies with such standard.

---

[13] It is possible that a Holder of a Claim or Interest may challenge the classification of Claims or Interests and that the Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors and Creditors' Committee intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

4912-8223-7850, v. 8
187746688.2

If the Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

**(c) Confirmation Pursuant to Bankruptcy Code Sections 1129(a)(10) and 1129(b)**

If any impaired class of claims or interests does not accept a plan, a plan proponent nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in Bankruptcy Code section 1129(b).  Bankruptcy Code section 1129(b) requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

Because Class 5 (Intercompany Claims) and Class 6 (Interests) are deemed to reject the Plan, the Debtors shall (a) seek Confirmation of the Plan from the Court by employing the "cramdown" procedures set forth in Bankruptcy Code section 1129(b) and/or (b) modify the Plan in accordance with Section 8.2 hereof.  The Debtors and Creditors' Committee reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Exhibit or schedule, including to amend or modify the Plan or such Exhibits or schedules to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

The Debtors and Creditors' Committee believe that the requirements of Bankruptcy Code section 1129(b) are satisfied. The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists; courts typically examine the facts and circumstances of each particular case to determine whether unfair discrimination exists. At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without sufficient justifications for doing so. The Debtors and Creditors' Committee believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, except where there is sufficient justification for different treatment.  Accordingly, the Debtors and Creditors' Committee believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

- Secured Creditors. Either (i) each impaired secured creditor retains the liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value at least equal to the amount of its allowed secured claim as of the effective date, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

4912-8223-7850, v. 8
187746688.2

- <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value as of the effective date equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan on account of such junior claim or interest.

- <u>Interests</u>. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any Interest that is junior to such non-accepting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors and Creditors' Committee believe that the distributions provided under the Plan satisfy the absolute priority rule.

### (d) Best Interests of Creditors Test and Liquidation Analysis

#### i.     Best Interests of Creditors Test

Even if a plan is accepted by the Holders of each Class of Claims and Interests, the "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the Debtors were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from the Debtors' Assets if the Chapter 11 Cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

To make these findings, the Court must (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Chapter 11 Cases were converted to a chapter 7 case and the Assets of the Debtors' Estates were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of a Claim or Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such Holder's liquidation distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

34

Here, the Plan contemplates the appointment of a Liquidating Trustee to continue the wind-down of the Debtors' Estates. The Debtors and Creditors' Committee believe that a conversion of the Chapter 11 Cases to cases under chapter 7 would disrupt an orderly plan process which is expected to result in a prompt initial distribution to Holders of Allowed Class 4 Claims, and that Creditors would be harmed by the delay and expense that would result.

The Debtors and Creditors' Committee believe that the primary advantage of the Plan over a chapter 7 liquidation is that Creditors will likely receive more under the Plan than they would in a chapter 7 case and receive their Distributions earlier. Costs would increase by the amount of the additional administrative expenses likely to be incurred in such a chapter 7 case, including the costs of time-consuming investigations and discovery. Under the Plan, the process of other Claims resolution will proceed without the necessity for additional investigation by a chapter 7 trustee and its separate and new professionals. The Plan offers the opportunity to avoid additional administrative costs and the resulting delay which would result from a chapter 7 liquidation.

### ii.    Liquidation Analysis

The Debtors and Creditors' Committee believe that the Plan will result in lower total administrative costs, and higher recoveries for Creditors than would the liquidation of the Debtors' Assets under chapter 7 of the Bankruptcy Code. A liquidation analysis that demonstrates the lower recovery for creditors in a chapter 7 liquidation will be submitted in a Plan Supplement. Thus, the Debtors and Creditors' Committee believe the Plan satisfies the "best interests of creditors test," and, indeed, that the Plan is in the best interests of Creditors.

### (e) Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, or any successor to the Debtors (unless, as is the case here, such liquidation or reorganization is proposed in such plan of reorganization).

The Plan contemplates the distribution of the proceeds from the Sale and from the Store Closing Sales followed by the winddown of the Debtors' remaining Estates. Accordingly, the Debtors and Creditors' Committee believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors, the Plan provides for the highest possible return for creditors, and the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

### 3.3.    Acceptance or Rejection of the Plan.

### (a) Presumed Acceptances by Vacant Classes

Any Class or sub-Class of Claims that is not occupied as of the date of the Confirmation Hearing by at least one Allowed Claim, or at least one Claim temporarily Allowed under Bankruptcy Rule 3018, shall not be included for purposes of (a) voting on the acceptance or rejection of the Plan and (b) determining acceptance or rejection of the Plan by such Class under Bankruptcy Code section 1129(a)(8).

4912-8223-7850, v. 8
187746688.2

**(b) Classes Deemed to Accept Plan**

Pursuant to Bankruptcy Code section 1126(f), only the Holders of Claims or Interests in Classes Impaired by the Plan and receiving a payment or Distribution under the Plan, consisting of Class 4 (General Unsecured Claims), may vote on the Plan. Class 1 (Pre-Petition Agent Claims), Class 2 (Other Secured Claims), and Class 3 (Priority Non-Tax Claims) are Unimpaired by the Plan. Therefore, under Bankruptcy Code section 1126(f), such Holders are conclusively presumed to accept the Plan and the votes of Holders of such Claims or Interests shall not be solicited.

**(c) Classes Deemed to Reject Plan**

Pursuant to Bankruptcy Code section 1124, a Class of Claims or Interests may be Impaired if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Interests treated in such Class. Holders of Claims or Interests in Class 5 (Intercompany Claims) and Class 6 (Interests) are not entitled to receive or retain any property under the Plan. Under Bankruptcy Code section 1126(g), such Holders are deemed to reject the Plan, and the votes of such Holders shall not be solicited.

**(d) Impaired Classes of Claims Entitled to Vote**

Because Claims in Class 4 (General Unsecured Claims), are Impaired under the Plan and Holders of such Claims may receive or retain property under the Plan, Holders of Claims in such Classes are entitled to vote and shall be solicited with respect to the Plan. **ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL BE PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 4 (GENERAL UNSECURED CLAIMS).**

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and at least two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan. At least one Impaired Class of Creditors, excluding the votes of Insiders, must actually vote to accept the Plan.

### 3.4.  Voting Procedures.

**(a) Eligibility to Vote on the Plan**

Except as provided in the Solicitation Procedures Order or as otherwise ordered by the Court, only Holders of Claims in Class 4 (General Unsecured Claims) may vote on the Plan. Further, subject to the specific tabulation procedures that were set forth in and approved by the Solicitation Procedures Order, in order to vote on the Plan, you generally must hold a Claim in the Voting Class that (i) to the extent a Proof of Claim has been filed, is not the subject of a pending Claim Objection or (ii) to the extent a Proof of Claim has not been filed, is listed in the Debtors' Schedules as not disputed, contingent, or unliquidated, or be the Holder of a Claim in such Classes that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a). **IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU WILL RECEIVE A BALLOT AND ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY SUBMIT YOUR BALLOT BEFORE THE VOTING DEADLINE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

36

4912-8223-7850, v. 8
187746688.2

**(b) Solicitation Packages and Notice**

All Holders of Allowed Claims in the Voting Class will receive (a) notice of the Confirmation Hearing (the "Confirmation Hearing Notice") setting forth: (i) the deadline to vote on the Plan, (ii) the deadline to object to confirmation of the Plan, (iii) procedures for filing objections and responses to confirmation of the Plan, and (iv) the time, date, and place of the Confirmation Hearing; and (b) a form of ballot.  All other Creditors and parties-in-interest not entitled to vote on the Plan will receive the Confirmation Hearing Notice.

**IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU (I) DID NOT RECEIVE A BALLOT, (II) RECEIVED A DAMAGED BALLOT, (III) LOST YOUR BALLOT, OR (IV) IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT BY (A) EMAILING FRANCESCASINQUIRIES@STRETTO.COM, (B) CALLING 855.408.3478 (TOLL-FREE) OR 949.617.0158 (INTERNATIONAL OR CANADA), OR (C) WRITING TO THE FOLLOWING ADDRESS: FRANCESCA'S ACQUISITION, LLC ET AL., CLAIMS PROCESSING C/O STRETTO, 410 EXCHANGE, SUITE 100, IRVINE, CA 92602.**

**THE CLAIMS AND NOTICING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.  IF YOU BELIEVE YOU REQUIRE LEGAL ADVICE YOU SHOULD CONSULT WITH AN ATTORNEY.**

**(c) Voting Deadlines**

In order for your Ballot to count, you must either (a) complete an electronic ballot at https://cases.stretto.com/FrancescasAcquisition or (b) complete, date, sign and deliver by: (i) First Class Mail, to the following address: Francesca's Acquisition, LLC et al., Claims Processing c/o Stretto, 410 Exchange, Suite 100, Irvine, Ca 92602, or (ii) by hand delivery or overnight mail to the following address: Francesca's Acquisition, LLC et al., Claims Processing c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602. **BALLOTS SENT BY FACSIMILE TRANSMISSION OR E-MAIL ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

Ballots must be submitted electronically, or the Claims and Noticing Agent must physically receive original ballots by mail or overnight delivery, on or before **August     , 2026 at 4:00 p.m. (Eastern Prevailing Time) (the "Voting Deadline")**.  Subject to the tabulation procedures approved by the Solicitation Procedures Order, you may not change your vote once a ballot is submitted electronically or once the Claims and Noticing Agent receives your original paper ballot.

Subject to the tabulation procedures approved by the Solicitation Procedures Order, any ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Plan.

4912-8223-7850, v. 8
187746688.2

# ARTICLE 4

## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 4.1.    General Bankruptcy Law and Plan Considerations.

#### (a) The Plan May Not be Accepted

The Debtors and Creditors' Committee make no assurances that the requisite acceptances to the Plan will be received, and the Debtors and Creditors' Committee may need to obtain acceptances to an alternative plan, or otherwise, may need to liquidate under chapter 7 of the Bankruptcy Code. The Debtors and Creditors' Committee make no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Holders of Allowed Claims as those proposed in the Plan.

#### (b) The Plan May Not be Confirmed

Even if the Debtors receive the requisite acceptances there is no assurance that the Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Court determined that the Plan and the balloting procedures and results were appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation had not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Allowed Claims ultimately would receive with respect to their Claims in a subsequent plan.

#### (c) Distributions to Holders of Allowed Claims Under the Plan May be Inconsistent with Projections

Projected Distributions are based upon good faith estimates of the total amount of Claims and Interests ultimately Allowed and the assets available for Distribution. There can be no assurance that the estimated Claim amounts set forth in herein are correct. These estimates are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the assets available for Distribution may differ from current estimates due to, among other things, the successful prosecution and liquidation of the Litigation Claims. If the total amount of Allowed Claims in a Class is higher than estimated, or

38

4912-8223-7850, v. 8
187746688.2

the funds available for Distribution to such Class are lower than estimated, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

**(d) The Disposition of the Litigation Claims May Impact Unsecured Creditor Recoveries**

Depending on any defenses or counterclaims set forth by the counterparties involved with any Litigation Claims and the resolution of any appeal(s), the anticipated proceeds associated with the Litigation Claims and available to unsecured creditors may be impacted.

**(e) Objections to Classifications of Claims**

The Debtors and Creditors' Committee believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Court finds that a different classification is required for the Plan to be confirmed, the Plan Proponents would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors and Creditors' Committee will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors and Creditors' Committee believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors and Creditors' Committee believe that the Plan complies with the requirement of equal treatment.  To the extent that the Court finds that the Plan does not satisfy such requirement the Court may deny confirmation of the Plan.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

**(f)  Failure to Consummate the Plan**

Section 3.2 of the Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date hereof, there can be no assurance that any or all the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that

4912-8223-7850, v. 8
187746688.2

the Plan will be confirmed by the Court.  Further, if the Plan is confirmed, there can be no assurance that the Plan will become effective.

### (g) Deemed Substantive Consolidation May Not be Approved

Section 2.6(b) of the Plan seeks substantive consolidation of the Debtors' assets and liabilities for the limited purposes of voting and Distribution, given the factors set forth in Section 2.6(b) above, including but not limited to the interrelated nature of the Debtors' business, the harm to creditors that may result absent such consolidation and the difficulty of allocating the proceeds of Litigation Claims on a debtor-by-debtor basis. However, certain creditors may object to the limited substantive consolidation of the Debtors' Estates for these purposes, which may negatively impact creditor recoveries.

### (h) Releases, Exculpation, and Injunction Provisions May Not be Approved

Section 2.17 and Article 6 of the Plan contains certain releases, exculpations, and injunction language.  Parties are urged to read these provisions carefully to understand how Confirmation and Consummation of the Plan will affect any Claim, Interest, right, or action with regard to the Debtors and certain third parties.

### (i) Actual Plan Distributions May Be Less Than Estimated for Purposes of the Disclosure Statement

The Debtors and Creditors' Committee project that the Claims asserted against the Debtors will be resolved in and reduced to an amount that approximates the estimates set forth herein. However, there can be no assurances that these estimates will prove accurate. In the event that the allowed amounts of such Claims are materially higher than the projected estimates, actual distributions to Holders of Allowed Claims could be materially less than estimated herein.

### (j) Claims Objections/Reconciliation Process

The Debtors and the Liquidating Trustee, as applicable, reserve the right to object to the amount of any Claim, except as provided in the Plan. The estimates set forth herein cannot be relied on by any Holder of a Claim whose Claim is subject to an objection. Any such Holder of a Claim may not receive its specified share of the estimated distributions described in the Disclosure Statement.

**THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

There can be no assurance that the releases, exculpation and injunction provisions, as provided in Section 2.17 and Article 6 hereof, will be granted. Failure of the Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

4912-8223-7850, v. 8
187746688.2

**(k) Risks Associated with Forward-Looking Statements**

The financial information contained in this Combined Disclosure Statement and Plan has not been audited. In preparing this Combined Disclosure Statement and Plan, the Debtors and Creditors' Committee relied on financial data derived from the Debtors' books and records available at the time of such preparation. Although the Debtors and Creditors' Committee have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Combined Disclosure Statement and Plan, and while the Debtors and Creditors' Committee believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors and Creditors' Committee are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**(l)  Alternatives to Confirmation and Consummation of the Plan**

The Debtors and Creditors' Committee believe the Plan affords the Holders of Claims the potential for a better realization on the Debtors' assets than a chapter 7 liquidation, and therefore, is in the best interests of such Holders. If, however, the Plan is not confirmed, the theoretical alternatives include (i) formulation of a different plan or plans of liquidation under chapter 11, or (ii) liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

**(m) Alternative Plan(s) of Liquidation**

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors and Creditors' Committee could attempt to formulate and propose an alternative plan of liquidation. With respect to an alternative liquidation plan, the Debtors and Creditors' Committee have explored various other alternatives in connection with the development and formulation of the Plan. The Debtors and Creditors' Committee believe that the Plan enables the Class 4 Creditors to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

**(n) Liquidation under Chapter 7**

As discussed above, with respect to each Class of Impaired Claims, either each Holder of a Claim of such Class has accepted the Plan, or will receive under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code. The Debtors and Creditors' Committee believe that significant costs would be incurred by the Debtors as a result of the delay that would be caused by conversion of the Chapter 11 Cases to cases under chapter 7, resulting in a reduced distribution to all Creditors.

4912-8223-7850, v. 8
187746688.2

# ARTICLE 5

# CONDITIONS PRECEDENT

### 5.1.    Considerations Precedent to Confirmation of the Plan.

The following conditions must be satisfied, or otherwise waived in accordance with Section 5.3 hereof, on or before the Confirmation Date:

(a)    The Confirmation Order shall have been entered and contain provisions that, among other things:

(i) authorizes the implementation of the Plan in accordance with its terms;

(ii) approves in all respects the other settlements, transactions, and agreements to be effected pursuant to the Plan;

(iii) finds that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud; and

(iv) approves the Liquidating Trust Agreement.

### 5.2.    Considerations Precedent to the Effective Date.

The Effective Date shall not occur and no obligations under the Plan shall come into existence, unless each of the following conditions is met or, alternatively, is waived in accordance with Section 5.3 hereof, on or before the Effective Date:

(a) The Confirmation Order shall have become a Final Order;

(b) The Confirmation Order shall have authorized and approved the appointment of the Liquidating Trustee and the Oversight Committee;

(c) The Debtors shall have sufficient Cash on hand to pay all Allowed Administrative Expense Claims;

(d) The Debtors have funded the Professional Fee Reserve; and

(e) The Confirmation Order shall have effectuated the transfer of all Liquidating Trust Assets to the Liquidating Trust.

### 5.3.    Waiver of Considerations Precedent.

Each of the conditions precedent in Sections 5.1 and 5.2 hereof may be waived or modified without further Court approval, in whole or in part, but only with the consent of the Debtors and Creditors' Committee.

4912-8223-7850, v. 8
187746688.2

# ARTICLE 6

## RELEASE; INJUNCTION; EXCULPATION

### 6.1.    Injunctions Against Interference with Consummation or Implementation of Plan.

All Holders of Claims shall be enjoined from commencing or continuing any judicial or administrative proceeding or employing any process against the Debtors, the Estates, the Creditors' Committee, the Liquidating Trustee, or the Oversight Committee (and their Members) with the intent or effect of interfering with the consummation and implementation of this Plan and the transfers, payments and Distributions to be made hereunder.

### 6.2.    Plan Injunction.

All injunctions or stays provided for in these Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date, except as otherwise provided in the Plan, or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court. All entities who have held, hold or may hold claims against or equity interests in the Debtors, will be permanently enjoined from taking any of the following actions against the Debtors, their estate, or any of their property on account of any such claim or equity interest: (i) commencing or continuing, in any manner or in any place, any action or other proceeding, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order; (iii) the creation, perfection or enforcement of any encumbrance of any kind; (iv) the assertion of any right of setoff, counterclaim, exculpation, or subrogation of any kind, in each case against the Debtors, the Estates, the Creditors' Committee, the Liquidating Trustee, Released Parties, or the Oversight Committee (and their Members) to the fullest extent authorized or provided by the Bankruptcy Code; and/or commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan, provided, however, that such entities will not be precluded from exercising their rights pursuant to and consistent with the terms of the Plan, the Confirmation Order, or the Liquidating Trust Agreement.

### 6.3.    Release of Collateral.

Except as expressly provided otherwise in the Plan, unless a Holder of a Secured Claim receives a return of its Collateral in respect of such Claim under the Plan, each Holder of (a) an Allowed Secured Claim; and (b) an Allowed Claim that is purportedly secured, on the Effective Date shall (x) turn over and release to the Debtors any and all property that secures or purportedly secures such Claim; and (y) execute such documents and instruments as the Debtors requires to evidence such claimant's release of such property; and (ii) on the Effective Date, all claims, rights, title and interest in such property shall revert to the Debtors, free and clear of all Claims against the Debtors, including (without limitation) liens, charges, pledges, encumbrances and/or security interests of any kind. No Distribution hereunder shall be made to or on behalf of any Holder of such Claim unless and until such Holder executes and delivers to the Debtors such release of liens. Any such Holder that fails to execute and deliver such release of liens within sixty (60) days of

43

any demand thereof shall be deemed to have no further Claim and shall not participate in any Distribution hereunder. Notwithstanding the immediately preceding sentence, a Holder of a Disputed Claim shall not be required to execute and deliver such release of liens until the time such Claim is Allowed or Disallowed.

**6.4.    Debtors' Releases.**

**Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, their Estates, successors and assigns, including any successor to the Debtors or any Estates representative, including the Liquidating Trustee, shall be deemed to forever release, waive, and discharge each of the Released Parties from any claim, Claim, Causes of Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, for any act or omission in connection with, relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' operations, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, or the Combined Disclosure Statement and Plan, and the administration, formulation, preparation, dissemination, solicitation, negotiation, consummation, and implementation of any of the foregoing or any contract, instrument, release, or other agreement, understanding, accord, course of dealing, or document created or entered into in connection with or evidencing any of the foregoing, whether or not accrued, arising or having occurred, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, mixed, or otherwise, that may be based in whole or part on any act, omission, transaction, agreement, understanding, course of dealing, event or other occurrence or omission taking place on or prior to the Effective Date.**

**For the avoidance of doubt, the following parties shall not be released under the Plan: Simon Barlava; Morris Barlava; Andrew Clarke; Bridgit Lombard; Christine Kaighn; Victoria Taylor; MAS Acquisition, LLC, or any other current or former director, officer, manager, member, employee, affiliates or insiders of the Debtors other than TerraMar and/or its principals and affiliates, each of which shall be released other than respect to any claims or causes of action against TerraMar and any of its representatives covered by any directors and officers' liability insurance policy; *provided*, *however*, that any recoveries resulting therefrom shall be limited to the insurance policies, exclusive of any deductibles and costs of defense.**

**6.5    Exculpation.**

**Except as otherwise specifically provided herein, the Exculpated Parties shall not have or incur, and are hereby released and exculpated from, any liability, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed,**

4912-8223-7850, v. 8
187746688.2

contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively in law or equity, to any Holder of a Claim or an Interest, or any other party-in-interest, or any of their respective members, directors, officers, managers, trustees, employees, advisors, attorneys, professionals, agents, partners, stockholders or Affiliates, or any of their respective successors or assigns, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Combined Disclosure Statement and Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, willful misconduct, or a breach of fiduciary duty (in each case as determined by a Final Order entered by a court of competent jurisdiction), and such parties in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Combined Disclosure Statement and Plan. For the avoidance of doubt, nothing contained in this paragraph shall exculpate acts or omissions prior to the Petition Date or post-Effective Date.

For the avoidance of doubt, the following parties shall not be exculpated under the Plan: Simon Barlava; Morris Barlava; Andrew Clarke; Bridgit Lombard; Christine Kaighn; Victoria Taylor; MAS Acquisition, LLC, or any other current or former director, officer, manager, member, employee, affiliates or insiders of the Debtors other than TerraMar and/or its principals and affiliates, each of which shall be released other than respect to any claims or causes of action against TerraMar and any of its representatives covered by any directors and officers' liability insurance policy; *provided*, *however*, that any recoveries resulting therefrom shall be limited to the insurance policies, exclusive of any deductibles and costs of defense.

### 6.6     Gatekeeper Provision

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Cause of Action of any kind against the Debtors, the Liquidating Trust, the Exculpated Parties, or the Released Parties, without first (1) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against a Debtor, Liquidating Trust, Exculpated Party, or Released Party and is not a Claim that the Debtors released under this Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (2) obtaining from the Bankruptcy Court specific authorization for such party to bring such Cause of Action against any such Debtor, Liquidating Trust, Exculpated Party, or Released Party. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action; provided, however, that nothing in this Section 6.6 requires, precludes, and/or prohibits an Insurer to or from administering, handling, defending, settling and/or paying claims covered by any Insurance Policies in accordance with and

45

4912-8223-7850, v. 8
187746688.2

subject to the terms and conditions of such Insurance Policies and/or applicable non-bankruptcy law.

### 6.7.    No Bar to Claims Against Third Parties.

Except as set forth herein, Holders of Claims against the Debtors are not barred or otherwise enjoined by the Plan from pursuing any recovery against Persons that are not the Debtors.

### 6.8.    All Distributions Received in Full and Final Satisfaction.

Except as otherwise set forth herein, all payments, all Distributions to be made in accordance with the Plan on account of Claims, and all rights conferred under this Plan shall be received in full and final satisfaction of the Estates' obligations for such Claims as against the Debtors, their property and the Estates.

### 6.9.    No Modification of Res Judicata Effect.

The provisions of this Article 6 are not intended, and shall not be construed, to modify the res judicata effect of any order entered in the Chapter 11 Cases, including, without limitation, the Confirmation Order and any order finally determining Professional Fee Claims to any Professional.

### 6.10.    No Discharge of Claims.

Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order will not discharge any debts or Claims against the Debtors.

## ARTICLE 7

## PROVISIONS GOVERNING DISTRIBUTIONS

### 7.1    Distributions by Liquidating Trustee.

The Liquidating Trustee shall make Distributions on account of Allowed Claims in accordance with Article 2 of the Plan. The Liquidating Trustee may use the services of a third party to aid in the Distributions required to be made under this Plan, including the Distribution Agent.

### 7.2    Indefeasibility of Distributions.

All Distributions made under the Plan shall be indefeasible.

### 7.3    Frequency of Distributions.

The Liquidating Trustee shall make Distribution(s) on account of Allowed Class 4 Claims in accordance with Article 2 of the Plan, the Liquidating Trust Agreement, and at such other times as may be determined to be appropriate by the Liquidating Trustee.

4912-8223-7850, v. 8
187746688.2

**7.4    Payment in U.S. Dollars.**

All Cash payments required under the Plan shall be made in U.S. dollars by checks drawn on domestic bank(s) selected by the Liquidating Trustee in accordance with the Plan or by wire transfer from a domestic bank.

**7.5    Claims In U.S. Dollars.**

Any Claims asserted in foreign currencies shall be converted to United States Dollars in accordance with the prevailing exchange rates published by the Wall Street Journal on the Confirmation Date.

**7.6    Distributions Only on Business Days.**

Notwithstanding the foregoing provisions, if any Distribution called for under this Plan is due on a day other than a Business Day, then such Distribution shall instead be due the next Business Day.

**7.7    Transmittal of Payments and Notices.**

Except as otherwise provided in the Plan, all Distributions shall be made to the Holder of a Claim by regular first-class mail, postage prepaid, in an envelope addressed to such Holder at the address listed on its Proof of Claim filed with the Bankruptcy Court or, if no Proof of Claim was filed, (i) at the address listed on the Debtors' Schedules, or (ii) at such address that a Holder of a Claim provides to the Liquidating Trustee after the Effective Date in writing at least fifteen (15) business days prior to a Distribution Date. The Liquidating Trustee shall be under no obligation to ascertain the mailing address of any Holder of a Claim other than as set forth herein. The date of payment or delivery shall be deemed to be the date of mailing. Payments made in accordance with the provisions of this Section shall be deemed made to the Holder regardless of whether such Holder actually receives the payment.

**7.8    Record Date for Distributions.**

Except as otherwise provided in a Final Order of the Bankruptcy Court, transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 with appropriate filings made on or before the Effective Date (the "Distribution Record Date") shall be treated as the Holders of those Claims for all purposes of this Plan, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer(s) may not have expired prior to the Distribution Record Date. The Liquidating Trustee shall be under no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date. In making a Distribution with respect to any Claim, the Liquidating Trustee shall be entitled to recognize and deal for all purposes hereunder only with the Person who is listed on the Proof of Claim filed with respect to such Claim, on the Schedules as the Holder thereof, and upon such other evidence or record of transfer or assignment filed as of the Distribution Record Date.

4912-8223-7850, v. 8
187746688.2

**7.9     Unclaimed Distributions.**

Unclaimed Distributions, including Distributions made by checks that fail to be cashed or otherwise negotiated within ninety (90) days after the Distribution Date or which Distributions are returned to the Liquidating Trustee as undeliverable to the addresses of record as of the Distribution Record Date, shall be canceled (by a stop payment order or otherwise), the Claim(s) relating to such Distribution(s) shall be deemed forfeited and expunged without any further action or order of the Bankruptcy Court. Any such Unclaimed Distributions shall, as soon as is practicable, be redistributed pursuant to the provisions of the Plan.

**7.10     No Payments of Fractional Cents or Distributions of Less Than One Hundred Dollars.**

(a) Notwithstanding any provision to the contrary herein, for purposes of administrative convenience, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with a half-penny or less being rounded down and fractions in excess of half of a penny being rounded up.

(b) Notwithstanding any provision to the contrary herein, for purposes of administrative convenience, no Distribution of less than One Hundred Dollars ($100) shall be made pursuant to the Plan. Whenever any Distribution of less than One Hundred Dollars ($100) under the Plan would otherwise be required, such funds will be retained by the Liquidating Trustee for the account of the recipient until such time that successive Distributions aggregate to One Hundred Dollars ($100), at which time such payment shall be made, and if successive Distributions do not ever reach One Hundred Dollars ($100) in the aggregate, then such Distributions shall revert to the Estates and be redistributed in accordance with the Plan. If the Cash available for final distribution is less than the cost to distribute such funds, the Liquidating Trust may donate such funds to the unaffiliated charity of its choice.

**7.11     Setoff and Recoupment.**

Except as otherwise provided in the Plan or the Liquidating Trust Agreement, the Liquidating Trustee may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims, defenses or Causes of Action of any nature whatsoever that the Liquidating Trustee may have, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Liquidating Trustee of any right of setoff or recoupment against the Holder of any Claim.

**7.12     Payment of Taxes on Distributions Received Pursuant to the Plan.**

(a)     The Debtors shall provide the Liquidating Trustee with all available tax identification, including, but not limited to W-9, W-8BEN, W-8BEN-E, or such other iteration of IRS Form W-8 that may be applicable under the circumstances, or social security numbers that they may possess for Creditors (collectively the "Tax Information") and the Liquidating Trustee may rely upon the same for purposes of Distributions and associated tax reporting and

48

compliance. Notwithstanding any provision to the contrary herein, as a condition to payment of any Distribution to a Creditor under this Plan, each Creditor shall provide a valid Tax Information if requested by the Liquidating Trustee for purposes of tax reporting. All Persons that receive Distributions under the Plan shall be responsible for reporting and paying, as applicable, any taxes on account of their Distributions.

(b)     At such time as the Liquidating Trustee believes that Distributions to a particular Class of Claims is likely, the Liquidating Trustee shall review the available Tax Information provided by the Debtors and where necessary, request Tax Information in writing from Creditors (the "Tax Information Request"). Any Creditor who fails to respond to Tax Information Request within ninety (90) days from the date posted on the Tax Information Request, shall forfeit all Distributions such Creditor may otherwise be entitled to under this Plan and such forfeited funds will revert to the Debtors to be disbursed in accordance with the terms and priorities established in this Plan.

**7.13    Compliance With Tax Withholding and Reporting Requirements.**

With respect to all Distributions made under the Plan, the Liquidating Trustee will comply with all withholding and reporting requirements of any federal, state, local or foreign taxing authority.

**7.14    Disputed Distribution.**

If a dispute arises as to the identity of a Holder of an Allowed Claim who is to receive a Distribution, the Liquidating Trustee may, in lieu of making such Distribution to such Holder, hold such amount until the dispute is resolved by Final Order of the Bankruptcy Court or by written agreement among the parties to such dispute.

**7.15    Claims Administration Responsibility.**

**(a)    Reservation of Rights.**

Unless a Claim is specifically Allowed prior to or after the Effective Date, prior to the Effective Date, the Debtors, and after the Effective Date, the Liquidating Trustee, reserve any and all objections to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, secured or unsecured, including without limitation any and all objections to the validity or amount of any and all alleged Administrative Expense Claims, Priority Tax Claims, or Priority Non-Tax Claims, liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The failure to object to any Claim prior to the Effective Date shall be without prejudice to the Liquidating Trustee's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of the Claim.

**(b)    Objections to Claims.**

Prior to the Effective Date, the Debtors shall be responsible for pursuing any objection to the allowance of any Claim. From and after the Effective Date, the Liquidating Trustee may dispute, object to, compromise or otherwise resolve all Claims, in accordance with Section 2

49

hereof. Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to Claims shall be filed and served no later than one hundred eighty (180) days after the Effective Date, provided that the Liquidating Trustee may request (and the Bankruptcy Court may grant) one or more extensions of time by filing a motion with the Bankruptcy Court prior to the expiration of such period.

**(c)      Filing Objections.**

An objection to a Claim shall be deemed properly served on the claimant if the Debtors or Liquidating Trustee, as applicable, effect service of any such objection in accordance with Rule 3007 of the Bankruptcy Rules by mailing or otherwise delivering the objection and a notice of hearing thereon to the claimant at the address set forth on such claimant's Proof of Claim at least thirty (30) days prior to the hearing thereon. The Debtors or the Liquidating Trustee may also effectuate service of an objection to a claim: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for a claimant is unknown, by first class mail, postage prepaid, to the signatory on the Proof of Claim or interest or other representative identified on the Proof of Claim or interest or any attachment thereto or; (iii) by first class mail, postage prepaid, on counsel that has appeared on the behalf of the claimant in the Chapter 11 Cases.

**(d)      Determination of Claims.**

Except as otherwise agreed by the Debtors or Liquidating Trustee, any Claim as to which a Proof of Claim or motion or request for payment was timely filed in the Chapter 11 Cases may be determined and liquidated after the Effective Date pursuant to (i) an order of the Bankruptcy Court (which order has not been stayed, reversed or amended and as to which determination or any revision, modification or amendment thereof, and the time to appeal or seek review or rehearing thereof, has expired, and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending), or (ii) applicable non-bankruptcy law. Any Claim determined to be an Allowed Claim after the Effective Date pursuant to this section shall be treated as an Allowed Claim in accordance with the Plan.

**7.16      Treatment of Claims without Further Order of the Court.**

**(a)      Certain Scheduled Claims.**

As of the Effective Date, any Scheduled Claim designated as disputed, contingent or unliquidated in amount, and for which a Proof of Claim has not been filed by the Creditor, shall be deemed Disallowed and expunged. All Scheduled Claims that correspond to a timely filed Proof of Claim filed by a particular Creditor shall be deemed to have been superseded by such later timely filed Proof of Claim, and the Scheduled Claims, regardless of priority, shall be expunged from the claims register; provided however, that such Proofs of Claim shall be subject to objection in accordance with Section 4.1(j) hereof.

**(b)      Late Filed Claims.**

Any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of

50

the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation of this Plan, such later Claim has been deemed timely filed by a Final Order.

### 7.17   Disputed Claims.

Except to the extent the Bankruptcy Court determines that a lesser amount is adequate, the Liquidating Trustee shall, on each Distribution Date, deposit in a Disputed Claims Reserve, Cash equal to the Distributions that would have been made to Holders of Disputed Claims if such Claims were Allowed Claims in their full amounts or such lower amount as to which the Holder of such Claim has agreed in writing, and in the case where any such Claim is unliquidated and/or contingent, the greater of (i) $1 and (ii) such other amount as is reserved by order of the Bankruptcy Court made upon motion of the Debtors, the Liquidating Trustee, or the Holder of such Claim.

For purposes of effectuating the provisions of this Section 7.17 and the Distributions to Holders of Allowed Claims, the Bankruptcy Court, upon the request of any Holder of a Claim, on the one hand, or the Liquidating Trustee, on the other hand, may estimate the amount of Disputed Claims pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts estimated shall be deemed to be the aggregate amounts of the Disputed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of Distribution under this Plan and for purposes of the Disputed Claims Reserve.

When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the Holder of such Allowed Claim, in accordance with the provisions of this Plan (but in no event later than the next succeeding Distribution Date), Cash in the amount of all Distributions to which such Holder would have been entitled if such Holder's Claim were Allowed on the Effective Date, to the extent of available Cash to make such Distribution.

In no event shall any Holder of any Disputed Claim be entitled to receive (under this Plan or otherwise) any Cash payment which is greater than the amount reserved, if any, for such Disputed Claim pursuant to this Section 7.17. In no event shall the Liquidating Trustee have any responsibility or liability for any loss to or of any amount reserved under this Plan unless such loss is the result of that party's fraud, willful misconduct, or gross negligence. In no event may any Creditor whose Disputed Claim is subsequently allowed, pursue or recover or from any other Creditor in respect of any funds received as Distributions under the Plan.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim and is entitled to a Distribution in an amount less than the amount reserved for such Disputed Claim, then on the next succeeding Distribution Date, the Liquidating Trustee shall make, in accordance with the terms of this Plan, a Distribution of the excess amount reserved for such Disputed Claim.

Any Disputed Claims Reserve shall be treated as a disputed ownership fund, within the meaning of Treasury Regulation section 1.468B-9, for all purposes associated with taxation.

4912-8223-7850, v. 8
187746688.2

**7.18**   **Limitations on Funding of Disputed Claims Reserve.**

Except as expressly set forth in the Plan, the Liquidating Trust Agreement, or otherwise agreed to in writing or ordered by the Court, the Liquidating Trustee shall have no obligation or duty to fund the Disputed Claims Reserve.

**7.19**   **Tax Requirements for Income Generated by Disputed Claims Reserve.**

The Liquidating Trustee shall pay, or cause to be paid, out of the funds held in a Disputed Claims Reserve, any tax imposed by any federal, state, or local taxing authority on the income generated by the funds or property held in a Disputed Claims Reserve. The Liquidating Trustee shall file, or cause to be filed, any tax or information return related to a Disputed Claims Reserve that is required by any federal, state, or local taxing authority.

**7.20**   **Timing of Distributions on Disputed Claims Subsequently Allowed.**

In the event that a Disputed Claim is Allowed, in whole or in part, after the Effective Date, a Distribution shall be made on account of such Allowed Claim on the next Distribution Date.

**7.21**   **Distributions Free and Clear.**

Except as otherwise provided in this Plan, any distribution or transfer made under this Plan, including Plan Distributions to any Holder of an Allowed Claim, shall be free and clear of any Liens, Claims, encumbrances, charges, and other interests, and no other entity shall have any interest, whether legal, beneficial, or otherwise, in property distributed or transferred pursuant to this Plan.

**7.22**   **Claims Paid or Payable by Third Parties**.

**(a) Claims Paid by Third Parties**

If a Holder of a Claim receives a payment or other satisfaction of its Claim other than through the Debtors or the Liquidating Trust on account of such Claim, such Claim shall be reduced by the amount of such payment or satisfaction without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, and if the Claim was paid or satisfied in full other than through the Debtors or the Liquidating Trust, then such Claim shall be disallowed and any recovery in excess of a single recovery in full shall be paid over to the Liquidating Trust without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment or satisfaction from a party that is not the Debtors or the Liquidating Trust on account of such Claim, such Holder shall, within fourteen (14) calendar days of receipt thereof, repay or return the Distribution to the Liquidating Trust, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.

4912-8223-7850, v. 8
187746688.2

**(b)      Claims Payable by Third Parties**

No Plan Distributions shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurers agrees to satisfy a Claim in full or in part (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' satisfaction, the applicable portion of such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**(c) Applicability of Insurance Policies**

Except as otherwise provided in this Plan, payments to Holders of Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy. Notwithstanding anything to the contrary contained herein, nothing in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including the Liquidating Trust, may hold against any other Entity, including Insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

**7.23      No Post-Petition Interest on Claims**.

Unless otherwise specifically provided for in the Financing Orders, this Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, post-petition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

**7.24      No Payment or Distribution on Disputed Claims.**

Notwithstanding any provision to the contrary herein, no payments or other Distributions shall be made on account of any Disputed Claim, or any portion thereof, unless and until such Claim or some portion thereof is allowed by Final Order of the Bankruptcy Court. For the avoidance of doubt, no portion of any Disputed Claim is entitled to a Distribution. Holders of Disputed Claims shall be bound, obligated and governed in all respects by this Plan.

**ARTICLE 8**

**PLAN INTERPRETATION, CONFIRMATION AND VOTING**

**8.1      Procedures Regarding Objections to Designation of Classes as Impaired or Unimpaired.**

In the event the designation of the treatment of a Class as impaired or unimpaired is objected to, the Bankruptcy Court shall determine the objection, and voting shall be permitted or disregarded in accordance with the determination of the Bankruptcy Court.

53

**8.2** **Withdrawal and Modification of Plan.**

This Plan may be withdrawn or modified by the Debtors and the Creditors' Committee at any time prior to the Confirmation Date. The Debtors and the Creditors' Committee may jointly modify the Plan in any manner consistent with section 1127 of the Bankruptcy Code prior to substantial consummation thereof. Upon request by the Liquidating Trustee, the Plan and Liquidating Trust Agreement may be modified after substantial consummation with the approval of the Bankruptcy Court, provided that such modification does not affect the essential economic treatment of any Person that objects in writing to such modification.

**8.3** **Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or the Plan, the laws of the State of New Jersey applicable to contracts executed in such State by residents thereof and to be performed entirely within such State shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with this Plan.

**8.4** **Voting of Claims.**

Each Holder of an Allowed Claim as of the Voting Record Date in Class 4 shall be entitled to vote to accept or reject the Plan. The Plan Scheduling Order shall govern the manner and procedures for casting of Ballots with the Voting Agent.

**8.5** **Acceptance by Impaired Class.**

Consistent with section 1126(c) of the Bankruptcy Code, and except as provided for in section 1126(e) of the Bankruptcy Code, a Class of creditors shall have accepted the Plan if it is accepted by at least two-thirds in dollar amount and more than one-half in number of the Holders of Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

**8.6** **Cram Down.**

The Debtors and Creditors' Committee will request that the Bankruptcy Court confirm the Plan in accordance with the provisions of section 1129(b) of the Bankruptcy Code to satisfy the requirements for confirmation of the Plan over the possible rejection of the Plan by any impaired Class entitled to vote on the Plan and the Plan shall constitute a motion for such relief.

**ARTICLE 9**

**JURISDICTION**

**9.1** **Retention of Jurisdiction by the Bankruptcy Court.**

From the Confirmation Date until entry of a final decree closing the Chapter 11 Cases, the Bankruptcy Court shall retain such jurisdiction as is legally permissible over the Chapter 11 Cases for the following purposes:

54

(a)     to hear and determine any and all objections to the allowance of any Claim, or any controversy as to the classification of Claims or any matters which may directly, indirectly or contingently affect the obligations of the Debtors to any Creditors, Holders of Claims, or other parties in interest;

(b)     to hear and determine any and all applications for compensation and reimbursement of expenses by Professionals;

(c)     to hear and determine any and all pending motions for the assumption or rejection of executory contracts and unexpired leases, and to fix any Claims resulting therefrom;

(d)     to adjudicate through final judgment such contested matters and adversary proceedings as may be pending or subsequently initiated in the Court by the Liquidating Trustee including, but not limited to, the Causes of Action;

(e)     to enforce and interpret the provisions of this Plan, the Confirmation Order, and the Liquidating Trust Agreement;

(f)     to hear and determine any matters relating to the appointment and replacement of the Liquidating Trustee;

(g)     to issue any injunction or other relief appropriate to implement the intent of the Plan, and to enter such further orders enforcing any injunctions or other relief issued under the Plan or pursuant to the Confirmation Order;

(h)     to modify the Plan pursuant to section 1127 of the Bankruptcy Code and the applicable Bankruptcy Rules;

(i)     to correct any defect, cure any omission, or reconcile any inconsistency in this Plan, the Confirmation Order, or the Liquidating Trust Agreement, as may be necessary to carry out the purposes and the intent of this Plan;

(j)     to interpret and determine such other matters as the Confirmation Order may provide for, or as may be authorized under the Bankruptcy Code;

(k)     to enter and implement such orders as may be appropriate in the event the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated; and

(l)     to adjudicate any disputes between the members of the Oversight Committee or between the Oversight Committee and the Liquidating Trustee.

4912-8223-7850, v. 8
187746688.2

# ARTICLE 10

## MISCELLANEOUS PROVISIONS

**10.1    Headings.**

Headings are utilized in this Plan for the convenience of reference only, and shall not constitute a part of this Plan for any other purpose.

**10.2    No Attorneys' Fees.**

No attorneys' fees with respect to any Claim shall be payable under the Plan, except as expressly specified herein or Allowed by a Final Order of the Bankruptcy Court.

**10.3    Notices.**

All notices, requests and demands by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, (iii) reputable overnight delivery service, all charges prepaid, or (iv) electronic mail, and shall be deemed to have been given when received and confirmed by telephone or reply email by the following parties:

If to Debtors' Counsel:

Mandelbaum Barrett PC
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
Attention:
Jeffrey M. Rosenthal, jrosenthal@mblawfirm.com
Vincent J. Roldan, vroldan@mblawfirm.com
Katie F. Warren, kwarren@mblawfirm.com


If to the Creditors' Committee's Counsel:

Fox Rothschild LLP
49 Market Street
Morristown, NJ 07960
Attention:
Joseph J. DiPasquale, jdipasquale@foxrothschild.com
Michael R. Herz, mherz@foxrothschild.com
Agostino A. Zammiello, azammiello@foxrothschild.com

If to the Liquidating Trustee:
To be included in the Plan Supplement

After the Effective Date, Persons or Entities that wish to continue to receive documents pursuant to Bankruptcy Rule 2002 must File a renewed request to receive documents pursuant to

4912-8223-7850, v. 8
187746688.2

Bankruptcy Rule 2002. After the Effective Date, the Liquidating Trust is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that Filed such renewed requests.

### 10.4     Binding Effect.

The rights, benefits, and obligations of any Person named or referred to in the Plan, or whose actions may be required to effectuate the terms of the Plan, shall be immediately effective, enforceable, and deemed binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person (including, but not limited to, any trustee appointed for the Debtors under chapter 7 or 11 of the Bankruptcy Code). The Confirmation Order shall provide that the terms and provisions of the Plan and the Confirmation Order shall survive and remain effective after entry of any order which may be entered converting the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, and the terms and provisions of the Plan shall continue to be effective in these or any superseding cases under the Bankruptcy Code.

### 10.5     Plan Supplement.

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan. Copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel or the Liquidating Trust's counsel (as applicable) at the address below or by downloading such exhibits and documents free of charge from the Notice and Claims Agent's website. All documents in the Plan Supplement are considered an integral part of this Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

### 10.6     Preservation of Books and Records.

On the Effective Date, the Debtors shall provide the Liquidating Trustee with timely access to all of the books and records of the Debtors in the Debtors' possession as of the Petition Date and the Effective Date, including, but not limited to the Debtors' servers, electronic mail and any other written communications whether electronic or paper, computers, and mobile devices (including, but not limited to mobile phones, iPads, laptops, etc.). The Debtors shall also instruct any third parties, including Professionals possessing such books and records (including computer generated or computer maintained books, records, and data) to permit access to such books and records as may be reasonably requested by the Liquidating Trustee, and each such party shall be directed not to dispose of or destroy any such books and records until such time as authorized in writing by the Liquidating Trustee or further order of the Bankruptcy Court.

### 10.7     Entire Agreement.

On the Effective Date, this Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

4912-8223-7850, v. 8
187746688.2

**10.8**    **Non-Severability of Plan Provisions.**

If any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is the following: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the consent of the Debtors or the Liquidating Trust (as applicable); and (3) non-severable and mutually dependent.

## ARTICLE 11

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**11.1**    **General.**

THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS LIMITED TO THE SPECIFIC FEDERAL INCOME TAX MATTERS DESCRIBED HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN OR OTHER FEDERAL INCOME TAX MATTERS DISCUSSED HEREIN AND THIS DISCUSSION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. EACH TAXPAYER IS STRONGLY URGED TO SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM SUCH TAXPAYER'S INDEPENDENT TAX ADVISOR.

THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS SOLELY FOR THE PURPOSE OF COMPLIANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE") TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW. NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS") AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION OR ADVICE IS GIVEN BY THIS DISCLOSURE STATEMENT.

4912-8223-7850, v. 8
187746688.2

This description does not cover all aspects of federal income taxation that may be relevant to the Debtors or Holders of Claims. For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and foreign taxpayers, nor is it intended to address all of the possible federal income tax consequences to Holders of Claims against the Debtors. This description also does not discuss the possible state tax or non-U.S. tax consequences that might apply to the Debtors or to Holders of Claims.

### 11.2     Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally.

The federal income tax consequences of the implementation of the Plan to the Holders of Allowed Claims will depend, among other things, on the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder's Claim is Allowed or Disputed on the Effective Date, and whether the Holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim. All Holders of Claims are urged to consult with their tax advisors concerning the tax consequences applicable under the Plan. Nothing contained herein shall be relied upon as tax advice.

### 11.3     Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally. Recognition of Gain or Loss

In general, a Holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the Holder, the length of time the Holder held the Claim and whether the Claim was acquired at a market discount or premium. If the Holder realizes a capital loss, the Holder's deduction of the loss may be subject to limitation. The Holder's tax basis for any property received under the Plan generally will equal the amount realized.

### 11.4     Bad Debt or Worthless Security Deduction

A Holder who receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166 of the Internal Revenue Code. The rules governing the availability, character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 11.5     Receipt of Interest

The Plan does not address the allocation of the aggregate consideration to be distributed to Holders between principal and interest and the Debtors cannot make any representations as to how the IRS will address the allocation of consideration under the Plan. In general, to the extent that any amount of consideration received by a Holder is treated as received in satisfaction of unpaid interest that accrued during such Holder's holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income and not

4912-8223-7850, v. 8
187746688.2

otherwise exempt from U.S. federal income tax). Conversely, a Holder may be allowed a bad debt deduction to the extent any accrued interest was previously included in its gross income but subsequently not paid in full. However, the IRS may take the position that any such loss must be characterized based on the character of the underlying obligation, such that the loss will be a capital loss if the underlying obligation is a capital asset. Again, Holders of Allowed Claims should address all potential tax implications with their own tax advisors.

## ARTICLE 12

## DEFINITIONS AND RULES OF INTERPRETATION

### A. Definitions

The following terms, when used in this Plan, or any subsequent amendments or modifications thereof, shall have the respective meanings hereinafter set forth and shall be equally applicable to the singular and plural of terms defined. A term that is used in the Plan and not defined herein, but that is defined in the Bankruptcy Code or in the Bankruptcy Rules, shall have the meaning set forth therein. Any reference contained in the Plan to a particular exhibit, paragraph or article shall be deemed to be a reference to an exhibit, paragraph or article of the Plan.

1.1     "Administrative Expense Claim" means a Claim for costs and expenses of administration allowed under sections 503(b) and 507(a)(2) including, without limitation, (a) any actual, necessary costs and expenses of preserving the Estates and winding down the Debtors' operations during the Chapter 11 Cases, (b) any indebtedness or obligations incurred or assumed by the Debtors in the ordinary course of business in connection with the wind-down of the Debtors' operations during the Chapter 11 Cases, (c) any Professional Fee Claims or Ordinary Course Professional Claims, whether fixed before or after the Effective Date, (d) any costs and expenses for the management, maintenance, preservation, sale, or other disposition of any Assets incurred during the Chapter 11 Cases, and (e) any fees or charges assessed against the Debtors' Estates under 28 U.S.C. § 1930.

1.2     "Administrative Expense Claims Bar Date" shall have the meaning set forth in Section 2.1(a) of the Plan.

1.3     "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

1.4     "Allowed" means, when referring to a Claim, a Claim against the Debtors (i) proof of which was originally filed within the applicable period of limitation fixed by the Bankruptcy Court in accordance with Rule 3003(c)(3) of the Bankruptcy Rules and as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, a Final Order, or the Claims Objection Deadline, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order, (ii) a Claim which

60

has been or hereafter is listed by the Debtors in their Schedules as liquidated in an amount and not disputed, contingent, or listed as zero, or (iii) a Claim that is allowed by this Plan or Final Order of the Bankruptcy Court. For purposes hereof, an "Allowed Claim" shall include any Claim arising from the recovery of property under sections 550 or 553 of the Bankruptcy Code and allowed in accordance with section 502(h) of the Bankruptcy Code, provided, however, that (i) a Claim allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered an "Allowed" Claim hereunder unless otherwise specified herein or by order of the Bankruptcy Court, (ii) an "Allowed" Claim shall not include interest, penalties, or late charges arising from or relating to the period from and after the Petition Date, unless otherwise specifically provided for in the Plan, and (iii) an "Allowed" Claim shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

1.5    "APA" means Intellectual Property Asset Purchase Agreement.

1.6    "Assets" means any and all property of the Estates, including without limitation all property and other interests identified in section 541(a) of the Bankruptcy Code. Without limiting the foregoing, Assets shall include all of the Debtors' tangible and intangible property, wherever located and whether acquired prior to or after the Petition Date, including Causes of Action (including Avoidance Actions), together with the proceeds and products, replacements and accessions thereof.

1.7    "Avoidance Action(s)" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies arising under the Bankruptcy Code or applicable non-bankruptcy law, including Claims or Causes of Action to avoid or recover a transfer of property of the Estates or an interest of the Debtors in property, including, without limitation, actions arising under sections 506, 510, 541, 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent and voidable transfer laws.

1.8    "Ballot" means the form distributed to a Holder of an Impaired Claim on which it is to be indicated whether such Holder accepts or rejects the Plan.

1.9    "Bankruptcy Code" means title 11 of the United States Code, as amended, in effect and applicable to the Chapter 11 Cases.

1.10   "Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the District of New Jersey wherein the Chapter 11 Cases are pending.

1.11   "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States, as amended, and any Local Rules of the Bankruptcy Court, as amended, in effect and applicable to the Debtors' Chapter 11 Cases.

1.12   "Bid Procedures Order" means the *Order (I) Approving Bid Procedures for the Sale of the Debtors' Intellectual Property and Other Assets, (II) Authorizing the Debtors to Enter Into a Stalking Horse Agreement, and (III) Granting Related Relief entered on February 12, 2026* [D.I. 96].

1.13   "Business Day" means any day other than a Saturday, Sunday or a "legal holiday," as such term is defined in Bankruptcy Rule 9006(a).

1.14   "Cash" means legal tender of the United States of America.

1.15   "Causes of Action" means any and all Claims, rights, actions, chose in action, suits, and causes of action belonging to the Debtors or their Estates and any and all liabilities, obligations, covenants, undertakings and debts owing to any of the Estate, whether arising prior to or after the Petition Date and in each case whether known or unknown, in law, equity or otherwise, including, but not limited to: (1) Avoidance Actions, (2) commercial tort claims as defined in Article 9 of the Uniform Commercial Code; (3) claims against present or former officers and directors of the Debtors that have otherwise not been released in the Plan, including, for the avoidance of doubt, direct or derivative claims or causes of action against any and all current and former officers, directors, shareholders, members, managers, employees, affiliates or insiders of the Debtors, including, but not limited to for breach of fiduciary duty or aiding and abetting breach of fiduciary duty, or under and pursuant to any directors and officers or fiduciary insurance policies maintained by the Debtors against Simon Barlava; Morris Barlava; Andrew Clarke;  Bridgit Lombard; Christine Kaighn; Victoria Taylor; MAS Acquisition, LLC, or any other current or former director, officer, manager, member, employee, affiliates or insiders of the Debtors other than TerraMar and/or its principals and affiliates, each of which shall be released other than respect to any claims or causes of action against TerraMar and any of its representatives covered by any directors and officers' liability insurance policy; *provided*, *however*, that any recoveries resulting therefrom shall be limited to the insurance policies, exclusive of any deductibles and costs of defense; (4) the non-exclusive right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under section 505 of the Bankruptcy Code; (5) any tax refunds, including, but not limited to tariff refunds; and (6) the Debtors' interest in the Discover Financial Services merchant class action litigation and the Google LLC advertising antitrust litigation.

4912-8223-7850, v. 8
187746688.2

1.16    "Chapter 11 Cases" means the cases concerning the Debtors under chapter 11 of the Bankruptcy Code, jointly administered under Case Number 26-11312 (MEH) in the Bankruptcy Court.

1.17    "Claim" means, as defined in Bankruptcy Code section 101(5): (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

1.18    "Claims and Noticing Agent" has the meaning set forth in Section 1.8.

1.19    "Claims Bar Date" means the earliest applicable deadline established by the *Amended Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), (II) Establishing an Amended Schedules Bar Date, Rejection Damages Bar Date, and Administrative Claims Bar Date, (III) Approving the Form, Manner and Procedures for Filing Proofs Of Claim, (IV) Approving Notice Thereof and (V) Granting Related Relief* entered March 26, 2026 [D.I. 331].

1.20    "Claims Objection Deadline" means, unless otherwise extended by Order of the Court, the first Business Day that is 180 days after the Effective Date.

1.21    "Class" means a category of Claims or Equity Interests described in Article 2 of the Plan.

1.22    "Collateral" means any property or interest in property of the Estates subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance under the Bankruptcy Code.

1.23    "Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.24    "Confirmation Hearing" means the hearing held to consider confirmation of the Plan on the date set forth in Section 3.1(a).

1.25    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as the Plan may be amended by its terms and consistent with applicable law, and any findings of fact and conclusions of law contained in the Confirmation Order or a separate document entered substantially contemporaneously therewith.

4912-8223-7850, v. 8
187746688.2

1.26   "Consolidated Objections" means the omnibus objections filed by landlords and the Creditors' Committee regarding final cash collateral relief, stub rent, and final Store Closing Sale relief at [D.Is. 210, 217, 219, 242, 250, 258].

1.27   "Consultant" means Tiger Finance, LLC, SB360 Capital Partners, LLC and GA Retail Solutions, LLC.

1.28   "Creditor" means any Person holding a Claim against the Debtors or, pursuant to section 102(2) of the Bankruptcy Code, against property of the Debtors, that arose or is deemed to have arisen on or prior to the Petition Date, including, without limitation, a Claim against the Debtors of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i).

1.29   "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

1.30   "Debtors" means Francesca's Acquisition, LLC, Francesca's Operations, Inc., Francesca's Administrative Management, Inc., and Francesca's IP Debtors, Inc.

1.31   "Deficiency Claim" means that portion of any Allowed Claim held by a Holder of a Secured Claim that exceeds the value distributed on account of such Allowed Claim.

1.32   "Disallowed" means, when referring to a Claim (including a Scheduled Claim) or Equity Interest, or any portion of a Claim or Equity Interest, which has been disallowed or expunged by a Final Order.

1.33   "Disputed" means, with respect to a Claim against the Debtors or Equity Interest, the extent to which the allowance of such Claim or Equity Interest is the subject of a timely objection, complaint or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order, or is otherwise disputed in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn with prejudice, or determined by a Final Order.

1.34   "Disputed Claims Reserve" means the segregated accounts established by the Liquidating Trustee, as necessary, consistent with Section 7.17 of the Plan.

1.35   "Distribution" means any distribution made pursuant to the terms of this Plan.

1.36   "Distribution Agent" means the entity, if any, to be engaged by the Liquidating Trustee to make Distributions under the Plan. If no such entity is engaged, then the Distribution Agent shall be the Liquidating Trustee.

1.37   "Distribution Date" means any date on which a Distribution is made to Holders of Allowed Claims under this Plan.

4912-8223-7850, v. 8
187746688.2

1.38    "Distribution Record Date" shall have the meaning set forth in Section 7.8 of the Plan.

1.39    "D&O Liability Insurance Policies" means collectively, all Insurance Policies (including any "tail policy"), covering any liability of the Debtors' present or former officers, directors, shareholders, members, managers, employees, affiliates or insiders, and all agreements, documents, or instruments relating thereto.

1.40    "Effective Date" shall mean the first day on which the Confirmation Order has become a Final Order and on which all of the conditions to the Effective Date in the Plan have been satisfied or waived.

1.41    "Estates" means the Debtors' bankruptcy estates created pursuant to section 541 of the Bankruptcy Code on the Petition Date.

1.42    "Equity Interest" means the ownership and related rights and interests in and with respect to the Debtors.

1.43    "Exculpated Party" means, collectively, and in each case in its capacity as such: (a) the Independent D&Os, solely with respect to their post-petition conduct; (b) the Creditors' Committee, its Professionals and its members (solely in their capacity as such); (c) any retained Professional of the Debtors whose retention was approved by the Court; and (d) the Debtors and each of the Debtors' Estates (if applicable).

1.44    "Fee Application Deadline" shall mean the last date for Professionals to file Final Fee Applications set forth in Section 2.1(c) of the Plan.

1.45    "Fifth Forbearance Agreement" shall have the meaning set forth in Section 1.2 of the Plan.

1.46    "File," "Filed," or "Filing" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or in the case of a Proof of Claim, the Notice and Claims Agent.

1.47    "Final Fee Application" shall have the meaning set forth in Section 2.1(c) of the Plan.

1.48    "Final Cash Collateral Order" means the Final Order (i) Authorizing the Debtors to Use Cash Collateral, (ii) Granting Adequate Protection to the Prepetition Secured Parties, (iii) modifying the automatic stay, and (iv) granting related relied entered at D.I. ____

1.49    "Final Order" means an order or judgment of the Bankruptcy Court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending; provided, however, if an appeal, or writ of certiorari, reargument or rehearing thereof has been filed or sought, such order shall have been affirmed by the

4912-8223-7850, v. 8
187746688.2

highest court to which such order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, further, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be but has not then been filed with respect to such order, shall not cause such order not to be a Final Order.

1.50   "Final Store Closing Sale Order" means the *Final Order (I) Authorizing and Approving the Store Closing Sales at All Retail Store Locations and (II) Granting Related Relief* entered on March 26, 2026 [D.I. 333].

1.51   "First Day Relief" has the meaning set forth in Section 1.8.

1.52   "General Unsecured Claim" means any Unsecured Claim against the Debtors that is not an Administrative Expense Claim, Priority Tax Claim, or Priority Non-Tax Claim. For the avoidance of doubt, any Deficiency Claim shall be a General Unsecured Claim.

1.53   "Global Settlement" means the settlement agreement among the Debtors, the Pre-Petition Agents, and the Creditors' Committee, resolving cash collateral and more global issues in the Debtors' Chapter 11 Cases, as more fully set forth in the Final Cash Collateral Order and the Settlement Order.

1.54   "Governmental Bar Date" means August 20, 2026, which is the last date for governmental units (as defined in section 101(27) of the Bankruptcy Code) to file a proof of claim in respect of a prepetition claim against the Debtors, as set forth in the *Amended Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), (II) Establishing an Amended Schedules Bar Date, Rejection Damages Bar Date, and Administrative Claims Bar Date, (III) Approving the Form, Manner and Procedures for Filing Proofs Of Claim, (IV) Approving Notice Thereof and (V) Granting Related Relief* entered March 26, 2026 [D.I. 331].

1.55   "Holder" means any person that holds a Claim against or Equity Interest in the Debtors.

1.56   "Impaired" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.57   "Independent D&Os" means Curt Kroll and Drew Baird.

1.58   "Insurance Policies" means any policy of insurance and any agreements relating thereto that may be available to provide coverage for Claims against the Debtors, their officers, directors, trustees, shareholders, members, managers, employees, affiliates, insiders, or any other Person, including, but not limited to the D&O Liability Insurance Policies.

4912-8223-7850, v. 8
187746688.2

1.59   "IP Sale Order" means the *Order (I) Approving the Asset Purchase Agreement Between the Debtors and Stand Out for Good, Inc. and (II) Granting Related Relief entered on March 12, 2026* [D.I. 295].

1.60   "Lien" means a "lien" as defined by section 101(37) of the Bankruptcy Code.

1.61   "Liquidating Trust" means the trust established under the Plan and the Liquidating Trust Agreement.

1.62   "Liquidating Trust Agreement" means the trust agreement between the Debtors and the Liquidating Trustee, which shall be filed with the Bankruptcy Court as part of the Plan Supplement.

1.63   "Liquidating Trust Assets" means all Assets, including Causes of Action, of the Estates as of the Effective Date transferred to the Liquidating Trust under the Plan.

1.64   "Liquidating Trust Beneficiaries" means the Holders of Allowed General Unsecured Claims.

1.65   "Liquidating Trust Expenses" means all reasonable and documented fees, expenses, and costs incurred by the Liquidating Trust in connection with carrying out the obligations of the Liquidating Trust, including the maintenance or disposition of the Liquidating Trust Assets (including Liquidating Trustee fees, indemnity reserves, attorneys' fees, the fees of other professionals, and other Persons retained by the Liquidating Trust, personnel-related expenses, and any taxes imposed on the Liquidating Trust or in respect of the Liquidating Trust Assets), and any other expenses incurred in accordance with the Liquidating Trust Agreement.

1.66   "Liquidating Trust Indemnified Parties" means the Liquidating Trustee and its consultants, agents, attorneys, accountants, financial advisors, estates, employees, officers, directors, principals, professionals, and other representatives, each in their respective capacity as such, and any of such Person's successors and assigns.

1.67   "Liquidating Trust Proceeds" means all Cash, and/or other assets that may be liquidated and reduced to Cash, of the Estate as of the Effective Date or thereafter by the Liquidating Trustee, including the proceeds of Causes of Action, except for that included in any Disputed Claims Reserve and the Professional Fee Reserve.

1.68   "Liquidating Trustee" means the Person appointed as of the Effective Date pursuant to the Plan and as identified in the Plan Supplement, solely in his/her capacity as Liquidating Trustee of the Liquidating Trust pursuant to the terms and conditions of this Combined Disclosure Statement and Plan and the Liquidating Trust Agreement.

4912-8223-7850, v. 8
187746688.2

1.69    "Liquidation Analysis" means the analysis of a liquidation scenario under chapter 7 of the Bankruptcy Code for these Debtors, to be attached as an exhibit to the Plan Supplement.

1.70    "Litigation Claims" has the meaning set forth in Section 1.11 of the Plan.

1.71    "Ordinary Course Professional" has the meaning ascribed to such term in the Ordinary Course Professional Order.

1.72    "Ordinary Course Professional Claims" means the Administrative Claims of an Ordinary Course Professional for compensation for services or reimbursement of expenses incurred after the Petition Date and on or before the Effective Date pursuant to the Ordinary Course Professional Order.

1.73    "Ordinary Course Professional Order" means the *Order Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business* [D.I. 294].

1.74    "Oversight Committee" means the committee appointed as of the Effective Date pursuant to the Plan and as identified in the Plan Supplement.

1.75    "Person" means any individual, corporation, partnership, association, joint venture, limited liability company, limited liability partnership, estate, trust, receiver, trustee, unincorporated organization or governmental unit or subdivision thereof or other entity.

1.76    "Petition Date" means February 5, 2026, the date the Debtors filed their voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the Chapter 11 Cases.

1.77    "Plan" means this Combined Disclosure Statement and Plan and any exhibits or schedules annexed hereto or otherwise filed in connection with the Plan, and any documents delivered in connection herewith, as the same may be amended or modified from time to time by any duly authorized and permitted amendment or modification.

1.78    "Plan Supplement" means the supplement to the Plan that includes documents and instruments required to implement the Plan, including, without limitation, the Liquidating Trust Agreement, which shall be filed with the Bankruptcy Court not later than ten (10) days before the deadline to object to confirmation of the Plan established by the Disclosure Statement Approval Order.

1.79    "Prepetition Agent" means, collectively, (i) Tiger Finance, LLC, as administrative agent and collateral agent, and (ii) Second Avenue Capital Partners LLC, as funding agent.

1.80    "Priority Non-Tax Claim" means an Unsecured Claim or a portion of an Unsecured Claim against the Debtors, other than an Administrative Expense Claim, a Priority Tax Claim, or

4912-8223-7850, v. 8
187746688.2

a General Unsecured Claim, which is entitled to priority in payment under sections 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.

1.81    "Priority Tax Claim" means an Unsecured Claim or a portion of an Unsecured Claim of a governmental unit against the Debtors which is entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.82    "Professional Fee Claim" means any Claim of a Professional retained in the Chapter 11 Cases pursuant to sections 327 or 1103 of the Bankruptcy Code, for compensation or reimbursement of costs and expenses relating to services incurred prior to and including the Effective Date, when and to the extent any such Claim is allowed by the Bankruptcy Court pursuant to sections 330, 331, 503(b), or 1103 of the Bankruptcy Code.

1.83    "Professional Fee Claims Bar Date" has the meaning set forth in Section 2.1(c) of the Plan.

1.84    "Professional Fee Claims Objection Deadline" has the meaning set forth in Section 2.1(c) of the Plan.

1.85    "Professional Fee Reserve" means the reserve of Cash funded by the Debtors and maintained by the Liquidating Trustee for the benefit of Holders of Allowed Professional Fee Claims in an amount equal to the amount of estimated Professional Fee Claims.

1.86    "Professional Retentions" has the meaning set forth in Section 1.8.

1.87    "Proof of Claim" means a proof of Claim filed against the Debtors in the Chapter 11 Cases by the applicable Bar Date.

1.88    "Records" means the Debtors' original hardcopy files and records stored by the Debtors or Liquidating Trustee, and electronic data on hard drives or other storage devices and media.

1.89    "Rejection Damages Claims" means a claim arising from the rejection of an executory contract or unexpired lease.

1.90    "Rejection Procedures Order" means the *Order Establishing Procedures for the Rejection of Executory Contracts and Unexpired Leases* [D.I. 261].

1.91    [Reserved.]

1.92    "Released Party" means, collectively, the following Entities, each in their capacity as such: (a) Independent D&Os, (b) the Creditors' Committee, its Professionals and its members (only in their capacity as such); (c) the Debtors' Professionals whose retention was approved by the Court; and (d) the Prepetition Secured Lenders under the Prepetition Secured Loans.

69

4912-8223-7850, v. 8
187746688.2

1.93   "Sale" means that certain sale of the Debtors' intellectual property Assets to Stand Out For Good, Inc., as approved by Order of the Bankruptcy Court on March 12, 2026 [D.I. 295].

1.94   "Scheduled Claim" means a Claim that is listed in the Debtors' Schedules.

1.95   "Schedules" means a set of schedules of assets and liabilities, schedules of executory contracts and unexpired leases, statement of financial affairs, and other schedules and statements filed by the Debtors pursuant to Federal Rule of Bankruptcy Procedure 1007, and any amendments thereto.

1.96   "Secured Claim" means a Claim secured by a Lien, as that term is defined in section 101(37) of the Bankruptcy Code, including, but not limited to, a judicial lien as that term is defined at section 101(36) of the Bankruptcy Code, against any property of the Estate, but only to the extent of the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012 or as otherwise agreed to, of such Creditor's interest in the Debtors' interest in such property.

1.97   "Settlement Order" means the *Order (I) Approving Settlement Pursuant to Federal Rule of Bankruptcy Procedure 9019; and (II) Granting Related Relief* entered at D.I. [____] approving the settlement agreement entered into among the Debtors, the Prepetition Secured Lenders, and the Creditors' Committee.

1.98   "Settlement Payment" means the $3 million payment made by the Pre-Petition Agents to the Debtors' estates as part of the Global Settlement of cash collateral and other issues among the Debtors, the Pre-Petition Agents, and the Creditors' Committee.

1.99   "Solicitation Procedures Order" has the meaning set forth in Section 3.1(a).

1.100   "Stalking Horse Bidder" means Stand Out for Good, Inc.

1.101   "Store Closing Sales" shall have the meaning set forth in Section 1.8(a).

1.102   "Store Closing Sale Consulting Agreement" means that certain consulting agreement by and between Tiger Finance, LLC, SB360 Capital Partners, LLC and GA Retail Solutions, LLC relating to the Store Closing Sales.

1.103   "Store Closing Sale Consulting Fees" means the fees payable under the Store Closing Sale Consulting Agreement, as approved pursuant to the Final Store Closing Sale Order.

1.104   "Stub Rent Stipulation" shall have the meaning set forth in Section 1.8(b).

1.105   "Stub Rent Reserve" shall have the meaning set forth in Section 1.8(b).

1.106   "Tax Information" shall have the meaning set forth in Section 7.12(a) of this Plan.

4912-8223-7850, v. 8
187746688.2

**1.107**  "Tax Information Request" shall have the meaning set forth in Section 7.12(b) of this Plan.

**1.108**  "TerraMar" means TerraMar Capital, LLC and its affiliates and / or principals  and any of its representatives covered by any directors and officers' liability insurance policy.

**1.109**  "Unclaimed Distribution" means any Distribution that is unclaimed after ninety (90) days following any Distribution Date. Unclaimed Distributions shall include, without limitation: (i) checks (and the funds represented thereby) which have been returned as undeliverable; (ii) funds representing checks which have not been paid; and (iii) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of a valid address.

**1.110**  "Unsecured Claim" means any Claim which is not secured by an offset or "lien," as that term is defined in section 101(37) of the Bankruptcy Code, including, but not limited to, a "judicial lien" as that term is defined at section 101(36) of the Bankruptcy Code, against any property of the Estate, but only to the extent of the "value," as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012, or as otherwise agreed to, of such Creditor's interest in the Debtors' interest in such property. For the avoidance of doubt, the term "Unsecured Claim" includes any Deficiency Claim.

**1.111**  "U.S. Trustee" means any and all representatives and employees of the Office of the United States Trustee for Region 3, District of New Jersey.

**1.112**  "Voting Class" means that class of Holders of Claims classified as Class 4 Claims under the Plan, who are entitled to vote to accept or reject the Plan.

**1.113**  "Voting Deadline" has the meaning set forth in Section 3.4(c) of the Plan.

**1.114**  "Voting Record Date" means the first date set for filing objections to the entry of [plan scheduling order].

**B. Rules of Interpretation**

For purposes of this Plan: (a) where appropriate in the relevant context, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any references in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) unless otherwise provided in the Plan, any reference in the Plan to an existing document or appendix filed or to be filed means such document or appendix, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) unless otherwise specified herein, any reference to a Person as a Holder of a Claim includes that Person's successors and

71

assigns; (e) unless otherwise specified, all references in the Plan to Sections and Articles are references to Sections and Articles of or to the Plan; (f) the words "herein", "hereto" and "hereof" refer to the Plan in its entirety rather than to a particular portion of the Plan; and (g) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to the Plan. To the extent that the Plan is inconsistent with the Disclosure Statement or provisions of the documents comprising the Plan Supplement, unless such document specifically states otherwise, the provisions of the Plan shall be controlling.

## ARTICLE 13

### RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Plan, the Debtors and Creditors' Committee believe that the confirmation and consummation of this Plan is preferable to all other alternatives. Consequently, the Debtors and Creditors' Committee urge all Holders of Claims and Interests entitled to vote on this Plan to vote to accept this Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the Voting Deadline.

Dated: July 28, 2026

MANDELBAUM BARRETT PC
By: */s/ Vincent J. Roldan*
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
Jeffrey M. Rosenthal
(N.J. Bar No. 008231982)
jrosenthal@mblawfirm.com
Vincent J. Roldan
(N.J. Bar No. 045371998)
vroldan@mblawfirm.com
Katie F. Warren
(N.J. Bar No. 540842025)
kwarren@mblawfirm.com
*Counsel for Francesca's Acquisition, LLC, et al*

FOX ROTHSCHILD LLP
By: */s/ Michael R, Herz*
Joseph J. DiPasquale, Esq.
Michael R. Herz, Esq.
Agostino A. Zammiello, Esq.
49 Market Street
Morristown, NJ 07960
(973) 992-4800 (Telephone)
(973) 992-9125 (Facsimile)
jdipasquale@foxrothschild.com
mherz@foxrothschild.com
azammiello@foxrothschild.com
*Counsel for the Official Committee of Unsecured Creditors*

4912-8223-7850, v. 8
187746688.2